IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| BIG CAT RESCUE CORP.,<br>a Florida not for profit corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>BIG CAT RESCUE ENTERTAINMENT<br>GROUP, INC., et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   CASE NO. 8:11-cv-00209-MSS-MAP<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS/COUNTERCLAIMANTS' SECOND AMENDED COUNTERCLAIM

Plaintiff, Big Cat Rescue Corp. ("BCR"), by and through its undersigned counsel, pursuant to Rule 56, Fed. R. Civ. P., moves for entry of a summary judgment against Defendants/Counterclaimants BIG CAT RESCUE ENTERTAINMENT GROUP, INC. ("BCRE"); G.W. EXOTIC MEMORIAL ANIMAL FOUNDATION d/b/a Big Cat Rescue Entertainment Group ("G.W. Exotic"); and JOE SCHREIBVOGEL a/k/a Joe Exotic a/k/a Aarron Alex a/k/a Cody Ryan ("Schreibvogel") (all collectively "Counterclaimants") on their Second Amended Counterclaims (Doc. 54) ("SAC") for slander, libel, and tortious interference, as set forth in the following Memorandum.

### MEMORANDUM

### I.   INTRODUCTION

BCR sued Counterclaimants for trademark infringement for Defendants' willful adoption of a misleading and confusing name, "Big Cat Rescue Entertainment," in violation of BCR's intellectual property rights. (Complaint at Doc. 1). Counterclaimants responded by asserting various Counterclaims against BCR for defamation (slander and libel) and tortious interference. (See Docs. 26, 30, & 54). Counterclaimants' SAC is their third attempt to state a cause of action.

BCR filed a Motion to Dismiss Counterclaimants' SAC, which remains *sub judice*. (Doc. 56). The goal of Counterclaimants' SAC is to establish a de facto "gag order" and crush BCR's efforts to advocate its views and mission of furthering humane treatment of undomesticated large felines.

Counterclaimants' claims are fraught with many fatal weaknesses, all examined in depth below, such as the inability to prove the existence of identifiable contractual relationships or business relationships not reduced to writing, the inability to prove ascertainable damages with any reasonable degree of certainty, and the inability to attribute damages (if any) to unauthorized, unprivileged conduct by BCR. For the reasons examined below, this Court should enter summary judgment in BCR's favor as to the Counterclaimants' SAC.

## II.   STATEMENT OF UNDISPUTED FACTS

### a.   The Parties

#### i.   *BCR*

BCR is a Florida not-for-profit corporation which operates a sanctuary for non-domesticated large felines, including tigers. Doc. 45, Exhibit (hereinafter, "Ex.") A, ¶6. BCR opposes breeding, exhibiting, and petting non-domesticated large felines, including juvenile and adult tigers. Part of BCR's mission is to advocate the end to these practices which it considers to be inhumane. BCR's advocacy necessitates educating its supporters as well as venues hosting animal exhibitions, including venues hosting Counterclaimants' animal exhibits, which is the subject of Counterclaimants' Second Amended Counterclaim. Doc. 45, Ex. A, ¶¶7-9.

#### ii.   *Counterclaimants*

G.W. Exotic operates an animal facility in Oklahoma. SAC ¶5. Schreibvogel is the principal of G.W. Exotic. *Id.* at ¶4. At some time in 2010, G.W. Exotic, by and through its officers (including Schreibvogel), created BCRE and adopted the Big Cat Rescue Entertainment

name.  Doc. 58 at 35:5-11.  Counterclaimants began traveling, exhibiting, and making non-domesticated large felines, including juvenile tigers, available for petting at various venues throughout the United States under the Big Cat Rescue Entertainment name.  SAC ¶7.

### b. Counterclaimants' Claims

Counterclaimants allege that BCR has defamed (through both slander and libel) Counterclaimants and that BCR has tortiously interfered with Counterclaimants' advantageous business relationships.  Counterclaimants seek both injunctive relief and damages.  All of the allegedly actionable statements were made either to venues hosting Counterclaimants' animal exhibits – meaning that they had an interest in certain animal rights issues relating to Counterclaimants – or to BCR's own supporters.  These statements directly relate to BCR's mission and activism.

## III.   LEGAL STANDARD

### a. Summary Judgment Standard

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A motion for summary judgment may be supported by "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A).

"The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).  "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present

affirmative evidence to show that a genuine issue of material fact exists." *Id.* (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993)).

"When faced with a properly supported motion for summary judgment, the party opposing the motion must establish, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Human v. City of Cocoa*, 2000 WL 33175455, *3 (M.D. Fla. 2000) (citing *Cohen v. United Am. Bank*, 83 F.3d 1347, 1349 (11th Cir. 1996). "The basic issue before the court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)).

### b.  Elements of a Cause of Action for Defamation

"To establish a cause of action for defamation, a plaintiff must show that (1) the defendant published a false statement about the plaintiff, (2) to a third party, and (3) the falsity of the statement caused injury to the plaintiff." *NITV, L.L.C. v. Baker*, 61 So.3d 1249, 1252 (Fla. 4th DCA 2011), citing *Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So.2d 437, 442 (Fla. 4th DCA 2002)(citing *Valencia v. Citibank Int'l.*, 728 So.2d 33, 330 (Fla. 3d DCA 1999).

Slander, by definition, is a defamation action based on oral statements. *See, e.g, Spears v. Albertson's, Inc.*, 848 So.2d 1176, 1179 (Fla. 1st DCA 2003) and *Gunder's Auto Center v. State Farm Mut. Auto. Ins. Co.*, 422 Fed. Appx. 819, 821 (11th Cir. 2011) (citing *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F.Supp.2d 1134, 1140 (M.D. Fla. 2007)).

### c.  Elements of a Cause of Action for Tortious Interference

To state a claim for tortious interference in Florida, the claimant must show (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference by the defendant; and (4) damage from

the breach of the relationship. *Gunder's Auto Center v. State Farm Mut. Auto. Ins. Company*, 422 Fed. Appx. 819, 821 (11th Cir. 2011) (citing *Gossard v. Adia Servs., Inc.*, 723 So.2d 182, 184 (Fla. 1998)). "[R]elationship with the public at large [i]s not the type of business relationship required to allege tortious interference with a business relationship" and a party must "allege and prove a business relationship with an identifiable person." *Ferguson Transportation, Inc. v. North American Van Lines, Inc.*, 687 So.2d 821 (Fla. 1996).

### d.  <u>Available Defenses for Alleged Defamation or Tortious Interference</u>

#### i.  *Privilege*

Privileged statements are protected from liability for claims of defamation or tortious interference. "Florida law recognizes a qualified privilege for statements that meet the following requirements: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner." *White v. School Board Hillsborough County, Florida*, 2009 WL 174944, *4 (11th Cir. Jan. 27, 2009), citing *Thomas v. Tampa Bay Downs, Inc.*, 761 So.2d 401, 404 (Fla. 2d DCA 2000). Each and every statement made by BCR challenged in the SAC satisfies these criteria.

Florida law protects otherwise actionable defamatory statements when privileged. *Gunder's Auto Center v. State Farm Mut. Auto. Ins. Company*, 422 Fed. Appx. 819, 821 (11th Cir. Apr. 7, 2011), citing *Nodar v. Galbreath*, 462 So.2d 803, 809-12 (Fla. 1984), 1 9 Fla. Jur.2d *Defamation and Privacy* § 58 (1980), and *Coogler v. Rhodes*, 21 So. 109, 112 (1897). The same privilege applies with respect to the Defendants' allegations of tortious interference. *Id.* at 822 n. 1, citing *KMS Restaurant Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1326 (11th Cir. 2004) and *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n. 9 (11th Cir. 2001)(Emphasis in original).

ii. *Truth*

Truth of a statement, coupled with a good motive by the speaker, is a defense to an action for defamation. *Axelrod v. Califano*, 357 So.2d 1048, 1050 (Fla. 1st DCA 1978). With respect to Counterclaimants' claims of tortious interference, because the alleged interference is based on underlying allegedly defamatory statements, if the statement is not defamatory because it is true, it is also not tortious.

iii. *Opinion*

A comment which constitutes "merely an opinion or inference from facts assumed to be true" is "immune from liability for defamation." *White v. Fletcher*, 90 So.2d 129, 131 (Fla. 1956), citing 53 C.J.S., *Libel and Slander*, § 131(3). *See also, Miami Child's World, Inc. v. Sunbeam Television Corp.*, 669 So.2d 336, 336-37 (Fla. 3d DCA 1996) (citing *Eastern Air Lines, Inc. v. Gellert*, 438 So.2d 923 (Fla. 3d DCA 1983) ("Statements of pure opinion cannot constitute actionable defamation . . . Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public."). With respect to Counterclaimants' claims of tortious interference, because the alleged interference is based on underlying allegedly defamatory statements, if the statement is not defamatory because it is opinion, it is also not tortious.

## IV. ARGUMENT

### a. Counterclaimants' proof of damages is completely lacking.

Damages are an essential element of all of Counterclaimants' claims. BCRE and Schreibvogel have admitted that all proceeds from Counterclaimants' operations pass to G.W. Exotic. *See,* Corley deposition transcript, attached as Ex. 1, at 24:7-14; Doc. 58 at 46:4-11; Schreibvogel 2011 Deposition Transcript, attached as Ex. 2, at 72:2-5; Schreibvogel 2012

Deposition Transcript, attached as Ex. 3, at 43:2-44:1; & 288:24-289:7; and Welch Deposition Transcript, attached as Ex. 4, at 28:21-23 & 45:23-46:7.  As a result, BCRE and Schreibvogel could not have been damaged, and this Court should enter summary judgment in BCR's favor for all claims asserted by BCRE and Schreibvogel.  Indeed, BCRE and Schreibvogel have failed to identify **any** damages.

Moreover, G.W. Exotic's damage claim is speculative and not readily ascertainable. *See, e.g.*, Ex. 3, at 63:24-92:15.  Throughout this litigation, G.W. Exotic's alleged damages have been a moving target.  For example, at a hearing on Counterclaimants' Motion for Temporary Restraining Order and Preliminary Injunction, Schreibvogel claimed that BCR had damaged Counterclaimants to the tune of $15 Million.  Doc. 58 at 28:2-6.  When BCR's counsel and the Court tested the components of this damage figure, Counterclaimants quickly reduced their total damage figure to under $10 Million.   Doc. 58 at 28:22-31:23 & 43:23-46:3.   At Counterclaimants' deposition, Schreibvogel claimed Counterclaimants had suffered damages substantially more than claimed at the Temporary Restraining Order hearing, repeatedly referring to a damage figure of $30 Million or more (*see*, Ex. 3, at 110:4-118:14), even though Counterclaimants' accounting expert calculates Counterclaimants' total annual revenue to be less than $300,000.  Bell Deposition Transcript, attached as Ex. 5, at 21:21-22:1.  Moreover, according to Counterclaimants' accounting expert, Counterclaimants' revenues actually increased from 2010 to 2011 during the period of alleged wrongdoing (Ex. 5, at 21:17-22:15), and he did not opine on damages suffered in 2010 or 2011. Ex. 5, at 38:4-11.

Finally, Schreibvogel has publicly commented that BCR has actually helped rather than damaged Counterclaimants, boasting that Counterclaimants had voluntarily left the business of traveling animal exhibitions.  Doc. 45, Ex. A, ¶14 & Ex. A-1.  Counterclaimants cannot claim that BCR has damaged them when they have made contradictory admissions and stated that any

lost revenues have been caused by their own failure to pursue revenue-generating opportunities.[1] Additionally, Counterclaimants' claim for injunctive relief must fail because Counterclaimants have failed to demonstrate any existing business relationship with which BCR must be enjoined from interfering.

      **b. <u>Counterclaimants have failed to prove that BCR caused their damages, if any.</u>**

Counterclaimants have failed to attribute any damages to BCR's allegedly defamatory or tortious words or conduct. First, there is no evidence in the record – and discovery is now closed – that a particular venue (a) cancelled an appearance by Counterclaimants and, most importantly (b) cancelled Counterclaimants' appearance as a direct result of some improper conduct by BCR. Counterclaimants chose not to depose any venues which purportedly cancelled Counterclaimants' exhibits as a result of BCR's conduct, and the sparse emails to that effect are unauthenticated hearsay.[2] *See,* Fed. R. Evid. 801-804 & *Western Sizzlin Corp. v. Pinnacle Business Partners, LLC,* 2012 WL 2048261, *4 (M.D. Fla. June 5, 2012) (emails without some authentication of validity are hearsay). Any statements by Counterclaimants at this point regarding cancellations or the reasons for any alleged cancellations would also be inadmissible hearsay since only the decision and motives of the third-party venues are probative. Simply stated, the record is devoid of any admissible evidence that any of the alleged defamatory statements of BCR **<u>caused</u>** the cancellation or termination of **<u>any</u>** of Counterclaimants' exhibitions.

---

[1]     Moreover, BCR raised this statement as part of its opposition to Counterclaimants' Motion for temporary restraining order and preliminary injunction (Doc. 45) eight months ago; Counterclaimants have made no effort to explain away this statement. *See also,* Corona Deposition Transcript, attached as Ex. 6 at 66:16-67:2 & 67:21-68:18 (Counterclaimants not booking traveling show in 2012 because did not have crew).

[2]     Schreibvogel acknowledged that the few emails he did produce do not state that Counterclaimants' exhibitions were cancelled as a direct result of any BCR action. Ex. 3, at 97:19-23 & 101:21-102:7. Also, with respect to the Mounds Mall, for example, Schreibvogel admitted that he did not have a signed contract or an email purporting to state the reason for the mall's cancellation of Counterclaimants' exhibit. *Id.* at 292:3-24.

Moreover, BCR is not alone in its efforts at activism with respect to Counterclaimants and their practices.[3] For example, in response to a subpoena directed to Courtland Center Mall, a venue with which BCR allegedly interfered, the Courtland Center Mall produced dozens of emails from animal rights groups not in any way affiliated with BCR. *See,* Ex. 3, at 118:19-124:6. Schreibvogel testified that be believes there are several hundred false stories about him attributed to sources other than BCR which have adversely impacted Counterclaimants, but he has not filed lawsuits or sought retractions. *Id.,* at 282:22-283:25.

Some venues even indicated that they would not have Counterclaimants' tiger cub show return for reasons unrelated to BCR and its activism, such as that Counterclaimants left a mess. Ex. 7, at 33:7-13. Counterclaimants' former employee, Ms. Corona, testified that Counterclaimants did not book any traveling exhibits in 2012 not because of any BCR action, but because they did not have a crew. Ex. 6, at 66:16-67:2 & 67:21-68:18. Even Counterclaimants' financial expert does not have an opinion regarding how much in damages (if any) Counterclaimants have suffered as a result of any alleged wrongful conduct by BCR. Ex. 5, at 55:6-9. Of course, BCR should not be solely responsible for Defendants' alleged damages caused by other people or entities, and Defendants cannot attribute alleged damages caused by BCR's allegedly actionable conduct. As a result, Counterclaimants' SAC must fail.

---

[3]     *See, e.g.,* Bass Deposition Transcript, attached as Ex. 7, at 67:4-7 (venues indicated not only BCR had complained); & 80:20-81:11 (protest in Wisconsin not organized by BCR); Erdman Deposition Transcript, attached as Ex. 8, at 10:15-18 (Erdman offered unsolicited advocacy to BCR with respect to Counterclaimants: "I would like to help you in any way to get these guys shut down."); Larkin Deposition Transcript, attached as Exhibit 9, at 13:17-21 ("Alliance for Animals sent out an alert that Big Cat Rescue Entertainment Group is once again on tour traveling to malls with their exhibit of very young exotic animals: some as young as two-weeks old."); and at 14:25-15:8; Mr. Zomberg Deposition Transcript, attached as Ex. 10 at 11:18-12:1 (it was Mr. Zomberg's idea to contact news station to get BCRE out of Centerpointe Mall), and at 14:9-23 & 24:2-25:4 (Mr. Zomberg organized protest which successfully kicked BCRE out of mall); Mrs. Zomberg Deposition Transcript, attached as Ex. 11 at 9:10-24 & 10:19-11:8 (Mrs. Zomberg's idea to call mall, mall manager, radio and TV stations, and secretary of state to get Counterclaimants' exhibit removed).

**c. Each and every alleged statement made by BCR is protected as privileged.**

Even without damages, BCR's alleged statements are protected as privileged. Counterclaimants' SAC is comprised of statements made by BCR either to various venues hosting Defendants' animal exhibitions[4] or to BCR's supporters.[5]   These statements are incorporated by reference into each and every count of the SAC.[6]  All of these statements were made in good faith with a primary intent aimed at activism, in an area of BCR's expertise. Doc. 45, Ex. A, ¶11.  All of these statements were made to listeners with a corresponding interest, namely venues hosting animal exhibitions[7] and animal activists which support BCR.  BCR made the statements on a proper occasion and in a proper manner because it only contacted individuals who expressed an interest in BCR's cause[8] or to venues which were hosting or contemplating hosting Defendants' animal exhibition. As a result, this Court should enter summary judgment in BCR's favor as to Counterclaimants' SAC because all of the allegedly actionable statements are protected as privileged.

**d. Each and every alleged statement made by BCR is protected as true or as BCR's opinion.**

The following alleged statements are protected as true or as BCR's opinion – and thus, not actionable – as demonstrated by the evidence following the below allegedly actionable statements.  Accordingly, this Court should enter summary judgment in BCR's favor as to Counterclaimants' SAC.

---

[4]   SAC at 11-23, 28, 31-32, 34, 45, 47-48, 55, 63-64, 75, and 88.

[5]   SAC at 36-37, 39-41, 43-44, and 55.

[6]   SAC at 52, 60, 71, and 84.

[7]   *See, e.g.,* Ex. 7, at 9:20-10:22 ("Bass will focus primarily on our efforts to educate venues that allow tiger-cub displays, mostly Joe Schreibvogel's mall exhibits, trying to convince them to adopt a policy of not having exotic animals on display."); & 17:21-23.

[8]   Doc. 45, Ex. A, ¶17.

       i. _Schreibvogel is involved in a "dangerous, deadly business" (SAC ¶ 28(a))_

Counterclaimants' veterinarians, Dr. Green and Dr. Krueger-Krisle, acknowledge that Counterclaimants' animals are "dangerous," making this statement true. Green Deposition Transcript, attached as Ex. 12, at 22:23 and Krueger-Krisle Deposition Transcript, attached as Ex. 13, at 45:7-15. Even Schreibvogel acknowledged that some of his animals die, rendering his business "deadly." Doc. 58 at 32:25-33:11. Schreibvogel also testified regarding incidents where animals scratched a visitor and other animals, and that someone risks losing an arm when feeding his cats. Ex. 3, at 233:10-12; 252:18-21; & 258:13-259:21. The statement above is also BCR's opinion. Doc. 45, Ex. A, ¶24(1).

       ii. _Schreibvogel operates "puppy mills" whereby Schreibvogel "churns out dangerous carnivores"; Counterclaimants are "incessant," "notorious," and/or "unscrupulous breeders" (SAC ¶¶ 28(c), 39, 40, 41, 43(b), 44, 45(a), 47(f), 55(o), 55(p), 55(r), & 55(t))_

This statement is true, as demonstrated by the following evidence. Schreibvogel acknowledged that he needs a constant stream of tiger cubs to operate his traveling show, and he generally has cubs available of the appropriate age. Doc. 58 at 37:17-38:9. _See also_, Ex. 3, at 170:22-171:13 (26 tiger cubs born at Counterclaimants' facility in 2011); 218:1-2; 247:5-6; & 247:8. Even Counterclaimants' veterinarian, Dr. Green, acknowledges that she recalls seeing lots of baby tigers in Schreibvogel's personal residence. Ex. 12 at 45:16-19. _See also_, Doc. 58 at 18:15-17; 32:11-14. Lanny Erdman, a visitor to Counterclaimants' exhibit at a South Dakota fair, testified that Schreibvogel engages in what he described as "natural breeding" where he "just put[s] cats together, and if they breed, they breed." Ex. 8, at 12:16-13:1. _See also,_ Ex. 9, at 14:25-15:8 (Ms. Larkin read an article which calls Counterclaimants "one of the most notorious breeders of baby lions and tigers[;] [t]his business makes a profit by breeding tiger cubs.").

The statement above is also BCR's opinion. Doc. 45, Ex. A, ¶¶24(3) & 24(17)-(21).

    iii.  *Schreibvogel is a "major supplier fueling the exotic animal trade" (SAC ¶ 28(d))*

This statement is true. Schreibvogel testified that people want to purchase tigers from him to make money from the animals. Ex. 3, at 300:6-13. When he sells tigers, he charges a higher price based on the anticipated use of the tiger by the purchaser. Ex. 3, at 298:16-299:12 & 299:15-22. With Schreibvogel's active breeding, as discussed above, Counterclaimants cannot dispute that they fuel the exotic animal trade. *See also*, Ex. 2, at 52:24-54:3 (sold tiger cub for $5,000); Ex. 3, at 174:15-22 (sold white tiger cub for $5,000); 195:11-22 (sold white tiger cub for $5,300 in fuel expenses and a donation); 275:13-276:2 (transferred tigers to Genesis Wildlife Center); 202:20-203:7 (Counterclaimants have sent animals to foreign zoos); 207:6-211:20; 213:24-214:1; & 214:21-216:8. The statement above is also BCR's opinion. Doc. 45, Ex. A, ¶¶13, 24(4), & 24(16).

    iv.  *The cute cubs being pet at Schreibvogel's shows "will end up as a backyard breeder, shot for a price at a canned hunting facility, killed and the parts sold off as ingredients for the Asian medicinal trade which values them highly" (SAC ¶ 28(e))*

This statement is BCR's opinion based on available information. Doc. 45, Ex. A, ¶¶24(5) & 24(16). First, Counterclaimants have taken the actual statement (Doc. 45, Ex. A-2), out of context. The actual statement reads "[t]hat cute cub you're petting today will end up . . .," without specific mention of Schreibvogel. The preceding paragraph discusses in general terms the absence of conservation value for young, undomesticated large felines used in traveling petting exhibits. Again, in general terms – while referring to Schreibvogel as a participant in this industry – the statement alludes to what can happen to these animals.

When Counterclaimants' animals die, sometimes Counterclaimants donate animal carcasses to Mr. Villemarette, who operates an osteology business and museum. When that occurs, Mr. Villemarette disposes the animal parts in the landfill, meaning that there is no

tracking, and animal parts can be sold or traded. Villemarette Deposition Transcript, attached as Ex. 14, at 13:11-14:4, 14:22-15:3, 20:9-21, & 23:17-24:1. As discussed below, once animals – dead or alive – are transferred, it is impossible to track or control what becomes of them.

     v. *Schreibvogel is "a modern day snake oil salesman making money off the backs of innocent animals" (SAC ¶ 28(f))*

As discussed below, Counterclaimants' operation is properly described as both a "con" and aimed at "making money." The "con" is the fact that Counterclaimants participate in the counterintuitive cycle of breeding tiger cubs in order to take them on the road to generate revenue for their animal park. Counterclaimants breed the very animals for which they are trying to raise money. Accordingly, this characterization is true, and it is also BCR's opinion. Doc. 45, Ex. A, ¶¶24(6), 24(19), & 24(22).

     vi. *Schreibvogel is "exposing the public and animals to danger and cruelty" (SAC ¶ 28(g))*

As discussed above, even Counterclaimants' veterinarians describe Counterclaimants' animals as dangerous. As discussed below, Counterclaimants' exhibits are properly described as a form of "abuse," with "cruelty" as another description properly associated with the exhibits. A news report discussed in Schreibvogel's 2012 deposition referred to Counterclaimants as "notorious for inhumane treatment of [their] animals." Ex. 3, at 278:4-5. Accordingly, this statement is true. *See also*, Doc. 45, Ex. A, ¶¶24(7) & 24(17). This statement is also BCR's opinion. *Id.*

     vii. *Schreibvogel has a "horrendous reputation," his organization is "dirty" and any association with Schreibvogel's operation will result in Courtland Center Mall's reputation being 'smeared' (SAC ¶ 28(h)-(i))*

This statement is true, as Mr. Zomberg testified that "the negative feedback and the work that these people are doing was just completely horrible." Ex. 10, at 12:9-10. This statement is also BCR's opinion. Doc. 45, Ex. A, ¶24(8).

viii.  *G.W. Exotic "is not an accredited sanctuary." (SAC ¶30)*

This statement is true because, in 2012, Schreibvogel testified that he does not operate a

sanctuary, meaning that he could not operate an accredited sanctuary either. Ex. 3, at 299:13-14.

Moreover, Counterclaimants are not members of the American Zoological and Aquarium

Association, which accredits sanctuaries. Doc. 58 at 33:19-23. Instead, Schreibvogel created the

U.S. Zoological Association, apparently to "accredit" Counterclaimants that way. Ex. 2, at 16:9-

17:13.

This statement is also BCR's opinion. Doc. 45, Ex. A, ¶24(10).

ix.  *G.W. Exotic has a "long, notorious history of USDA violations,*
*suspensions, and fines for animal abuse and public endangerment" (SAC*
*¶ 32)*

This statement is true.  As part of Schreibvogel's 2012 deposition, he was read a news

report which said: "In 2006 the USDA fined the park $25,000, suspended its license for 2 weeks,

and put it on an 18-month probation for violating at least 14 regulations of the Animal Welfare

Act." Ex. 3, at 278:5-9. *See also*, Doc. 45, Ex. A, ¶¶18-24(2) & 24(12) & Ex. A-2, Ex. A-3, &

Ex. A-4.  Even Schreibvogel admitted that he was fined by the USDA for violations. Doc. 58 at

43:17-22.

x.  *Counterclaimants' animal exhibits are a type of "abuse" which expose*
*animals to a "poor quality of life and lack of care" (SAC ¶¶ 28(b), 31(b),*
*34(b), 36-37, & 40-41)*

This statement is true, as demonstrated by the following deposition testimony.  Lanny

Erdman, a visitor to Counterclaimants' exhibit at a South Dakota fair testified that some animals

on exhibit

> had sores on them . . . there was one just laying there that kind of
> just stretched his neck out.  He was like laying by his dish, and he
> kind of stretched his little neck out to put over the side of the dish
> so that he could get a drink.  He was still just laying on his side.
> He didn't proceed to try to get up or anything.  He just stretched
> his neck out over the dish to get a drink.  They looked lethargic.

Ex. 8, at 13:16-25. *See also,* Ex. 9, at 14:25-15:8 ("This business makes a profit by breeding tiger cubs, taking them from their mothers shortly after birth, and abusing them by carting them around from mall and mall charging people to pet them and be photographed with the young cubs.").

This statement is also BCR's protected opinion. Susan Bass, who is charge of BCR's public relations efforts, testified that she would send a fact sheet supporting BCR's opinion that tiger cub exhibits were abusive when she contacted venues. Ex. 7, at 15:13-17; 16:1-7; 16:18-20; & 73:15-19. *See also,* Doc. 45, Ex. A, ¶¶12, 24(1)-(2), 24(13)-(19), & Ex. A-2.

> xi. *Schreibvogel "rips the cubs from their mothers a few days after birth." (SAC ¶¶ 40 & 41)*

This statement is true, as Counterclaimants' veterinarian, Dr. Green, testified that tiger cubs are pulled from their mothers after birth, and that she recalls seeing lots of baby tigers in Schreibvogel's personal residence. Ex. 12 at 30:11-31:8 & 45:16-19. Ms. Larkin testified that she read an article which stated that "[t]his business makes a profit by breeding tiger cubs, taking them from their mothers shortly after birth, and abusing them by carting them around from mall and mall charging people to pet them and be photographed with the young cubs." Ex. 9, at 14:25-15:8. This statement is also BCR's opinion. Doc. 45, Ex. A, ¶¶24(17)-(18).

> xii. *Counterclaimants are "cub exploiters" who do "horrible acts," they are engaged in "shameful tiger exploitation," and they "pimp" tiger cubs (SAC ¶¶ 34(a) 37, 43(a), 44 & 55(q))*

This statement is true. As discussed above, Counterclaimants engage in activity considered to be abuse, and they breed tigers in order to take them on traveling shows to make money. Accordingly, the characterization above is accurate. *See also,* Ex. 9, at 14:25-15:8 (Ms. Larkin testified that she read an article about Counterclaimants which stated that "[t]his business makes a profit by breeding tiger cubs, taking them from their mothers shortly after birth, and

abusing them by carting them around from mall and mall charging people to pet them and be photographed with the young cubs.").

      This statement is also BCR's opinion. Doc. 45, Ex. A, ¶¶24(13)-(15), 24(19), & 24(22).

> xiii. *Counterclaimants "often promote their pay to play with cubs scheme under the guise of providing consumers with education about the plight of exotic cats . . . But the truth is [Counterclaimants] are exhibiting the cubs only to make money" (SAC ¶¶ 31(a), 43(c), 45(b)-(c), & 47(c))*

      This statement is true because Ms. Corley, Schreibvogel's second in command, testified that a primary focus of the road show is to generate revenue for G.W. Exotic. See Ex. 1, at 7:15-22; 8:5-17; and 24:7-14. *See also,* Ex. 9, at 14:25-15:8 ("This business makes a profit by breeding tiger cubs, taking them from their mothers shortly after birth, and abusing them by carting them around from mall and mall charging people to pet them and be photographed with the young cubs."). Ms. Welch, Counterclaimants' volunteer, confirmed the focus of the traveling show: "[w]e would go around and show the tigers and people were able to play with them or receive a photo for them for a fee, for a donation, and then they would – it would help make money for the park." Ex. 4, at 12:9-12 & 27:22-28:2.

      Mr. Zomberg, who visited Defendants' exhibit at the Centerpointe mall, testified that Counterclaimant "were allowing people to go into their cage and play . . . for a price." Ex. 10, at 10:21-23. *See also,* Doc. 58 at 9:15-10:2; 12:7-14; 31:24-32:10; & 46:4-14. As part of Schreibvogel's 2012 deposition, a news report was discussed which referred to Counterclaimants' park as "particularly infamous among animal-sanctuary experts for breeding exotic animals indiscriminately to entice visitors who want to play with new cubs." Ex. 3, at 278:9-12; 216:21-217:9 (must pay to visit Counterclaimants' facility). This statement is also BCR's opinion. Doc. 45, Ex. A, ¶¶24(11) & 24(20).

xiv. *Schreibvogel's shows are a "con" and he uses the name 'Big Cat Rescue Entertainment' simply to "dupe and confuse the public" (SAC ¶¶ 28(h), 47(a) & 55(w))*

This statement is true, as demonstrated by the deposition testimony of Ms. Erdman, Ms. Larkin, Ms. Percival, Mr. Zomberg, and Mrs. Zomberg, who all felt deceived by the "Big Cat Rescue Entertainment" name and/or logo. Ex. 8, at 14:1-11; Ex. 9, at 9:22-11:3; 11:10-21; 13:15; 14:7-16; & 15:12-17; Percival Deposition Transcript, attached as Ex. 15, at 9:8-21 & 13:5-7; Ex. 10, at 7:5-9:7, 11:4-17, & 15:1-5; Ex. 11, at 6:1-7 & 6:21-7:7. Mr. Zomberg also observed that Counterclaimants' literature at the Centerpointe Mall exhibit was not consistent with the message sent by their exhibit. Ex. 10, at 12:12-13:4. Even Ms. Welch, a volunteer for the Counterclaimants' traveling exhibit, observed that people were confused by the Big Cat Rescue Entertainment name, believing it referred to BCR. Ex. 4, at 36:20-37:8. Counterclaimants used a "Big Cat Rescue Entertainment" business card which listed a Florida office, even though they never had an office in Florida. Ex. 2, at 57:9-58:4; 58:17-20; & 68:5-13. Moreover, Counterclaimants did not stop using the Big Cat Rescue Entertainment name even after this lawsuit was filed. Ex. 3, at 150:10-21.

This statement is also BCR's opinion. Doc. 45, Ex. A, ¶¶24(9) & 24(19)-(21).

xv. *Schreibvogel displays tiger cubs as young as "5 weeks old (which is illegal)" (SAC ¶ 47(b))*

This statement is true. Ms. Corona, Counterclaimants' former employee and Board Member, testified that the acceptable age range for tiger cub interaction with the public is "8-12 weeks." Ex. 6, at 12:2-13 & 26:15-25. *See also*, Doc. 45, Ex. A, ¶24(21). Notwithstanding this policy, Schreibvogel has displayed tiger cubs under 5 weeks of ago. Ex. 3, at 230:9-17. This statement is also BCR's opinion. *Id.*

xvi. *Tiger cubs used in Schreibvogel's shows are "often . . . sold to private*
*owners or roadside zoos, and some may be killed to supply the illegal*
*trade in tiger parts" (SAC ¶ 47(d))*

This statement is true. In 2011, Schreibvogel admitted that he sold a tiger for $5,000.00.

Ex. 2, at 52:24-54:3. In 2012, Schreibvogel admitted that he cannot control what happens to

animals once they are transferred. Ex. 3, at 281:1-13. This statement is also BCR's opinion.

Doc. 45, Ex. A, ¶¶24(16) & 24(21).

xvii. *Schreibvogel "has a huge tiger breeding program at his zoo that greatly*
*contributes to the overcrowding of sanctuaries in the U.S. and to the ease*
*in which people can purchase tiger cubs over the internet as pets" (SAC ¶*
*47(e))*

This statement is both true and BCR's opinion. Doc. 45, Ex. A, ¶¶24(16)-(18) & 24(21).

Even Schreibvogel acknowledged that he has a breeding program. Doc. 58 at 19:4-7; Ex. 3, at

181:4-6. Schreibvogel even went so far as to say "I'll sell anything now"; "I'm going to start

supplying the pet trade if I have to." Ex. 3, at 181:19-182:18 & 183:4-184:17. He also

acknowledged that it is possible to exchange or swap animals over the Internet. *Id.* at 198:1-

199:7. *See also*, Ex. 3, at 278:9-12 (as part of Schreibvogel's 2012 deposition, a news report was

mentioned which stated that "[f]or sanctuary-accrediting agencies such as the American

Sanctuary Association and the Global Federation of Animal Sanctuaries, breeding breaks the

cardinal rule of true sanctuaries because it adds to the population of unwanted captive species.").

xviii. *"[A]t least one of the cubs [for the Centerpointe Mall show] is quite ill"*
*(SAC ¶ 47(g))*

This statement is true. Mr. Zomberg, who visited Counterclaimants' exhibit at the

Centerpointe mall, testified that a cub looked sick at the exhibit. Ex. 10, at 18:25-19:4. Mrs.

Zomberg also testified that Counterclaimants' animals "just didn't look healthy." Ex. 11, at 8:4-

13.

**e.** **Counterclaimants have failed to prove identifiable business relationships with various third parties.**

As part of their tortious interference claims, Counterclaimants must prove the existence of business relationships with identifiable people or entities. As discussed above, to date, Counterclaimants have failed to take any depositions or conduct any discovery directed to venues with which they allege to have business relationships. Counterclaimants have produced only a handful of signed contracts, and those contracts expressly provide that they are for one-time appearances. Counterclaimants testified that any signed contracts would have been produced. Ex. 3, at 294:10-18.

Moreover, Counterclaimants' Second Amended Counterclaim contains allegations of general relationships with mall ownership groups, such as General Growth Properties, which owns and/or operates more than 100 malls. SAC ¶11. As demonstrated at the Temporary Restraining Order hearing and Counterclaimants' deposition, Counterclaimants' damage theory relies on an acceptance of the premise that (1) Counterclaimants had a business relationship with the mall ownership group(s); (2) that this relationship meant that Counterclaimants had a business relationship with each and every mall owned and/or operated by the mall ownership group(s); (3) that this relationship meant that Counterclaimants would be invited to exhibit animals at each and every mall owned and/or operated by the mall ownership group(s) not once, but many times in the future; (4) that Counterclaimants would continue to generate the same level of revenue at each and every mall appearance into the future; and (5) that BCR's actions alone caused the deterioration of these relationships.[9] There is no evidence whatsoever in the record to establish the existence of these "identifiable" business relationships.

---

[9]     Of course, this final prong is contradicted by Counterclaimants' public admissions that BCR has helped, not harmed, Counterclaimants and that Counterclaimants have voluntarily left the marketplace of traveling animal exhibitions at malls. Doc. 45, Ex. A, ¶14 & Ex. A-1.

**f.   Some allegedly actionable statements are barred by the statute of limitations.**

At paragraph 31 of the SAC, including sub-paragraphs "a" and "b," Counterclaimants allege that BCR published allegedly actionable statements on June 10, 2009. This allegedly actionable statement is incorporated by reference into every count of the SAC. SAC ¶¶52, 60, 71, & 84. The allegedly actionable statement reappears at paragraph 55(k), a paragraph part of Count I, seeking damages for libel. The SAC also references these statements made on June 10, 2009 as "false, defamatory statements" at paragraphs 75(b) and 88(b), seeking injunctive relief and damages for tortious interference.

The applicable statute of limitations for an action for libel or slander is two years. Fla. Stat. § 95.11(4)(g). That statute of limitations applies to the SAC because it is a permissive counterclaim under Fed.R.Civ.P. 13(b). Pursuant to Fla. Stat. § 770.07, a cause of action for libel "shall be deemed to have accrued at the time of the first publication or exhibition or utterance thereof." As a result, the Counterclaim (Doc. 26) filed on July 29, 2011, was more than two years after June 10, 2009, and thus this statement, as it appears in paragraphs 31, 55(k), 75(b), and 88(b) and incorporated by reference in paragraphs 52, 60, 71, and 84, falls outside the statute of limitations.

Counterclaimants cannot turn their failed defamation claim as to this allegedly defamatory statement into a timely tortious interference claim, which carries a four-year statute of limitations. Fla. Stat. § 95.11(3). This outcome is governed by Florida's "single publication/single action rule." *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 208 (Fla. 4th DCA 2002). "In Florida, a single publication gives rise to a single cause of action." *Id.*, citing *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So.2d 607, 609 (Fla. 4th DCA 1975). "The single publication/single action rule . . . does not permit multiple actions when they arise from the same publication upon which a failed defamation claim is

based." *Id.*, citing *Ovadia v. Bloom*, 756 So.2d 137, 141 (Fla. 3d DCA 2000) and *Orlando Sports* at 609. "The rule is designed to prevent [claimants] from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Id.*, citing *Messenger v. Gruner + Jahr USA Publ'g*, 994 F.Supp. 525, 531 (S.D.N.Y. 1998), *vacated on other grounds by* 208 F.3d 122 (2d Cir. 200); and *Trujillo v. Banco Central Del Ecuador*, 17 F.Supp.2d 1334, 1339 (S.D.Fla. 1998). "Thus, if the defamation count fails, the other counts based on the same publication must fail as well because the same privileges and defenses apply." *Id.*, citing *Fridovich v. Fridovich*, 598 So.2d 65, 70 (Fla. 1992). As a result, this Court should enter summary judgment in BCR's favor with respect to Counterclaimants' claims relating to the statement discussed above.

## V.   **CONCLUSION**

For the foregoing reasons, this Court should enter summary judgment against Counterclaimants and in BCR's favor, and grant such further relief as it deems appropriate.

Respectfully submitted,

*/s/ Aleksas A. Barauskas*
FRANK R. JAKES, FBN 372226
E-Mail:  frankj@jpfirm.com
ALEKSAS A. BARAUSKAS, FBN 0068175
E-Mail:  aleksasb@jpfirm.com
JOHNSON, POPE, BOKOR, RUPPEL
 & BURNS, LLP
403 E. Madison Street, 4th Floor
Tampa, FL  33602
Tel:  (813) 225-2500
Fax:  (813) 223-7118

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 15, 2012, I filed the foregoing using the CM/ECF electronic filing system, which will serve a copy of the foregoing on all counsel of record, including the following counsel:

Tracy M. Henry, Esq.
Daniel W. Anderson, Esq.
Anderson Law Group
13577 Feather Sound Drive
Suite 670
Clearwater, Florida 33762
Telephone: (727)329-1999;Fax:(727)329-1499
Attorneys for Defendants

/s/ Aleksas A. Barauskas
FRANK R. JAKES, FBN 372226
E-Mail: frankj@jpfirm.com
ALEKSAS A. BARAUSKAS, FBN 0068175
E-Mail: aleksasb@jpfirm.com
JOHNSON, POPE, BOKOR, RUPPEL
 & BURNS, LLP
403 E. Madison Street, 4th Floor
Tampa, FL 33602
Tel: (813) 225-2500
Fax: (813) 223-7118

951437v.2