Joe Schreibvogel - 6/5/2012

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BIG CAT RESCUE CORP.,
a Florida not for profit corporation,

    Plaintiff,

-vs-              CASE NO.  8:11-cv-209-MSS-MAP

BIG CAT RESCUE ENTERTAINMENT
GROUP, INC., et al.,

    Defendants.
_____/


VIDEOTAPED
DEPOSITION OF:    JOE SCHREIBVOGEL, individually and as
                    30(b)(6) corporate representative of
                    Big Cat Rescue Entertainment Group,
                    Inc., and G.W. Exotic Animal
                    Foundation

DATE TAKEN:    Tuesday, June 5, 2012

TIME:    9:36 a.m. to 5 p.m.

PLACE:    Johnson Pope Bokor Ruppel & Burns
             403 East Madison Street
             Suite 400
             Tampa, Florida

REPORTED BY:    Beverly Replogle
             Notary Public


VOLUME 1

EXHIBIT
3

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

1    APPEARANCES:

2    FRANK R. JAKES, ESQUIRE
     ALEKSAS BARAUSKAS, ESQUIRE
3         Johnson, Pope, Bokor, Ruppel & Burns, LLP
          403 East Madison Street
4         4th Floor
          Tampa, Florida 33602
5         813-225-2500
          frankj@jpfirm.com
6         aleksasb@jpfirm.com

7             Appearing on behalf of the Plaintiff

8
     ERIC C. PINKARD, ESQUIRE
9         Anderson Pinkard
          13577 Feather Sound Drive
10        Suite 670
          Clearwater, Florida 33762
11        727-329-1999
          epinkard@floridalawpartners.com
12
              Appearing on behalf of the Defendants
13

14    ALSO PRESENT:

15        Howard Baskin
          Shawn Lane, Videographer
16
                   I N D E X
17
TESTIMONY OF JOE SCHREIBVOGEL:                      PAGE
18
          Direct Examination By Mr. Jakes..............    6
19
     CERTIFICATE OF OATH.............................. 265
20
     CERTIFICATE OF REPORTER......................... 266
21
     LETTER TO ATTORNEY.............................. 267
22
     ERRATA SHEET.................................... 268
23

24                     - - - - -

25

First Choice Reporting & Video Services
Worldwide Scheduling

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

1                          E X H I B I T S

2                                                        PAGE

3        Exhibit Number 1
             Notice of taking videotaped
4            deposition................................. 8

5        Exhibit Number 2
             Defendants' Second Amended Answer,
6            Affirmative Defenses, and
             Counterclaims............................. 11
7
         Exhibit Number 3
8            Series of calendars....................... 82

9        Exhibit Number 4
             12/18/11 e-mail to Nancy M. Ellifrit
10           from Bobbi Corona, Subject:
             Beth Corley............................... 93
11
         Exhibit Number 5
12           6/13/11 e-mail to
             bigcatentertainment@ymail.com from
13           C. Parrack, Subject: Mall Harassment........ 96

14       Exhibit Number 6
             4/15/11 e-mail to Tracy Henry from
15           World Magic, Subject: Fw: Tiger and
             Liger Cubs Exploited at Casino.............. 98
16
         Exhibit Number 7
17           6/13/11 e-mail to
             bigcatentertainment@ymail.com from
18           C. Parrack, Subject:  Big cats belong
             in the wild and not traveling
19           sideshows................................. 99

20       Exhibit Number 8
             2/3/11 e-mail exchange between
21           Big Cat Entertainment and
             Clarine Eickhoff...........................100
22
         Exhibit Number 9
23           Letter dated December 16, 2011 from
             James to Big Cat Rescue Entertainment
24           and Joe Schreibvogel.......................105

25

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 4

```
1                    E X H I B I T S

2                                                      PAGE

3      Exhibit Number 10
            Series of communications that were
4           provided to Big Cat Rescue through
            third-party subpoenas in this action.........118
5
       Exhibit Number 11
6           Documents that were provided in
            response to third-party subpoenas
7           relating to the Courtland Center Mall........121

8      Exhibit Number 12
            Board minutes of G.W. from 1/6/11............128
9
       Exhibit Number 13
10          Computer program that relates to the
            USDA inventory...............................156
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 5

1        THE VIDEOGRAPHER:  We are now on the record

2   in the matter of Big Cat Rescue Corporation

3   versus Big Cat Rescue Entertainment.  Today's

4   date is June 5, 2012, and the time is

5   approximately 9:36 a.m.

6        This is the video-recorded deposition of

7   Joe Schreibvogel being taken at 403 East Madison

8   Street, Tampa, Florida.  My name is Shawn Lane,

9   and I'm the camera operator.  And our court

10  reporter today is Miss Beverly Replogle.  We

11  both represent First Choice Reporting & Video

12  Services located at 201 North Franklin Street,

13  Tampa, Florida.

14       Will counsel please introduce themselves

15  for the record?

16       MR. JAKES:  On behalf of the plaintiff Big

17  Cat Rescue Corp., Frank Jakes of Johnson, Pope,

18  Bokor, Ruppel & Burns, Tampa, Florida.

19       MR. PINKARD:  I'm Eric Pinkard from

20  Anderson Pinkard on behalf of the defendants.

21       THE VIDEOGRAPHER:  And will our court

22  reporter please swear in the witness?

23       THE COURT REPORTER:  Sir, would you raise

24  your right hand?  Do you swear or affirm that

25  the testimony you are about to give in this

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 43

1    tiger show.  So it's all broke down.

2        Q    Okay.  Sitting here today, how much -- well,

3    before we go there, so all of the revenue that you claim

4    to have lost from your magic shows would be revenue that

5    would go to G.W.  Correct?

6        A    Everything went through G.W.

7        Q    Okay.  So it's not revenue that you personally

8    lost.  Correct?

9        A    If you want to talk about personally lost, I've

10   lost $247,000 personally in the last two years to keep

11   the park open because of your clients costing me work --

12       Q    Okay.

13       A    -- so personally, Joe Schreibvogel has lost

14   $247,000 that he's had to put in to make up the

15   difference.

16       Q    Okay.  How about you answer my question, though?

17       A    I just did.

18       Q    No, you didn't, sir.  My question was, as to the

19   magic shows, none of the alleged lost revenues from the

20   magic shows would be lost revenues for you personally.

21   Correct?

22       A    I didn't work personally for myself.  I worked

23   for my animals and my park.

24       Q    Okay.  So you personally did not lose any

25   revenue from any alleged loss of a magic job.  Correct?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 44

1      A    I did not.

2      Q    Thank you.

3           The T -- the -- you claim to have lost the

4    ability to do TV commercials because of the conduct of my

5    clients.  Is that correct?

6      A    Yes.

7      Q    What TV commercials do you claim to have lost

8    the opportunity to perform for?

9      A    I cannot even get any.

10     Q    Okay.  When was the last time that any of the

11   defendants received revenues from a TV commercial?

12     A    Right off the top of my head, I can't remember

13   if it was -- I believe it was -- it might have been

14   December, January of -- December of 2011, January of -- I

15   did a commercial for the Riverwind Casino with a white

16   tiger.

17     Q    Where is the Riverwind Casino?

18     A    Norman, Oklahoma.

19     Q    And were you paid for that?

20     A    Yes.

21     Q    Where did the revenues go?

22     A    To the park.

23     Q    How much -- oh, okay.  When you do TV

24   commercials, do the revenues always go to the park?

25     A    Everything goes to the park.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 63

1    Florida; so as far as advertising our uniforms, they

2    should have been in just plain clothes.

3        Q    I'm sorry.  Why is that?

4        A    Because we have friends of other facilities down

5    here, and we didn't want to do competition with like

6    Big Cat Habitat, so we were passing out paperwork to

7    promote their parks.

8        Q    And these friends that you passed out paperwork

9    for are who?

10       A    Big Cat Habitat and Dade City Wild Things is the

11   two that we were promoting, I think.

12       Q    Did they receive any of the revenues from those

13   two shows?

14       A    No, not that I know of.  There's a lot went on

15   there that I didn't know of.

16       Q    Who -- I'm sorry.  You said Tim and/or Bruce

17   collected the revenues from those two shows?

18       A    Yes.

19       Q    I'm still confused.  If the magic show was not

20   part of these shows, how was Bruce there?

21       A    Bruce was there to help.

22       Q    But he wasn't driving the magic-show bus?

23       A    No.

24       Q    Going back to the defendants' claims of damages

25   and specifically the testimony that you can't get

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 64

1    contracts anymore for the road shows.  What contracts do

2    you contend you cannot get anymore because of the direct

3    conduct of any of my clients?

4        **A**    **I cannot get any General Growth Property**

5    **contracts.  I cannot get any Westfield contracts.  I**

6    **cannot get any J. Herzog contracts.  I cannot get any**

7    **Coyote Property contracts.  There's probably close to 10**

8    **or 15 independent mall owners that I can no longer go**

9    **back to.  There's DDJ -- that's Develop Diversified**

10   **something.  I cannot get any more contracts with those**

11   **people.  I cannot get any more contracts with Simon**

12   **Properties.  That's probably close to 800 malls.**

13       Q    In 2011 how many malls did G.W. and Big Cat

14   Rescue Entertainment Group go to?

15       **A**    **Right off the top of my head, I couldn't answer**

16   **that without the schedules.**

17       Q    Does -- when you do the road shows at malls, do

18   you have contracts with the malls?

19       **A**    **Most of them.  Some of them.  We have just over**

20   **the years had a reputation of, you know, when they ask us**

21   **to come and we say we'll be there and we're there.  So in**

22   **the early years we had contracts with almost every one of**

23   **them; and then as we've built a reputation with them, it**

24   **was just a handshake and agreed to -- to be there.**

25       Q    In the course of this litigation we had

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 65

1    requested that the defendants provide us with any written

2    contracts with malls that they contend that they lost

3    because of any of the conduct of the plaintiff, Big Cat

4    Rescue Corp., and I'll represent to you that we didn't

5    receive any signed contracts.  Does that sound right?

6        A    **You did not?**

7        Q    Did not.

8        A    **We provided them with it.**

9        Q    Which signed contracts can you recall?

10       A    **Off the top of my head, I couldn't.  There was**

11   **six file cabinet drawers full of malls that we had to**

12   **scan and send.**

13       Q    But anything that existed would have been

14   produced in discovery in this case?

15       A    **Anything that's existed would have been sent to**

16   **my law firm --**

17       Q    Yeah.

18       A    **-- let's put it that way.**

19       Q    What evidence do the defendants have that they

20   cannot get any new contracts with General Growth --

21   Growth Malls?  Did I get that right, General Growth?

22       A    **General Growth?  What evidence do we have?**

23       Q    Yeah.

24       A    **We have the cancellation of the shows due to why**

25   **they were canceled and all of that should have been**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 66

1    already sent too.

2        Q    Well, how did General Growth advise you that

3    they were canceling the shows?

4        A    The property that we were at in midstream, due

5    to managers of the mall came and told us that we were

6    going to have to shut down early.

7             And the lady who scheduled the General Growth

8    Property tours name was Linda Schultz with

9    General Growth; and she's the one who canceled it, and I

10   believe it was in an e-mail.

11       Q    Do you recall whether that e-mail stated that

12   General Growth would not do any new contracts with your

13   organization?

14       A    I think they terminated everything to have to do

15   with our organization.

16       Q    And that's reflected in the e-mail you believe?

17       A    I believe so.

18       Q    What mall were you at when you were allegedly

19   canceled by General Growth?

20       A    I believe it was the mall in Taylor, Michigan.

21       Q    Do you happen to remember the name of the mall?

22       A    No.

23       Q    Were you there?

24       A    Yes.

25       Q    Was Linda Schultz there?

First Choice Reporting & Video Services
Worldwide Scheduling

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 67

1      A    No.  She's out of the corporate office.

2      Q    And where is the corporate office for

3   General Growth, if you recall?

4      A    For that region, I'm really not sure.  They

5   usually have their region offices out of one mall in that

6   region, and I believe she's somewhere in Michigan.

7      Q    Okay.  Westfield is a chain of malls.  Correct?

8      A    Yes.

9      Q    Very large one.  Right?

10     A    Yes.

11     Q    And who were you dealing with at Westfield?

12     A    Right off the top of my head, I couldn't tell

13  you that one.

14     Q    Okay.  Who on behalf of G.W. would be dealing

15  with Westfield?

16     A    Well, I dealt with them all.

17     Q    So you just cannot recall who you dealt with?

18     A    I don't have 800 different malls tapped in my

19  head up here.  No, I don't.

20     Q    Well, did you deal with a specific individual at

21  Westfield, or was it mall by mall?

22     A    No, we deal with the people out of their

23  headquarters with every chain mall.

24     Q    Okay.  And you don't recall who you were dealing

25  with at Westfield's headquarters?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 68

1      A      No.

2      Q      And for the record, please explain your -- what

3    evidence you have that Westfield refuses to give G.W. new

4    contracts because of any of the direct conduct of my

5    clients.

6      A      We should have the same type of e-mails.

7      Q      From whom?

8      A      From Westfield.

9      Q      From their corporate offices?

10     A      I just answered that question to you 30 seconds

11   ago.  I couldn't tell you their name.

12     Q      Okay.  Do you recall what mall you were --

13   what -- strike that.

14            Was there an actual cancellation in the case of

15   Westfield do you contend?

16     A      It was -- we were at one of their malls on the

17   south side of Chicago when we got canceled in midstream.

18     Q      Have you tried to get rebooked into Westfield

19   malls?

20     A      Yes.

21     Q      And how have you done that?

22     A      We contact all of our malls by e-mails.

23     Q      Okay.  Now, I got confused there.  I thought you

24   said you dealt with corporate.

25     A      Well, you know, malls, corporate, who -- who

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 69

1    cares, okay?  We contact all of our people by e-mails,

2    okay?  If I -- if an S really screwed you up that bad, I

3    will rephrase myself.  Okay?  We contact all of our

4    clients by e-mails.

5        Q    Okay.  And so since you claim to have

6    experienced the cancellation at the south side of Chicago

7    Westfield mall, you have sent e-mails to other Westfield

8    malls.  Is that correct?

9        A    To their regional managers.  Every big chain

10   malls have regional managers.

11       Q    And have you been booked at any Westfield Malls

12   since the south side of Chicago?

13       A    No.

14       Q    Have you received any e-mails back from anyone

15   at Westfield saying why they were not booking you?

16       A    Not since they canceled.

17       Q    And what did they tell you at the time they

18   canceled?

19       A    Due to all of the floods of e-mails from the

20   Google or from the Capwiz alerts that your client puts

21   out saying that I slaughter my baby tigers after I'm done

22   with them, they do not want to be involved in the middle

23   of the harassment.

24       Q    How was that conveyed to you?

25       A    Mostly by e-mails.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 70

1    Q    And have all of those e-mails been produced in

2    this litigation?

3    A    You know, since half of our office staff quit

4    and walked out, I can't even get in most of those

5    e-mails.

6    Q    Okay.  So have those -- let me ask the question

7    again.

8    A    No, they haven't.

9    Q    So you don't -- you have not produced them?

10    A    I can't even get to them.

11    Q    Why can't you get to them?

12    A    Because I can't get the passwords to our e-mail

13    accounts.

14    Q    What e-mail accounts are you locked out of?

15    A    I'm locked out of G.W. Marketing.  I'm locked

16    out of G.W. Park Staff.

17    Q    Park Staff?

18    A    Yep.  I am locked out of the web designer's

19    e-mail.  I am locked out of the very first e-mail I ever

20    started my park with, which was

21    gwexoticanimalfound@likeus.com.  Yeah, I'm in a hell of a

22    mess.

23    Q    When did half of your office staff walk out?

24    A    Bobbi Corona and Ryan Miller just left within

25    the last month.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 71

1       Q     Okay.  Is that half of your staff?

2       A     Considering I only had three, I would say it's a

3    little more than -- of my office staff, yeah.

4       Q     And I'm sorry.  When did you say they left?

5       A     Within the last 30 days.

6       Q     Okay.  We had asked for these e-mails well prior

7    to that time.  Did you --

8       A     And to my knowledge Bobbi sent them to you.

9       Q     Let me -- let me -- please let me finish my

10   question, because it's not going to work otherwise.

11      A     Okay.

12      Q     And my question is why you weren't getting these

13   e-mails before they left.

14      A     I -- to my knowledge, they were supplying

15   everything my lawyers asked for.

16      Q     Okay.  So if they existed, we should have

17   received them?

18      A     You should.

19      Q     And Bobbi Corona was tied to what e-mail that

20   you're now locked out of?

21      A     All of them.

22      Q     And just for clarity of the record -- and I

23   apologize, I don't quite understand how your operation

24   works.  So how many different e-mail accounts did

25   Bobbi Corona control?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 72

1        A    Without the five-page list of passwords they

2    have all created, I could probably say eight, maybe.

3        Q    Okay.  What is the domain name for G.W.?

4        A    What do you mean, "domain"?

5        Q    When you're talking about e-mail accounts, are

6    they --

7        A    We don't have --

8        Q    -- Internet or internal?

9        A    Well, we don't have like joe@gwpark.org.

10   They're all Yahoos or g-mails or --

11       Q    And prior -- you used to think that Bobbi Corona

12   had about eight of those e-mail accounts?

13       A    Yeah.

14       Q    Okay.  And you're not able to get into any of

15   them?

16       A    I can't even get into my website by now.

17       Q    Which -- which website are you referring to?

18       A    Anything.  I cannot operate my business right

19   now.

20       Q    Well, which website were you referring to?

21       A    I can't get in any of them; my G.W. website, my

22   magic website, my Save the China website, Save the

23   Animals in the UK website, the 911 website.  I am

24   screwed.

25       Q    Who had the e-mail access or the access to those

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 73

1       websites?

2           A       Ryan Miller.

3           Q       Okay.  Did Ryan Miller and Bobbi Corona leave at

4       the same time?

5           A       No.  They left --

6           Q       Okay.  Who left first?

7           A       -- three weeks apart.

8           Q       Who left --

9           A       Bobbi left first.

10          Q       Okay.  Ryan Miller had how many of the e-mail

11      accounts that you are now locked out of?

12          A       He had just the -- the web designer e-mail.

13          Q       Was that a Yahoo?  Likeus?  What was it?

14          A       You know, I couldn't tell you because it's

15      automatically programmed in my -- and all I have to do is

16      type "the" and it throws the thing up there.  I've never

17      really even paid attention if it was AOL or Yahoo or --

18      I know it's not G.W. Park.

19          Q       But your testimony is even though you have that

20      on your computer, you aren't able to access it because

21      you don't have the password.  Is that correct?

22          A       Right.  I cannot check e-mail.  I can send one,

23      but I can't check 'em.  I can send one to that e-mail

24      account, but I can't get in to check them.

25          Q       Okay.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

```
                                                    Page 74
  1       A    And we've currently got things filed with Yahoo

  2   and AOL to try and retrieve those, but it's not an easy

  3   process.

  4       Q    Why did Ryan Miller leave?

  5       A    You know, people that work for free can only

  6   work for free for so long; and the stress of this lawsuit

  7   and the negativity phone calls and the negativity

  8   e-mails, somebody that works for free can only put up

  9   with so long and they must move on and get a life.

 10       Q    I understand the general statement.   Why did

 11   Ryan Miller leave?

 12       A    He was just fed up.

 13       Q    Did he give a written termination notice?

 14       A    Nope, just got up and walked out in the middle

 15   of the day.

 16       Q    Where is he now?

 17       A    I have not a clue.

 18       Q    Where was he from?

 19       A    His address on his application was Houston, but

 20   he answered our help-wanted ad for a web designer out of

 21   Dallas.

 22       Q    How long had he been with G.W.?

 23       A    Maybe four or five months.

 24       Q    Who preceded him as the web designer?

 25       A    Aaron Stone.
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 75

1      Q     Bobbi Corona left when?

2      A     About a month ago.

3      Q     Why did she leave?

4      A     Same thing, digging up all of this and being on

5   a 12- to 18-hour time limit to have it all done.  She

6   just -- people -- like I said, people that work for free

7   can only be put through so much.

8      Q     And Bobbi Corona had been with G.W. for a while,

9   though.  Right?

10     A     On and off for a year.

11     Q     Oh, just a year?

12     A     A year or so.  She was -- I mean, during her

13  whole time of being involved with us, she was gone

14  probably three or four months in between a

15  year-and-a-half span --

16     Q     Okay.

17     A     -- something like that.

18     Q     Was there any particular incident that related

19  to her departure?

20     A     This time?

21     Q     Yes.

22     A     She had an argument at a staff meeting.

23     Q     Was there any physical confrontation?

24     A     Between her and someone else, yes.

25     Q     And who was that?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 76

1     A     And I'm -- I'm -- I'm not going to divulge that.

2     And you can set there and throw me in jail or wring my

3     neck or do whatever, but I have divulged so much

4     information that your clients are using online at this

5     time that that doesn't even need to be out there.  It has

6     nothing to do with this lawsuit.

7         Q     Well, Miss Corona is listed as a potential --

8         A     But --

9         Q      -- witness.

10        A     Well, what happened between her and a staff

11    member has nothing to do with this lawsuit.

12        Q     I'm going to ask again.  Who was the person with

13    whom she had a physical confrontation?

14        A     And I'm going to tell you again that I'm not

15    going to tell you.

16        MR. JAKES:  Okay.  Certify that question.

17        A     I will tell a Court and I will tell a judge; but

18    between now and the time that your clients are putting my

19    expert witnesses on the Internet and bashing them, I'm

20    not going to give you any more names.

21        MR. JAKES:  Just for clarity, you're not

22    instructing him not to answer.  Correct, Eric?

23        MR. PINKARD:  I am not.

24        MR. JAKES:  Thank you.

25    BY MR. JAKES:

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 77

1    Q    Where is Bobbi Corona now?

2    A    I have no idea.

3    Q    When is the last time you spoke with

4  Bobbi Corona?

5    A    Maybe three weeks ago.

6    Q    And where was she then?

7    A    She didn't tell me where she was.

8    Q    Where was she from?

9    A    Somewhere in the Dallas-Fort Worth area.

10    Q    Have you blocked Ryan Miller on all of your

11  Facebook and -- accounts and all of that like you said

12  you had with Satrina and Ben McAnally?

13    A    I don't think he was ever on my Facebook.

14    Q    Okay.  What about Bobbi Corona?

15    A    Bobbi Corona blocked herself from mine and then

16  just recently she started making comments on one of them

17  again.

18    Q    "Recently" like last couple of nights?

19    A    A couple of weeks ago, maybe.

20    Q    How about last night?

21    A    I don't know if she commented on one last night.

22  I know she commented on one yesterday.

23    Q    Okay.  Why didn't you block her from your

24  Facebook site the way you did Satrina and Ben McAnally?

25    A    Because I'm trying to get my passwords back from

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 78

1    her.  Would that not be the smart idea?

2         Q    Do you have Bobbi Corona's phone number?

3         A    Phone number?

4         Q    Yes.

5         A    I have it programmed, yeah.

6         Q    Okay.  What is it?

7         A    I don't know.  It's not on the phone I have with

8    me.

9         Q    What phone is it on?

10        A    The phone at the office.

11        Q    Is that a landline?

12        A    No.

13        Q    What is the cellphone number of the phone that

14   you have her number on?

15        A    4 -- you know, I have like 12 cellphone

16   accounts.  I think it's the one that ends in 7113.

17        Q    It's a 405 area code?

18        A    Yeah.  All of them are.

19        Q    And what's the exchange?

20        A    What do you mean?  Well, some of them are 207

21   and some of them are 489.  It just depends on what day

22   you go get a new cellphone, because they're never the

23   same, like landlines are, you know, for areas.  So I --

24   on that one I'm not sure, because I never call myself.

25        Q    So what are the two possible exchanges on that

First Choice Reporting & Video Services
www.firstchoicereporting.com            Worldwide Scheduling            800.939.0093

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)            01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 79

1    phone?

2        A    Could be -- let me look and see if I've still

3    got my -- could be 331 or most of them are 207s.

4        Q    Okay.  J. Herzog is a chain of malls.  Correct?

5        A    Correct.

6        Q    Is it your contention that you are no longer

7    able to get contracts with the J. Herzog malls?

8        A    Yes.

9        Q    And did you -- do you contend that you were

10   canceled out of any active jobs with the J. Herzog malls?

11       A    Yes.

12       Q    And which one or ones?

13       A    All of them.

14       Q    Which one -- were you at the mall when you got

15   canceled?

16       A    The Enid, Oklahoma, mall.

17            THE COURT REPORTER:  I'm sorry.  Say that

18       again.

19       A    The Enid, E-n-i-d, Oklahoma, mall was the last

20   one I did for them.

21   BY MR JAKES:

22       Q    Were you asked to leave that mall?

23       A    We finished our -- our show there.

24       Q    Okay.  Did they tell you not to come back?

25       A    Yes.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 80

1      Q    And who told you that?

2      A    **The current mall manager that was there.**

3      Q    Was that verbally or in writing?

4      A    **Verbally.**

5      Q    Did you receive any e-mails from J. Herzog

6   regarding whether or not you could book in the future at

7   any of their malls?

8      A    **We should have, because we tried booking with**

9   **them again just last year.**

10     Q    Have those e-mails been produced?

11     A    **That would be in the same e-mail account that**

12   **Bobbi was using.**

13     Q    Again, Bobbi only left a month ago.  Right?

14     A    **Right.**

15     Q    So --

16     A    **All of those should have been produced --**

17     Q    Okay.

18     A    **-- if they exist --**

19     Q    Okay.

20     A    **-- everything.**

21     Q    Coyote Property, how many malls?

22     A    **I think they only have like six or seven malls.**

23   **They're a small company.**

24     Q    Region of the country?

25     A    **Texas to Indiana --**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 81

1    Q    Okay.

2    A    -- Arkansas, through that.

3    Q    Does G.W. contend that it was canceled out of

4    any of the malls at Coyote Properties?

5    A    Yes.

6    Q    Which one or ones?

7    A    We ended their show contracts at the

8    Alton Square Mall.

9    Q    Well, did you actually get canceled out of any

10   existing --

11   A    We finished that one, and they canceled any

12   others.

13   Q    Which ones did they cancel?

14   A    All of them.  We're not allowed to go back.

15   Q    Okay.  There's a difference between being booked

16   somewhere and being canceled out of someplace you're

17   being booked and not getting booked in the future, and

18   I'm trying to distinguish --

19   A    Oh, I would have --

20   Q    -- between the two of those.

21   A    I would have to have the schedules in front of

22   me to show you which malls were canceled after or which

23   malls were booked in front of or...

24        MR. JAKES:  Oops.  I got the wrong one.

25        Yeah, you're right.  Try that again.  I'll take

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 82

1      this one.

2            MR. PINKARD:  Is this one right?

3            MR. FRANK:  Yeah, you've got the right one.

4            (Exhibit Number 3 marked for identification.)

5    BY MR. JAKES:

6       Q    Mr. Schreibvogel, I've provided you what we

7    marked as Exhibit 3 to today's deposition.  It's a series

8    of calendars.  These are calendars that have been

9    produced by your counsel in this litigation.  There are

10   no document control numbers on it, but it was a

11   supplemental production, meaning it came after the

12   initial production.

13           First of all, do you recognize the documents

14   generally?

15      A    No.

16      Q    Have you ever seen them before?

17      A    No.

18      Q    Do they look like your calendar records from

19   G.W. regarding the road-show schedule?

20      A    No.

21      Q    Okay.  Is it your testimony you're never seen

22   these documents before?

23      A    All of my calendars that I do my bookings

24   through myself -- now, this could have been made by Bobbi

25   when she was gathering the evidence and -- and this is a

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 83

1      computer calendar, but mine are actual calendar books.

2         Q    Is there a reason those haven't been provided in

3      this litigation?

4         A    No.  I mean, if you asked for the calendar

5      books, they should have been; but I don't know how

6      specific your requests have been.

7         Q    Well, do you know whether you --

8         A    I have them.

9         Q    -- provided those?

10             Do you know whether you provided those to be

11     produced in the litigation?

12        A    The actual books?

13        Q    Yes.

14        A    Again, I'm not the one who has been sitting in

15     the office providing her information, so I couldn't

16     answer that.

17        Q    Yeah.  Is it your testimony that your hard-copy

18     calendar books would reflect which malls that you contend

19     G.W. was canceled out of as a result of any of the

20     alleged conduct of my clients?

21        A    They should.

22        Q    Let's go through what I provided you because

23     that's the only thing I've got --

24        A    Okay.

25        Q    -- okay?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 84

1    A    And I'm assuming that she got this information

2    out of my calendar books, but I don't know why she just

3    didn't Xerox my calendar books.

4    Q    Okay.  The first page is an October 2010

5    computer calendar.  There are shaded areas.  Do you

6    recognize those as being, when they're shaded, dates that

7    you were supposedly having a road show at a mall?

8    A    Yes.

9    Q    Okay.  And the first one that appears on the

10   first page seems to show?

11   A    Mall of the Mainland.

12   Q    Mall of the Mainland, I don't know why the 3rd

13   of October is shaded.  Would you have gone to the Mall of

14   the Mainland on Sunday, the 3rd, and then started on

15   Wednesday, the 6th?

16   A    No.

17   Q    Okay.  So the Sunday shading, does that make any

18   sense to you?

19   A    Well, the show always sets up on Tuesday night

20   and opens Wednesday mornings and always runs through the

21   day on Sundays and breaks down on Sunday nights.

22   Q    Okay.  So the October 3rd one doesn't make

23   sense, but the other 10th, 17th, 24th, and 31st make

24   sense to you?

25   A    That should go from the 6th to the 10th.

First Choice Reporting & Video Services
Worldwide Scheduling
www.firstchoicereporting.com                              800.939.0093

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 85

```
 1        Q    Okay.  So the Mall of the Mainland is what
 2   company?
 3        A    It's been bought and sold three times since I've
 4   been going there, so the current owners I'm not aware
 5   of --
 6        Q    Okay.
 7        A    -- but it's the Mall of the Mainland in Texas
 8   City, Texas.
 9        Q    Okay.  And you were not canceled out of that.
10   Correct?
11        A    Not that time.
12        Q    Okay.  And on the 13th your show was in
13   Pasadena, Texas.  Is that correct?
14        A    Yes.
15        Q    What mall?
16        A    Pasadena?  Baytown, Pasadena.  Right off the top
17   of my head, I couldn't tell you the name of the mall.
18        Q    Okay.  You weren't canceled there, though.
19   Correct?
20        A    Not that time.
21        Q    Okay.  The week of the 20th of October, 2010 you
22   had -- this document has "Buffalo Wild Wings canceled for
23   harassment."  Do you see that?
24        A    Right.
25        Q    And do you know what that reference is to?
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 86

1      A      Your client sent out a mass e-mail thing, and

2   they received so many e-mails that they asked us to

3   leave; and because they felt bad because they asked us to

4   leave, they were supposed to make a company donation.

5   But to set here right now and say if we ever received

6   that, I wouldn't know.

7      Q      Where was the Buffalo Wild Wings in question?

8      A      I believe it was Lewisville, Texas.

9      Q      And then the last one on the first page is the

10  Mounds Mall.  Is that correct?

11     A      Yes.

12     Q      And you were not canceled out there that week?

13     A      If that's the Mounds Mall, there's a couple of

14  Mounds Malls.  If that's the Mounds Mall in -- in

15  Indiana, I think -- I think that's the one that's on

16  the -- there's two in Indiana.  I think this is the one

17  that's -- because we did the magic and -- it is.  It's on

18  Halloween.  So Anderson, Indiana, is where this mall

19  should have been.

20            We weren't canceled that one, but we were booked

21  to go back for Halloween of 2011, which they canceled.

22     Q      And what records do you have that reflect the

23  cancellation of the Mounds Mall at -- in Halloween --

24     A      I believe --

25     Q      -- of 2011?

First Choice Reporting & Video Services
www.firstchoicereporting.com                Worldwide Scheduling                 800.939.0093

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 87

1      A     I believe they have an e-mail.

2      Q     Okay.  The next page is a December 2010

3   reference on -- and I just want to focus on the 22nd of

4   December, the Lincoln Mall, and it's typed in "Canceled

5   for harassment, went to Centerpointe."  Do you see that?

6      A     Yes.

7      Q     What does that mean, to your understanding?

8      A     To my understanding, that they canceled the

9   Lincoln Mall and went to the Centerpointe Mall because

10  they got thrown out of the Lincoln Mall.

11     Q     What evidence do the defendants have that the

12  cancellation at the Lincoln Mall was attributable in any

13  fashion to conduct of my clients?

14     A     Should have e-mail -- e-mails.

15     Q     Okay.  And if you had e-mails, they have been

16  produced?

17     A     Should have been, um-hmm.

18     Q     If the show went back to the Centerpointe Mall,

19  you still would have received revenue during that week.

20  Correct?

21     A     Depends on the -- how long it took to break down

22  and how long it took to travel and how long it took to

23  set back up.  I'm sure that they would have lost a couple

24  to three days there.

25     Q     Let me turn you to the next page, July 2011.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                  01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 88

1    There is an event noted for the Eufaula Hog Festival, is

2    that Eufaula, Alabama?

3        **A     Eufaula, Oklahoma.**

4        Q    Go figure.  Okay.  And --

5        **A     In what month are you in?**

6        Q    I'm sorry.  It's the third page, which is

7    July 2011.

8        **A     Okay.**

9        Q    Okay?

10       **A     In the dark one, yeah.**

11       Q    July 27th, somebody's typed in here, "Canceled

12   by BCR harassment."

13           What do you know about that incident?

14       **A     We were booked -- that was the first time we**

15   **were ever booked to go there, and the City actually**

16   **booked us.  And they received so many e-mails from your**

17   **client sending out an action alert that they didn't even**

18   **allow us to go and set up.**

19       Q    Did you do the road show in an alternative

20   location that week?

21       **A     I don't believe so.  I think we just stayed**

22   **home.**

23       Q    August 2011 is the fourth sheet, and there's a

24   notation on the 30th of August, 2011 "Levis Commons."  Do

25   you see that?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 89

1     **A**    Yes.

2     Q    Where is that?

3     **A**    **It's actually Levis Commons, and it's in**

4  **Perrysburg, Ohio.**

5     Q    And somebody's typed in "Canceled for BCR

6  harassment."

7     What do you know about that?

8     **A**    **We were there for every Labor Day prior as long**

9  **as I've been doing shows, and they received so many**

10  **e-mails from your client's action alert in 2010 that**

11  **their corporate canceled us for 2011.**

12     Q    Were you -- okay. I'm sorry. So when were you

13  canceled?

14     **A**    **It was like two weeks prior to the time we were**

15  **supposed to go.**

16     Q    And is that reflected in any written

17  communications?

18     **A**    **It should be in the e-mails.**

19     Q    Okay. So if it exists, it's been provided?

20     **A**    Yes.

21     Q    And then the final page that we've received is a

22  December 2011. And when I say "received," I mean one

23  that indicates a cancellation.

24     December 2011, the 14th of December,

25  Centerpointe. Where is that?

First Choice Reporting & Video Services
Worldwide Scheduling

www.firstchoicereporting.com                 800.939.0093

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)         01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 90

1       A       In Grand Rapids, Michigan.

2       Q       And somebody's typed in "Canceled for BCR

3    harassment"?

4       A       Yeah.

5       Q       What do you mean about that?

6       A       That one was canceled in the middle of the show,

7    so we had nowhere to go to make that up.  And they not

8    only received all of the e-mails from harassment of your

9    clients, but they also have audiotape of your clients or

10   your client's representatives, Sue Bass, on audiotape.

11      Q       Okay.  And how do you know that?

12      A       Because they sent me a copy of it.

13      Q       Okay.  So you have a copy of the audiotape?

14      A       And so should you.

15      Q       Don't think so.

16              THE VIDEOGRAPHER:  Mr. Jakes, we have about

17      five minutes remaining on the disk.

18              MR. JAKES:  Thank you.  We'll do a couple

19      more and wrap it up.

20              THE VIDEOGRAPHER:  Okay.

21   BY MR. JAKES:

22      Q       Apart from the cancellations that are reflected

23   in Exhibit 3, are -- do the defendants contend that any

24   of their other shows were canceled as a result of any of

25   the conduct of my client?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 91

1    A    For the year 2010?

2    Q    Sir, this includes 2010 and '11, and this is the

3  only thing we've received from you-all.

4    A    Okay.  Well, like on page 2, December 2010, the

5  Orchards Mall canceled us for 2011 because of the

6  harassment --

7    Q    Okay.

8    A    -- okay?

9         The Centerpointe Mall is the same

10  Centerpointe Mall.  The Lincoln Mall is the same

11  Lincoln Mall.  The Concord -- Concord Mall, Concord.  I

12  have to look and see where that mall's from.  The

13  Northland Mall will not allow us back anymore.  The

14  Marquette Mall will allow us back.

15         The -- I'm taking it the Central States Fair

16  would be -- the Amarillo Fair will not let us back

17  anymore.  The Jackson County Fair will not allow us back

18  anymore.  Pasadena, Texas, won't allow us.  Mall of the

19  Mainland won't allow us.

20    Q    And my question to you, sir, if you know,

21  because you're testifying on behalf of all of the

22  defendants, is if you've been canceled by any of these

23  other malls, why isn't that reflected on Exhibit 3 the

24  way a few of them are?

25    A    Well, it depends on what you asked for, I guess.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 92

1   If you asked for the ones that were canceled in the year

2   due to harassment -- you've got to keep in mind that this

3   is already the sixth month of 2012, and most of these

4   malls have canceled or told us that 2012 we're not

5   welcome back, so I don't know what you requested and what

6   you didn't request.

7   Q   Okay.  Was this document specifically created

8   for this lawsuit, or did it exist independently in the

9   records of the defendants, Exhibit 3?

10  A   I would have to ask Bobbi Corona that question.

11  Q   And you're not able to do that right now.

12  Correct?

13  A   No.

14      MR. JAKES:  Okay.  We'll go off the record

15  now.

16      THE VIDEOGRAPHER:  Okay.  This

17  concludes disk number 1 in the deposition of

18  Joe Schreibvogel.  The time's approximately

19  11:44 a.m.  We're off the record.

20      (Recess taken from 11:44 a.m. to 12:38 p.m.)

21      THE VIDEOGRAPHER:  This is the beginning of

22  disk number 2 in the deposition of Joe --

23  sorry -- Schreibvogel.

24      MR. JAKES:  Schreibvogel.

25      THE VIDEOGRAPHER:  -- Schreibvogel, pardon

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 97

1      A      No.

2      Q      Do you know whether you were canceled out of the

3  Heartland Mall that's referenced here?

4      **A      I know we're not allowed to go back.  Whether or**

5  **not they were canceled in mid -- mid-show, I'm not sure**

6  **of.**

7      Q      Okay.  Apart from this e-mail, assuming it to be

8  an accurate recounting of an e-mail from Mr. or

9  Ms. Parrack -- I guess it's Charlotte Parrack; it's

10  Ms. Parrack -- there's nothing in this e-mail that

11  indicates that you are not allowed to go back to

12  Heartland Mall.  Correct?

13      **A      I haven't read this whole e-mail.**

14      Q      I believe --

15      **A      I'm taking it the top part is the part from the**

16  **mall.  The rest is from Sue Bass.**

17      Q      I think -- well, I think it's from other people;

18  perhaps Sue Bass, perhaps others.

19              So my question is again, there's nothing in this

20  e-mail, Exhibit 5, which indicates that Heartland Mall is

21  refusing to book Big Cat Entertainment or G.W. in the

22  future.  Correct?

23      **A      Apparently not in this e-mail, no.**

24      Q      Okay.

25              (Exhibit Number 6 marked for identification.)

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 101

1      Q    Look --

2      A    The top one isn't.  Now, the second one says

3  from Big Cat -- Big Cat Entertainment.

4      Q    @ymail.com.  Correct?

5      A    Right.

6      Q    Which would be Bobbi Corona's?

7      A    Should be, yeah.

8      Q    Yeah.  Okay.  Do you recall whether or not

9  Big Cat Rescue Entertainment received the e-mail at the

10  top of the page?

11     A    I don't know.

12     Q    Okay.  You'd agree with me that there is no

13  reference to Big Cat Rescue, my client, in

14  Miss Eickhoff's e-mail at the top of the page.  Correct?

15     A    Repeat that.  I was reading it.  I'm sorry.

16     Q    That's okay.  Are you done reading?

17     A    Well, I'm --

18     Q    Take a moment and read and tell me when you're

19  ready.

20     A    Okay.

21     Q    Okay.  You would agree with me that Big Cat

22  Rescue Corp., my client, is not referenced in

23  Ms. Eickhoff's e-mail at the top of the page.  Correct?

24     A    Not in this particular e-mail, no.

25     Q    Okay.  And she writes, "Hmmm, Beth must of

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 102

1   assumed that based on our conversation with her. But I

2   have at no point said that you are not welcome back. I

3   was on the news saying that you are not scheduled to

4   return at this time."

5          Would you agree that this e-mail does not in any

6   way suggest that you have been banned from this mall?

7      A   This particular e-mail does not, no.

8      Q   Okay.

9      A   You are -- well, I can't ask you a question --

10     Q   You can't.

11     A   -- but this is the particular mall where your

12   clients got people, including Sue Bass, I believe, to

13   protest outside the mall.

14     Q   In Bobbi Corona's e-mail, at the bottom she

15   apparently requests of Ms. Eickhoff and the Platt River

16   Mall in Nebraska copies of any e-mails or anything in

17   writing that she received for, quote, "our attorney as we

18   are pursuing legal action against them for violating the

19   Animal Terrorism Act."

20          Do you see that?

21     A   Yes.

22     Q   Are you pursuing legal action against my client

23   for violating the Animal Terrorism Act?

24     A   I don't think that "legal action" would have

25   been the term she used as criminal action is in play,

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 110

1    that it has been damaged for -- by the actions of my

2    clients related to the road show.  Right?

3        **A**    **Correct.**

4        Q    Okay.  What is the amount of the damage that

5    G.W. is claiming?

6        **A**    **I believe in the last trial we claimed**

7    **$9.3 million, did we not?**

8        Q    Okay.  Is that the claim in this litigation as

9    we're sitting here?

10       **A**    **As we keep digging and as we get in front of a**

11   **jury trial, I'm hoping that they will award more.**

12       Q    And what is your basis for claiming that G.W.

13   has suffered loss of revenues from the -- related to the

14   road show as a result of the actions of my clients in the

15   amount of $9.3 million or more?

16       **A**    **Because your clients have ruined my name, my**

17   **reputation, and my business for the next 20 to 30 years,**

18   **as long as I'm in this business.**

19       Q    Okay.  Let me follow up, because I'm not trying

20   to be confusing.

21           You testified a few moments ago that your

22   accountant, Katie Johnson, believes that the actual

23   revenues for 2011 for the road show were between 350- and

24   $400,000.  Right?

25       **A**    **For just the road-show income.**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

```
                                                    Page 111
    1        Q     Right.  The road show's still going on.  Right?
    2        A     No.
    3        Q     Did you stop it?
    4        A     We only have two contracts this year.
    5        Q     Okay.  And where are those contracts?
    6        A     And if I tell you, are your clients going to
    7   exploit those?
    8        Q     Where are the two contracts?
    9        A     Wisconsin and Iowa.
   10        Q     Okay.  When are they scheduled?
   11        A     He's getting notes of that.  July.
   12        Q     Both in July?
   13        A     Yes.
   14        Q     G.W.'s claiming, based on what you just said,
   15   damages of $9.3 million, and I'm trying to understand how
   16   you calculate $9.3 million.
   17        A     Because you take what I have been making
   18   according to what's been canceled, according to as you
   19   grow in business, your name gets better instead of worse
   20   and you grow in clients.
   21              Right now I cannot have a client without your
   22   clients harassing them.
   23        Q     Okay.  I'm still trying to understand how you
   24   calculate the 9.3 million.
   25        A     Take $400,000 times the next 20 years.
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                  01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 112

```
 1      Q    Okay.  I can tell you that doesn't equal
 2  $9.3 million.
 3      A    I don't have a calculator.  I couldn't tell you
 4  what that come up with.  But I can tell you and if -- I
 5  don't even know why you're asking me this, because the
 6  judge sat there and made me tell you in court how many
 7  malls were canceled off the top of my head; and we
 8  averaged 12,000 at a low number and 22,000 per show at a
 9  high number, and we arrived at a middle number, if I'm
10  not mistaken, right, and you-all sat there with a
11  calculator and figured up $9.3 million.  Do you not
12  remember?
13      Q    The --
14      A    You and the judge even -- are the ones that come
15  up with $9.3 million, not me.  So ask the judge.
16      Q    Let me assure you that the judge is not going to
17  make your arguments for what your damages are, and let me
18  assure you that I won't make arguments that you've been
19  damaged.  So I'm trying to understand what your arguments
20  are -- you, the defendants in this case, G.W. -- how you
21  calculate the 9.3 number or whatever number it is.
22      A    Again, I didn't calculate that.
23      Q    Well, what number is it that you claim is your
24  damages?
25      A    I want -- I want $15 million out of you.
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)        01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 113

1    Q    Okay.  You want, and how do you get to 15-?

2    A    Because I intend on living until I'm 80 years

3    old in this business, and your clients have cost me 400,

4    roughly, thousand dollars per year.

5    Q    Okay.

6    A    And they have ruined my name.  I don't think

7    that's too hard to figure out.

8    Q    Apart from the fact that G.W. claims it has lost

9    approximately $400,000, I guess, beginning in 2012,

10   because you did go to a lot of shows last year.  Right?

11   That's how you made the 350- to 400,000 last year.

12   Right?

13   A    That's how we proved how much the shows were

14   worth.

15   Q    Okay.  So apart from the $400,000 in alleged

16   lost revenue from the road show, is there any other

17   damage that G.W. is seeking from my clients under the

18   counterclaims?

19   A    I'm -- I would hope so.

20   Q    What is it?

21   A    It's going to be I can't even put a sponsor's

22   name on my website without your clients harassing them.

23   I can't get sponsors for my park because your client's of

24   harassment.  They have Google alerts on every name and

25   address and affiliation I have, and now no one in the

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 114

1    animal industry hardly even wants anything to do with me

2    because the minute they do, your clients start harassing

3    them on the Internet, including my expert witnesses.

4        Q    So the sponsors are a separate damage that

5    you're claiming apart from the $400,000 per year from the

6    road show.  Is that your testimony?

7        A    They will be.

8        Q    Well, we're here and now and I've got to ask the

9    question:  What is the amount?

10       A    I just threw out there $15 million.

11       Q    Another $15 million?

12            And how did you lose $15 million from sponsors?

13       A    From harassment from your clients.

14       Q    Well, how much have you received from sponsors

15   prior to 2009?

16       A    Just my fencing on my park is probably 2 million

17   that's been sponsored.

18       Q    Who gave you 2 million for the fence in your

19   park?

20       A    All of my sponsors between the time that I

21   started building my park.

22       Q    What documentation do you have to reflect the

23   revenues that G.W. has received from sponsors up till

24   now?

25       A    Should be all based on spreadsheets that the

First Choice Reporting & Video Services
Worldwide Scheduling

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 115

1    accountants have, tax returns.

2        Q    Is it your contention that you had $15 million

3    in revenues from sponsors in the past?

4        A    Since we've been open, yeah.

5        Q    Any time.  You believe you have records that

6    reflect $15 million in revenue from sponsors?

7        A    Sponsors and donations.

8        Q    Well, I'm just talking about sponsors.

9        A    I'm talking -- okay.  Let's just break this down

10   real quick.  Okay?  No one asked me I had to prepare

11   numbers of sponsors versus donations versus checks versus

12   credit cards today, so I do not have those numbers in

13   front of me.

14            Your client could not even testify yesterday how

15   much she pays her husband, so let's move on.

16       Q    Mr. Schreibvogel, we're going to go through

17   these questions.

18       A    And I'm going to keep saying "I don't know" --

19       Q    Okay.

20       A    -- so have a great day.

21       Q    So sitting here today, you cannot explain for

22   the record how much the defendants -- G.W., in this

23   case -- contends that it lost as damages from lost

24   sponsors related to the alleged conduct of my client,

25   BC -- Big Cat Rescue?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 116

1       **A      I'm going to say today, I don't know.**

2       Q      All right.  But for clarity, your contention is

3   that you have records at G.W. that show that previously

4   you have received at least $15 million from sponsors?

5       **A      I just threw that number out there for you,**

6   **because you insisted on having a number.  My accountants**

7   **can get you hard facts; but today, I don't know.**

8       Q      So you don't know how much G.W. has received

9   from sponsors in the past?

10      **A      No.**

11      Q      We've talked about the donation income of the

12  repeat credit-card donations.  We've talked about the

13  road show.  We've talked about sponsors.

14          Are there any other damages that the defendants

15  contend they have suffered as a consequence of any direct

16  action by my clients?

17      **A      Defamatory statements, defamation of character,**

18  **slander, stalking.**

19      Q      Okay.

20      **A      That ought to cover most of it.**

21      Q      Actually it doesn't, because my question was

22  damages.  What damages, not conduct -- what damages do

23  the defendants -- other than the three categories we've

24  talked about, what do they contend they have suffered as

25  a result of the conduct alleged in the counterclaims of

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 117

1    this action?

2         A    I don't have a dollar figure for you today.

3         Q    I'm just talking about categories.  Is there any

4    other category?

5         A    No, I don't believe so.

6         Q    Okay.  So donation losses from the repeat

7    credit-card donations.  Correct?

8         A    Right.

9         Q    The road-show revenues --

10        A    Right.

11        Q    -- correct?  And sponsorship revenues.  Correct?

12        A    Correct.

13        Q    That's it?

14        A    And just regular donations.  Not just repeat

15   credit-card donations but people who would normally send

16   in a donation and now will not because all they see is

17   the crap your client puts on the Internet.

18        Q    Okay.  Let's talk -- let's call those one-time

19   donations --

20        A    Okay.

21        Q    -- if we can.  Okay.  What evidence do -- do the

22   defendants have that they have lost any one-time

23   donations as a result of the conduct of my clients as

24   alleged in the counterclaims?

25        A    I can provide you with letters of hate mail from

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 118

1    people who won't because of your clients.

2        Q    Apart from that, do you have any other evidence?

3        A    Not that I can recall today.

4        Q    Okay.  And where are those letters that you

5    contend support this position?

6        A    They're at the office and in the e-mails.

7        Q    When you say "and in the e-mails," let me be

8    clear.  I've not seen any of these letters.

9        A    That you should have been provided that I'm

10   locked out of currently.

11       Q    Okay.  So these are, again, e-mails that are in

12   these e-mail accounts that you no longer have the

13   password access to?

14       A    Right.

15       Q    Okay.

16       A    Do you get these back?  Just lay them up here?

17            (Exhibit Number 10 marked for identification.)

18   BY MR. JAKES:

19       Q    Mr. Schreibvogel, I'm providing you a Composite

20   Exhibit Number 10, which are a series of communications

21   that were provided to my client, Big Cat Rescue, through

22   third-party subpoenas in this action, and they are

23   numbered third party -- BCR Third Party 364 through --

24   well, they're not -- they're not going to be consecutive,

25   so they'll speak to themselves in the record.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 119

1        I will represent to you that we culled through

2    these, and these are apparently from something called

3    advocate@animalactivist.com.  Do you see that?

4        A    Yes.

5        Q    Do you know what that is?

6        A    I don't -- no.

7        Q    Okay.  Do you know who Troy Hannon is?

8        A    No.

9        Q    Do you recognize that if you look at the body of

10   these e-mails, they reflect -- they relate to the

11   Courtland Center?

12       A    Yes.

13       Q    Okay.  What's the Courtland Center?

14       A    A mall in Grand Rapids, Michigan --

15       Q    Okay.

16       A    -- I think.

17       Q    Is this one of the malls that G.W. contends it

18   can no longer send its road show to?

19       A    Courtland Center?  Apparently.

20       Q    Well, is it one that you contend you can no

21   longer go to?

22       A    I'd have to Google which one Courtland Mall is.

23       Q    So you don't know?

24       A    I don't know which state this one's in, no.

25       Q    Do you contend that my client somehow caused

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 120

1    these e-mails to be sent to Mr. Hannon at the

2    Courtland Center Mall?

3         **A    Yes.**

4         Q    Why do you believe that?

5         **A    Because it's in a Capwiz alert style e-mail**

6    **where all the people have to do is fill in their name and**

7    **hit the send button.**

8         Q    Are there any other animal-welfare advocates

9    that have complained about G.W.'s road show going to

10   malls other than Big Cat Rescue, my client?

11        **A    Let's see.   The Global Federation of Animal**

12   **Sanctuaries, which is affiliated with your clients.**

13   **There's one in California that is affiliated with your**

14   **clients.   And I'm sure that the Humane Society of the**

15   **United States for the $100,000 a year that your clients**

16   **give them probably does their share too.**

17        Q    So it is -- why do you believe

18   advocate@animalactivist.com is affiliated with my client?

19        **A    Because your clients and Carole Baskin have so**

20   **many satellite websites out there.   You heard her testify**

21   **yesterday to that fact.   She couldn't even name them all.**

22        Q    Well, I'm coming back to why you believe that.

23        **A    Why I believe that?**

24        Q    Yeah.

25        **A    Because she's that vindictive.**

First Choice Reporting & Video Services

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 121

1      Q     Apart from your general belief, do you have any

2    evidence to support your belief that

3    advocate@animalactivist.com is related in any fashion to

4    Big Cat Rescue?

5      A     Today, no; but you can bet the next time I'm

6    under oath I'll find out.

7            (Exhibit Number 11 marked for identification.)

8      A     I'm in a hurry to see what the next surprise you

9    have there.  Oh, it looks like the same ones.  It is.

10   BY MR. JAKES:

11     Q     I'm providing you what we've marked as

12   Exhibit 11 to this deposition today of the defendants.

13           Mr. Schreibvogel, again, these are documents

14   that were provided in response to third-party subpoenas

15   that my client sent out.  You'll notice that they all

16   relate again to the Courtland Center Mall.  Correct?

17     A     Correct.

18     Q     And they're all directed to a Mr. Troy Hannon.

19   Correct?

20     A     Correct.

21     Q     And they all come from where?

22     A     This one says "PETA."

23     Q     Well, in fact they all say "PETA," don't they?

24     A     This set of exhibits do.

25     Q     Okay.  That's what we talked about.  I

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 122

1    apologize.  I found one that says "Animal Advocate" in

2    there, so we'll exclude that one.

3         A    Surprise.

4         Q    So is it your contention that these

5    communications to Mr. Hannon at the Courtland Center Mall

6    are controlled by my client, Big Cat Rescue?

7         A    These ones come from newsmanager@peta.org, but I

8    guess we got to find out who news manager is, don't we?

9         Q    So let me ask the question again.  Do you -- do

10   the defendants contend that these e-mails came from or

11   were controlled by my client, Big Cat Rescue?

12        A    I'm claiming that she probably had something to

13   do with it.

14        Q    What is your factual -- or evidence in support

15   of that claim?

16        A    Because in the past she's had no bones about

17   putting on her website that she supports PETA.

18        Q    Well, do you understand PETA to be a

19   stand-alone, distinct organization separate from Big Cat

20   Rescue?

21        A    Animal-rights people in this industry don't

22   never stand alone.

23        Q    Do you contend that my client, Big Cat Rescue,

24   controls PETA?

25        A    Oh, she -- they don't control Ingrid Newkirk.  I

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 123

1    can promise you that.

2        Q    Okay.  So you would agree that PETA is a

3    separate organization?

4        A    It is a separate organization --

5        Q    Okay.

6        A    -- but it can still be affiliated with.

7        Q    Well, people can have similar views.  I'm simply

8    trying to understand regarding the Courtland Center Mall,

9    that these e-mails to the Courtland Center Mall came from

10   or were directed through PETA.  Correct?

11       A    Apparently.

12       Q    Okay.  Just as Exhibit 10 apparently came

13   through animalactivists.com.  Correct?

14       A    Well, the only difference is Carole Baskin loves

15   to use the word "AdvoCat."  And in this set of exhibits

16   "AdvoCat" is the first thing in the e-mail.  And if you

17   Google Big Cat Rescue and AdvoCat, they both come up to

18   the same e-mail.

19       Q    There's a difference between the word "AdvoCat"

20   and "advocate," isn't there?

21       A    It depends on how you spell it and how you say

22   it, because she uses "AdvoCat" in her newsletter and she

23   uses "advocates" on Big Cat Rescue.org.

24       Q    Apart from the similar word -- letters of

25   "AdvoCat" and "advocate," is there any other basis for

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 124

1     your belief that Exhibit 10 emanated from my clients?

2                I'm going to have to ask you not to go on the

3     Web while we're taking your deposition, sir.

4          **A    Oh.  Well, you're asking me to answer your**

5     **questions.  I'm just giving you firm answers.  As of this**

6     **right moment, no, there's not, but there will be.**

7          Q    Do persons other than Big Cat Rescue communicate

8     to the malls where the road show exhibits to the effect

9     that they don't like what the road show is doing?

10         **A    Not since about 2006 --**

11         Q    What happened?

12         **A    -- that I'm aware of.**

13         Q    What happened in 2006?

14         **A    Well, it went from PETA to Carole Baskin.  Now,**

15    **it's moving to the Humane Society of the United States**

16    **because PETA didn't get anywhere, so Carole stepped up to**

17    **the plate.  Carole's not getting anywhere, so now**

18    **Wayne Pacelle is stepping up to the plate because they're**

19    **all intertwined in money donations and board of officers**

20    **in each other's business, and that doesn't take a rocket**

21    **scientist to find out.**

22         Q    Do the defendants believe that people have a

23    right to express their opinions as to animal welfare?

24         **A    If they're honest about it.**

25         Q    Does "honest" mean agree with your position?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 150

1    use the Big Cat Rescue Entertainment name?

2        A    Well, whenever we were first using it, we only

3    used it.  They were not supposed to ever use it when it

4    was just the animals before by themselves.  They was only

5    supposed to use when we had the magic show and animals

6    together, because that's what it was designed for.  And

7    they were supposed to go out as the animal show with the

8    animal show, because there was no entertainment.

9        Q    My question is a little bit more refined.

10            Did you ever instruct the road show not to use

11   the Big Cat Rescue Entertainment name?

12       A    I don't remember.

13       Q    That's something you'd remember, wouldn't you?

14       A    I don't know why I would do that or when I would

15   do that; but I know after the suit was filed by your

16   clients and it became an issue, I don't think I even

17   cared, really.

18       Q    So after the suit was filed, you didn't make a

19   decision, "Hey, we'd better stop using the Big Cat Rescue

20   Entertainment name," did you?

21       A    No.

22       Q    How many people at the park have USDA licenses?

23   You've identified yourself.  Correct?

24       A    There's me.

25       Q    Yeah.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 170

1     Q    And in 2011 how many cubs did you borrow from
2     Mr. Woody for use on -- let me finish --
3     A    Okay.
4     Q    -- on the road show?
5     A    I don't recall.
6     Q    Was it more than ten?
7     A    No.
8          THE VIDEOGRAPHER:  Mr. Jakes, we have
9     around three minutes remaining on this disk.
10         MR. JAKES:  We'll go off the record.
11         THE VIDEOGRAPHER:  This concludes disk
12    number 2 in the deposition of Joe Schreibvogel.
13    The time is approximately 2:42 p.m.  We are off
14    the record.
15         (Recess taken from 2:42 p.m. to 2:52 p.m.)
16         THE VIDEOGRAPHER:  This is the beginning of
17    disk number 3 in the deposition of
18    Joe Schreibvogel.  The time is approximately
19    2:51 p.m.  we are on the record.
20    BY MR. JAKES:
21    Q    Thank you.
22         At your deposition in April I asked you a
23    question regarding, I think, the number of cubs, tiger
24    cubs, that were born at G.W. in 2011.  And I believe you
25    testified that there were 26 born, and you placed 17 of

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 171

1    them at a variety of places.  I think you said 11

2    different places?

3        A    I think so.

4        Q    Okay.  In going through the census, which is

5    Exhibit 13, I could only find 14 tigers being born in

6    2011.  Is there a reason for the discrepancy?

7        A    If they're shipped out, like right now I have so

8    much going on trying to keep up with you-all and the park

9    and the staff and everything else, you get a little bit

10   behind of entering all of this.  So if they have been

11   born and been shipped out, like I need to update this for

12   probably two months now.  If they have been and they're

13   already gone, we don't even put them on the database,

14   because we have the transfer forms to show that.

15       Q    Okay.

16       A    And when you asked me that, I believe my

17   manager, John Reinke, researched everywhere they went and

18   provided you all of that.  I'm not sure.

19       Q    Okay.  I just -- I want to follow through just

20   to make sure I understand your testimony.

21           So you're saying that because many things are

22   going and you're busy sometimes a new cub who's born at

23   G.W. doesn't get recorded on your inventory.  Correct?

24       A    On this one, because this is not our USDA

25   required inventory.  Our deposition forms are the thing

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)        01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 174

1   said of these 26 that were born, you placed 17 of them.

2   Is there a reason -- you're saying that this disposition

3   list is not comprehensive either?

4        **A    You just asked the same question --**

5        Q    Right.

6        **A    -- you just asked a second ago --**

7        Q    Yeah.

8        **A    -- so it's going to be the same answer.   If**

9   **they're born and I don't get around to putting them on**

10  **this within the time they get shipped out to another zoo,**

11  **all there is is a disposition form.  And we take this and**

12  **the disposition form and put it in our inspector's book.**

13  **And once she takes that disposition form, it's up to her**

14  **to keep up where they go, because --**

15       Q    I think it was in -- yeah, it was in your June

16  deposition last year I asked you about a tiger that had

17  been transferred from G.W. to Kathy Stearns in Dade City.

18       **A    A white tiger.**

19       Q    Right.

20            And I think she paid 5,000 for it, if I recall

21  right?

22       **A    She did.**

23       Q    Okay.  Why isn't that reflected on the

24  inventory, Exhibit 13?

25       **A    It was a cub, that we would have a disposition**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 181

1       **A**      **Do you have an address?**

2       Q      No, I don't.

3       **A**      **It doesn't ring a bell.**

4       Q      Okay.  Does G.W. have a breeding program for

5   tigers?

6       **A**      **Yes.**

7       Q      What is that breeding program?

8       **A**      **We work with the Rare Species Fund --**

9              THE VIDEOGRAPHER:   The --

10      **A**      **The Rare Species Fund and several other very**

11  **close, tight-knit facilities, I guess you'd call them.**

12  **And then we work with Texas A & M with their genome and**

13  **DNA program.**

14  BY MR. JAKES:

15      Q      Anything else?

16      **A**      **That's about it trying to track our bloodline**

17  **and keep our -- keep our pure bloodline pure, and**

18  **Texas A & M is very interested in hybrids.**

19      Q      On your website do you state, "We do breed a

20  select few but we do not sell"?

21      **A**      **That -- again, if I could change that, I would;**

22  **but that was our very early-day statement.  We did not**

23  **sell.**

24      Q      Okay.

25      **A**      **I'll sell anything now.**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 182

1     Q    I'm sorry?

2     A    I will sell anything now.

3     Q    You will sell anything?

4     A    I damn sure will.

5     Q    Okay.

6     A    They don't want me doing shows, so I got to pay

7  my bills somehow.  So now I'm going to start supplying

8  tigers to the pet trade if I have to.  So all they did

9  was make the problem worse.

10    Q    Have you sold tigers recently?

11    A    Not recently.  Last year I did.

12    Q    Okay.  What -- what tigers did you sell last

13 year?

14    A    I'd have to pull the disposition forms.

15    Q    Do you know approximately how many?

16    A    Maybe four or five.

17    Q    Was Kathy Stearns one of those?

18    A    I think she got hers in 2010.

19    Q    Okay.  Can you recall -- who can you recall that

20 you sold tigers to in 2011?

21    A    Off the top of my head, I'm not going to name

22 any names that I'm going to be wrong about.

23    Q    Okay.  And each of the tigers that you sold is

24 reflected by a disposition form?

25    A    Yes.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 183

1      Q    Does the disposition form reflect how much

2    you -- G.W. was paid for the tiger?

3      A    No.

4      Q    So how do we know which ones were sold?

5      **A    Because it will say "sell" at the top.  A USDA**

6    **disposition form says "sell," "exchange," I think, or**

7    **"donation," and you mark one of the boxes, and it doesn't**

8    **have a place for a price.**

9      Q    Okay.  So your testimony is that on each of your

10   disposition forms for 2011 in which you sold a tiger, you

11   checked the sell box?

12     **A    It should say, yes.**

13     Q    And what records would reflect how much G.W.

14   received for the sale?

15     **A    It would depend on how they paid, with a credit**

16   **card or cash or a check, just a deposit slip.**

17     Q    Where in the financial records of G.W. would

18   revenue from the sale of tigers be reflected?

19     **A    I'm not sure how the accountant breaks that**

20   **down.**

21     Q    We talked a bit about the website language, "We

22   do breed a select few."  Do you remember that?

23     **A    Yes.**

24     Q    And that's still currently your website

25   language?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 184

1      A      Yeah, I believe so.

2      Q      Is that a correct statement of what G.W. does?

3      A      We don't breed just every pair of tigers, no.

4  We breed a select few.

5      Q      And how do you define a "select few"?

6      A      Depends on their genetics and where they come

7  from and their bloodline.

8      Q      Okay.  Well, I think you confirmed what you

9  testified to in April that you had 26 that were born last

10  year.  Is that a "select few" in your opinion?

11      A      Oh, yeah, considering most moms will have four.

12      Q      You also had language on your website that says,

13  "Since the start of our breeding program we have not sold

14  a tiger, period.  We donate baby tigers to reputable zoos

15  around the world."

16            That's no longer true, is it?

17      A      Since then we've started selling, yes.

18      Q      Why in 2011 did you not change the language on

19  your website?

20      A      Because I wasn't the one that was controlling

21  our website.  Not to mention that what it says on my

22  website is not even a concern.  I mean, we tell people we

23  breed, so what do you want me to change it to?

24      Q      How about the truth?

25      A      Well, why don't they change theirs to the truth?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)
01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 195

1      Q    Okay.

2      A    **Are you sure it's --**

3      Q    I think your census shows that two of your

4    tigers went to them in 2010.

5      A    **Okay.  Pam Paige.  Okay.  Could be a typo --**

6      Q    Could be, yeah.

7      A    **-- because Pam Paige -- Paige, I don't know,**

8    **but -- or Pan -- now, you've got me confused.  You said**

9    **"Pape."  Right?**

10     Q    Yes, I did.

11     A    **Her last name is Paige, Pam Paige.**

12     Q    Okay.  And did they ever donate to G.W.?

13     A    **I think they paid fuel expenses.**

14     Q    Okay.  Would $5,300 be fuel expenses?

15     A    **Well, I think we sold her a white cub.**

16     Q    Aah, okay.  So if there was a sale, it might be

17   listed as a donation?

18     A    **Well, again, I don't know how the bookkeeper**

19   **records it in the bank, because our deposit slips don't**

20   **break it down.  So how it goes on the computer program, I**

21   **have no idea, because they use Peachtree Accounting, and**

22   **I have no clue.**

23     Q    Are cub -- tiger cubs sold over the Internet?

24     A    **No.**

25     Q    You've never seen that happen?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 198

1    Q    Does the USZA approve of selling tigers over the
2    Internet?
3    A    No.  Our -- if you're referring to the animal
4    page there, it's just for zoos to do swaps or show
5    surplus animals.
6    Q    Okay.  So while there is on the website --
7    A    He can't --
8    Q    -- a page --
9    A    Okay.
10   Q    -- a page in which animals are offered, you're
11   saying that it's only for other members?
12   A    Only other members that are USDA licensed.
13   Q    And there are ads on that page.  Right?
14   A    There used to be.
15   Q    Are there also codes as to who's advertising?
16   A    What states they're located in.
17   Q    Aah.  So if it says "OK 600," who's that?
18   A    Somewhere in the 600, and I'd have to get to the
19   database to see who is registered as that.
20   Q    The 600 means what?  I'm sorry?
21   A    It -- that like 400 could be Arkansas, and then
22   401 is a certain facility.  409 is a certain facility.
23   And that's to protect their -- from being harassed by
24   animal-rights people.
25   Q    So your facility would be listed or on the

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 199

1    codes.  Right?

2         A      Could be, yes.

3         Q      And you were the founder of USZA.  Right?

4         A      Correct.

5         Q      So if Oklahoma is 600 and Oklahoma 600 is a

6    code, wouldn't it be your code?

7         A      It probably is.

8         Q      Okay.  Is the Lowry Park Zoo here in Tampa a

9    member of the USZA?

10        A      No, and it doesn't say that on the website

11   either.  It's a recommended place to go.

12        Q      Okay.  Has the Lowry Park Zoo ever sought

13   accreditation by the USZA?

14        A      No, because they accredit them -- they're --

15   they have an accreditation service of their own.

16        Q      Did you ever receive -- excuse me.

17               Did the USZA ever receive permission from the

18   Lowry Park Zoo to use its logo?

19        A      No.  And in fact after Carole filed a complaint

20   with the Lowry Park Zoo, they asked us to take them off

21   of our recommendation list.

22        Q      And have you?

23        A      Yes, I thought.  I mean, Ryan got the -- Ryan

24   conversed that with me.

25        Q      Has your facility ever advertised in that USZA

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 202

1    A    It seems like a couple of years ago.

2    Q    How many Barbary lions do you have?

3    A    Maybe four true Barbaries, that we believe is

4    true Barbaries.

5    Q    And so you did the DNA testing, but --

6    A    We drew the blood.

7    Q    You drew -- I'm sorry.  You're right.

8         You drew the blood.  You sent it to Africa for

9    the DNA testing?

10   A    Correct.

11   Q    And you haven't heard the results yet?

12   A    No.  Don't even know right now really if that

13   program's still active.

14   Q    Okay.  And you don't know whether the animals

15   you have are --

16   A    True.

17   Q    -- Barbary lions with the right markers.

18   Correct?

19   A    Correct.

20   Q    Has G.W. ever sent tigers to foreign zoos?

21   A    Not tigers, mountain lions.

22   Q    But never tigers?

23   A    Never a tiger.

24   Q    I'm going to show my ignorance, and it may not

25   be the first time.  Is a mountain lion a cougar?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 203

1       A       Yes.

2       Q       Okay.  And what zoo did you send the mountain

3    lions to --

4       A       Don't --

5       Q       -- foreign zoo?

6       A       -- remember the name of the zoo, but we've sent

7    mountain lions to Bulgaria, Thailand and Korea.

8       Q       And how did you determine that these zoos were

9    good facilities to receive the animals?

10      A       We worked through Texas -- Texas --

11   Animal Source Texas --

12      Q       What's that?

13      A       -- was the shipper's --

14      Q       Yeah.

15      A       -- name.  They're importers/exporters.

16              I have a federal import/export license by the

17   Fish & Game myself; and Martin, who at that time was on

18   our board of directors -- and God, he's got offices all

19   over the world -- and he would fly to the zoos.  And

20   that's where his business was was importing/exporting

21   animals.  Okay?  And he would fly to the zoos and check

22   the zoos out, do the paperwork, and transfer them.  But

23   we never sold one.  We donated to Thailand, Korea, and

24   Bulgaria, because back in those days, and I think --

25   hell, that was back in 2004, maybe, 2005 -- it's been a

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 207

1          A    Yes.  I've learned in my day if I can give you

2      references, I'm only going to give you the good ones.

3      I'm not going to give Howard as a reference for me

4      because I know what he's going to say, so I'm going to

5      give Eric a reference for me.

6          Q    Did you send a leopard and a liger to

7      Spring Hill Wildlife Center in Texas?

8          A    We got them from Spring Hill Wildlife Center.  A

9      liger -- Spring Hill?  Spring Hill, is that -- I mean,

10     are you looking at my inventory?

11         Q    It was from your inventory, yeah.

12         A    Does it say "Texas"?

13         Q    I believe it does.

14         A    I don't think we've ever sent animals to there.

15     We've got them from there --

16         Q    Okay.

17         A    -- especially a liger.

18         Q    Were you ever aware that there were accusations

19     that Spring Hill was selling tigers --

20         A    Yeah.

21         Q    -- improperly?

22         A    And I was involved in that.  I was involved in

23     her case.  She was accused of selling tigers in a Walmart

24     parking lot when she was not.  She was just meeting

25     someone halfway and got ahold of a rookie cop that saw

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 208

```
1      tigers in her truck and arrested her without finding out

2      the facts.

3          Q    And how were you involved in the case?

4          A    By giving references to the federal

5      investigators that were investigating them.

6          Q    Okay.  Tammy Thompson in Texas, who is she?

7          A    Tammy Thompson?  Tammy Thompson?  God, that

8      rings a bell.

9          Q    Well, it's on your inventory.  That's why.

10         A    It is?

11         Q    Yeah, I think so.

12         A    Tammy Thompson.  In Texas?

13         Q    Yes.  Page 3, bottom entry.

14              MR. PINKARD:  Of the disposition one or

15         the --

16              MR. JAKES:  Yeah, I'm sorry.  Disposition

17         one.  Yeah.

18         A    I'm on page 2.  Which one are you looking at?

19     BY MR. JAKES:

20         Q    The last entry on page 3 of the disposition form

21     of Exhibit 13.

22         A    Tammy Thompson.  I'd have to look at the

23     disposition form to see what zoo she has.

24         Q    So sitting here today, you don't know who she

25     is?
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 209

1       A       No.

2       Q       Do you know if she has a USDA license?

3       A       Oh, yeah, especially if we sold a tiger --

4       Q       Why do you say that?

5       A       -- you bet your butt.  Huh?

6       Q       Why do you say that?

7       A       Because I don't sell to people without USDA

8   licenses, so every disposition form has their USDA

9   license form on it --

10      Q       Okay.

11      A       -- and it would have her name instead of a

12  facility name, because my license is under my name; so if

13  you're going to do anything with me, it's going to be

14  Joe Schreibvogel, because that's what my license is at,

15  doing business as --

16      Q       Um-hmm.

17      A       -- where I think Big Cat Rescue's is actually

18  under Big Cat Rescue.

19      Q       Do you know Jeremy Hinkle?

20      A       Jeremy Hinkle?  You want to show me what page

21  that's on?

22      Q       Well, I'm just asking, do you know -- do you

23  know Jeremy Hinkle?

24      A       No, not right off the top of my head.

25  Jeremy Hinkle doesn't ring a bell.  I should have --

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 210

1      Q      Page 5, third from the bottom.

2      A      **Maryland.**

3      Q      A spotted leopard was transferred --

4      A      **Oh.**

5      Q      -- to him in Stratford, Missouri?

6      A      **Yeah, that's a USDA facility.**

7      Q      Okay.  Are you aware that Mr. Hinkle's facility

8      has been cited by the USDA for failure to provide

9      veterinary care?

10     A      **Name me a facility in the country that hasn't**

11     **been cited, including Big Cat Rescue, okay, so let's**

12     **don't even --**

13     Q      The question is, are you aware --

14     A      **Yes.**

15     Q      -- that Hinkle's facility has been cited by the

16     USDA?

17     A      **I pull up everybody's inspection reports.**

18     Q      Okay.  Were you aware of that before you

19     transferred the leopard?

20     A      **Yeah.**

21     Q      That didn't concern you?

22     A      **No, because there's more to it than just the**

23     **title, failure to provide veterinary care.  I've been**

24     **written up for that, and it was simply because I didn't**

25     **have the receipts from the vet's office in my office.  So**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-a54b-a54b-6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 211

1    to --

2        Q    Who -- who is Robert Engesser?

3        A    **Robert Engesser?**

4        Q    Engesser, E-n-g-e-s-s-e-r.

5        A    **He is based out of Florida, and he has a**

6    **traveling exhibition educational show.**

7        Q    Okay.  Has G.W. sent tigers to him?

8        A    **Yes.**

9        Q    Okay.  Are you aware that USDA had cited him a

10   number of times?

11       A    **Yes.**

12       Q    And that didn't concern you?

13       A    **No.**

14       Q    You'd still send tigers to him?

15       A    **Yeah.**

16       Q    How many animals have you sent to

17   Serenity Springs out in Colorado?

18       A    **They helped me with that big rescue of 42 out of**

19   **St. Louis, and I think they took 19 of those or 15 of**

20   **those.  We worked very close together, so the numbers**

21   **with them is probably up in the high 20s, low 30s.**

22       Q    Um-hmm.  Okay.  You feel that Serenity Springs

23   is a good facility?

24       A    **I've been there many times.  It's very -- nicer**

25   **than their facility.**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 213

1    Keenesburg, Colorado, and them.  And it's no different

2    than me and them.  It's a pissing contest of who's going

3    to get the most donations from what they do.  So

4    90 percent of the allegations are false.

5        Q    But it is a claim that there were a number of

6    animals who died at his park.  Correct?

7        A    130 has died at their park.

8        Q    Just stick with my question.

9        A    It doesn't concern me.

10       Q    This doesn't really work.

11            Okay.  So you're aware that the claims are

12   that --

13       A    I am very aware.

14       Q    Okay.  That a number of animals have died at his

15   park.  Correct?

16       A    I am very aware.

17       Q    Okay.  And that doesn't concern you?

18       A    No.

19       Q    Okay.

20       A    Animals die.

21       Q    And you would still send animals to

22   Serenity Springs?

23       A    You bet.

24       Q    Okay.  And you've provided tigers to

25   Doug Terranova.  I think we talked about that.  Right?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 214

1    A    Two, um-hmm.

2    Q    And he's even performed his circus act at your

3    park.  Right?

4    A    During Memorial Day, of which I got turned in

5    for.

6    Q    "Turned in for" for what?

7    A    Ask Howard.

8    Q    Turned in to whom?

9    A    The USDA.

10   Q    Okay.  Were you aware that Mr. Terranova has

11   been fined by the USDA?

12   A    I'm aware that Mr. Terranova has had an employee

13   killed by an elephant too, yeah, and he takes awesome

14   care of his animals.

15   Q    Okay.  So that didn't concern you when you

16   transferred the tigers to him?

17   A    No, it didn't.

18   Q    Have you ever sold lion cubs to the

19   Amarillo Zoo?

20   A    No.

21   Q    Have you ever transferred lion cubs to the

22   Amarillo Zoo?

23   A    I have never.

24   Q    Do you know of anyone who has?

25   A    Animal Source Texas has.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 215

1    Q    How do you know that?

2    A    Because they were our tigers, and we donated

3    them to Animal Source Texas, and they're the ones who

4    sold them to the Amarillo Zoo.  I didn't know even know

5    they were selling them to the Amarillo Zoo.  And for some

6    reason PETA put on the Internet that I'm the one who sold

7    them to the Amarillo Zoo.

8    Q    So let me just understand your testimony.  You

9    provided them to Animal Source Texas?

10   A    Yes.

11   Q    And you sold them to Animal Source Texas?

12   A    No.  I gave them to Animal Source Texas.

13   Q    Okay.  And these were two tigers?

14   A    No, lions.

15   Q    Lions.  I'm sorry.  I thought you said "tigers."

16   It got me confused.

17        And you received no compensation for that?

18   A    No.

19   Q    Apart from the white tiger that we talked about

20   that went out to Kathy Stearns, have you sent any other

21   animals out there?

22   A    To Kathy Stearns?

23   Q    Yes.

24   A    I don't believe I have.

25   Q    Are you familiar with Stapp's Circle S Ranch?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 216

```
 1        A     Yes.

 2        Q     And have you sent cats to Stapp's Circle S

 3   Ranch?

 4        A     Yes.

 5        Q     What kind?

 6        A     Tigers and maybe a bear even.

 7        Q     And where -- what state are they in?

 8        A     Indiana, I think.

 9        Q     And prior to sending the cats out there, were

10   you aware that the USDA had found Mr. --

11        A     Yes.

12        Q     -- Stapps to be in noncompliance?

13        A     Yes.

14        Q     All right.  Doesn't matter -- didn't matter to

15   you?

16        A     Because it doesn't concern me that Walmart has

17   been fined by the USDA, but I still buy groceries there.

18        Q     Do you send tigers to Walmart?

19        A     No, but I eat from Walmart, which should concern

20   me even more.

21        Q     G.W. raises revenue among other ways by doing

22   tours inside its facility.  Right?

23        A     What do you mean?

24        Q     Well, you're an open -- you're an open facility

25   basically?
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 218

1      there, our customers know their animals -- our animals
2      are born and bred there.  We don't pose them all off to
3      be rescues.
4          Q    Okay.  Do you, as part of the training, develop
5      a script for the tour guides?
6          A    We have a script that starts our tour, our
7      endangered tour.  We have two different kinds of tours.
8          Q    Okay.
9          A    We have a private tour and an endangered tour.
10         Q    Do both of them have scripts that you utilize?
11         A    No.
12         Q    Just the endangered tour?
13         A    Yes.
14         Q    Okay.  Is that part of the training, to get the
15     tour guides familiar with the script for the endangered
16     tour?
17         A    Yes.
18         Q    And the script is developed by whom?
19         A    Myself.
20         Q    Okay.  How do you maintain the quality of your
21     tour guides?  How do you keep track of whether they're
22     doing what you want them to do?
23         A    Because my or John Reinke, my manager, usually
24     follow them around or poke in on their tours from time to
25     time.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                                        01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 230

1    We -- every inspector has a different way of -- of

2    interpretating what they want.  There is no written USDA

3    law age on cubs.  Regardless to what you've been told,

4    there is no written law in the CFR, which is the animal

5    welfare act handbook that we all follow.

6            So my inspector says if I have a large

7    four-week-old cub and he's healthy enough to withstand

8    public contact, to use that.

9            I have an inspection report that you can pull

10   offline where I was written up on the eastern office for

11   not having a four-week-old cub vaccinated for public

12   contact, and they overturned it because my vet says that

13   a four-week-old cub is carrying enough antibodies from

14   the mother to not need to be vaccinated until it's six

15   weeks old.  So they allowed me to use a four-week-old

16   cub.  Okay?  And that's documented in USDA inspection

17   reports.

18           My inspector says if I have -- because general

19   rule is 8 to 12 weeks old, okay?  If I have a 9-week-old

20   cub that is rowdy and is not properly suitable to have

21   public contact, to quit using him.

22           If I have a 16-week-old cub that is an

23   exceptional calm cub, to use it instead of breeding more

24   cubs to meet that 8- to 12-week-old thing, and that's

25   what my inspector goes by.

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 233

1    A    Not that I'm aware of.  The one in the video

2    that you might be egging up to, it says on the video 20

3    months old; and I don't know if you've ever seen a

4    20-month-old tiger, but they're huge.  So that was a

5    misprint in -- in the animal rights propaganda.  20

6    months old is over a year-old tiger.

7    Q    When you're referring to the video that I'm

8    egging on about, are you referring to -- what video are

9    you referring to?

10   A    I'm referring to the one that Big Cat Rescue has

11   on their website that a child got bitten when he did not

12   get bitten.  He got scratched.

13   Q    Okay.  And how old was the tiger cub that

14   scratched that little boy?

15   A    I believe it was 16 weeks.  And the USDA has

16   already investigated that, and we've proved that by birth

17   records.

18   Q    Yeah.  And you've reviewed that video, I take

19   it?

20   A    Yes.

21   Q    All right.  And you're aware what your tour

22   guide said about the age?

23   A    Yeah.

24   Q    What do you remember them saying about the age?

25   A    On -- on the big one, I'm not sure.  Now, are

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 247

1    or the liver or whatever to send to the vet for diag --

2    diagnosis and having tissue samples done; because rescued

3    animals, you don't know where they come from, what

4    they've been through, and -- and you're going to lose a

5    rescued animal before you lose one that you breed

6    yourself just because you don't know what care or hell

7    they've been through.

8          If it's one of ours that we have bred or we've

9    had there a long time and they're healthy and they look

10   good and they just die, we necropsy them to make sure we

11   don't have any kind of disease or problem going through

12   the park.

13        Q    When was the last time you and/or John Reinke

14   did a necropsy on a large feline?

15        A    It's been a while.

16        Q    More than a year?

17        A    I would say probably mid-2011, maybe.

18        Q    Oh, okay.  About a year ago?

19        A    Yeah.

20        Q    Was it before or after your deposition in

21   Oklahoma City?

22        A    Ooh, God.  I couldn't tell you.

23        Q    Okay.  And what was the outcome of that last

24   necropsy of the large feline that you and John Reinke

25   did?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Page 252

1      A      Dr. Green.

2      Q      Okay.  Apart from Dr. Green, Dr. Gilmore, and

3   Dr. Krueger, have any of those three provided you or

4   Mr. Reinke in training for performing certain types of

5   medical procedures on your large felines?

6      A      Are you asking a certificate or in writing or --

7      Q      Oh, just training.  Just training.

8      A      Oh, God.  She's taught us how to neuter, suture.

9   We don't do any kind of surgeries.  I don't spay anything

10  because that's a little invasive; but minor suture work,

11  we do that.

12     Q      In the absence of a vet?

13     A      Yeah.

14     Q      Okay.

15     A      We have -- we have a form that our inspector

16  requires us to use, whether it's a phone order by the vet

17  or whether it's an on-site vet, you know, if we call her

18  up and say, "We've got a tiger" -- because they made it

19  illegal for you to declaw cats, so you get quite a few

20  more scratches nowadays than you did back then, you know,

21  with other cats arguing and fighting.

22            So we'll call her and say, "We've got about a

23  three-inch laceration on a hip of a tiger," and she'll

24  say, "Suture it shut and give him 15 cc's of penicillin

25  today and 5 for the next 10 days," and we write it down

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 258

1    times under 75-degree temperatures outside, she has to

2    sign off on it.  If I change a diet, she has to sign off

3    on it.

4        Q    Okay.  I think it was during the deposition out

5    in Oklahoma City, you provided, I think, some documents

6    that you give to volunteers and employees that they have

7    to review and sign and all of that stuff.  Maybe it was

8    in Beth Corley's employment folder.

9        A    Employment --

10       Q    Yeah --

11       A    -- I think it was.

12       Q    -- probably something like that.

13            I think one of your rules is you don't put any

14   part of your body -- hands, fingers, feet, et cetera --

15   into a cage for any reason.  Right?

16       A    That's absolutely correct.

17       Q    Why?

18       A    Because they -- you sew your fingers back on.

19   You -- cats, I mean, the -- they do it.  I've seen

20   pictures of it.  The worst thing you can do is feed a cat

21   from the outside of the cage, because they get your

22   finger, your whole arm is gone, because you're not

23   getting it back.

24            I mean, people, especially people that work

25   around cats on a permanent basis, let their guard down

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/5/2012

Page 259

1    too much, and they'll get up there and they'll chuck

2    through the cage and then they'll start rubbing on them

3    and people get hurt.

4           I mean, every cage of ours has a shift pin.  So

5    the cats are moved from the shift pin, and they go in and

6    they clean the entire cage.  And no, I have a zero policy

7    about catching somebody with their hand in a cage.

8        Q    Who is --

9        A    I do it, but I own the park, and I'm not going

10   to sue myself.  Okay?

11       Q    I think you still have everything.  Right?

12       A    Well, thanks to good surgeons.

13       Q    Have you ever had an incident personally?

14       A    Oh, yeah.  They've sewed these two fingers back

15   on, you know, from outside the cage, a toenail.

16       Q    A toenail.  I'm sorry?

17       A    A toenail -- hooked me with a toenail --

18       Q    Oh.  Oh.  Oh.

19       A    -- and pulled my whole hand in the cage.

20       Q    Gotcha.

21       A    It happens that fast.

22       Q    How long ago did you have the incident with the

23   two fingers?

24       A    Oh, when I first started my park.  Yeah, I

25   learned the hard way, and that's why we have zero

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)          01eb2a51-a54b-4c14-b6b7-437a1121dbc2

Joe Schreibvogel - 6/8/2012

Page 275

1      A     I haven't even thought about it since Tuesday,
2   to be honest with you.
3      Q     Okay.  Are you familiar with something called
4   the Genesis Wildlife Center?
5      A     That one rings a bell.
6      Q     And what do you know about the Genesis Wildlife
7   Center?
8      A     I believe that, if I'm not mistaken, that's the
9   one that had issues with their -- that was run by the
10  city or something like that; but it shut down, if I'm
11  thinking about the right zoo, and the man moved the
12  animals out to his property.
13     Q     Okay.  First of all, is Genesis Wildlife Center
14  located -- was it located in or around Scranton,
15  Pennsylvania?
16     A     I believe so.
17     Q     All right.  And G.W. Exotic transferred two
18  tigers to that facility.  Correct?
19     A     Yes.
20     Q     Do you remember when that occurred?
21     A     No.
22     Q     Does 2008 sound about right?
23     A     Couldn't -- couldn't tell you without looking at
24  the transfer forms.
25     Q     You do remember, though, two tigers going from

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 278

1    tigers from G.W. Exotic Animal Park, which formerly

2    billed itself as a sanctuary but now considers itself a

3    conservancy and educational zoo in Wynnewood, Oklahoma.

4    Sanctuary representatives say G.W. Exotic is notorious

5    for inhumane treatment of its animals.  In 2006 the USDA

6    fined the park $25,000, suspended its license for

7    2 weeks, and put it on an 18-month probation for

8    violating at least 14 regulations of the Animal Welfare

9    Act.  The park is particularly infamous among

10   animal-sanctuary experts for breeding exotic animals

11   indiscriminately to entice visitors who want to play with

12   new cubs.  For sanctuary-accrediting agencies such as the

13   American Sanctuary Association and the Global Federation

14   of Animal Sanctuaries, breeding breaks the cardinal rule

15   of true sanctuaries because it adds to the population of

16   unwanted captive species.  Lisa Wathne, a captive exotic

17   animal specialist with People for the Ethical Treatment

18   of Animals, said acquiring cubs from the park makes

19   Genesis complicit in G.W. Exotic's behavior," okay, end

20   of the quote.

21        Have you ever read that report or heard about

22   that news report prior to today?

23   A    There's so many out there, I couldn't tell you

24   if I read that particular one or not.

25   Q    Okay.  When there -- when it comes to media

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)            8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 281

1        Q      Because once you've let a tiger get out of your
2    control with a disposition form, you can't control what
3    happens to it from that point?
4        **A      I have no legal power.  I mean, I can file**
5    **complaints if they're in an abusive situation with the**
6    **USDA, you know.  I can file complaints with whoever, you**
7    **know, whether they have a local humane society; but once**
8    **they lose their license, they're not governed by anybody.**
9    **So there's really nobody to complain to, and I have no**
10   **law-enforcement powers to go get my animals back.**
11       Q      Well, they wouldn't be your animals anymore.
12   Right?
13       **A      Right.**
14       Q      And so it was your understanding that when --
15   when the Genesis Wildlife Center closed down, there was
16   no longer a USDA license involved at that juncture?
17       **A      That was my understanding.**
18       Q      So at that point any USDA-regulated animals were
19   no longer within the regulation of USDA, because there
20   wasn't a license anymore.  Right?
21       **A      You have to be open to the public as an**
22   **exhibitor or a breeder or a broker in order to have an**
23   **active license.**
24       Q      To this day, do you know what happened to those
25   two tigers?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 282

1        A        Sitting here right now, no.

2        Q        In that instance did you try to contact the USDA

3    and express any concern?

4        A        No, because the USDA wouldn't have any power

5    over it anyway.

6        Q        Did you ever hear from that man again who had

7    the animals?

8        A        No.

9        Q        You testified that you thought some of what I

10   just read was false and was --

11       A        Most of it.

12       Q        -- a lie.

13                Okay.  Did you pursue the newspaper or anybody

14   else for -- with claims of defamation, libel, or slander?

15       A        No.

16       Q        Why not?

17       A        Because there's so many out there, I would -- I

18   would never get anything done at my park or you -- you

19   cannot control the press.  I mean, we have sent rebuttals

20   that never get printed, so I don't even feed my bleeding

21   ulcers over it anymore.

22       Q        Do you have any idea how many news reports have

23   named you or G.W. in what you would view as a false

24   light?

25       A        As far as a number?  No.  There's a lot.

First Choice Reporting & Video Services
Worldwide Scheduling

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 283

1      Q    I always hate to do this, but I have to ask the

2    question.  "A lot" can be 5.  It can be 50.

3      **A    You could --**

4      Q    What do you think?

5      **A    You could Google my name right now, and I bet**

6    **you'd find several hundred.**

7      Q    Okay.  And in any of those instances did you

8    send letters demanding retractions?

9      **A    No.**

10     Q    In any of those instances did you bring lawsuits

11   for defamation or libel or slander?

12     **A    Nope.**

13     Q    Does -- do you believe that those like the one I

14   read, those articles that you contend are false have

15   adversely affected your reputation?

16     **A    Well, they most certainly have.**

17     Q    And how does -- how does that hurt your

18   business?

19     **A    Makes it hard to get a contract to do anything.**

20   **I do business as --**

21     Q    Would that -- I'm sorry.

22     **A    Whether it's trying to do shows, whether it's**

23   **trying to do magic, I mean, anything that's Googled back**

24   **to my name that comes up with that crap, I have to**

25   **explain myself.  And 90 percent of it comes from -- they**

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 288

1    October 2010 calendar in Exhibit 14 -- and incidentally
2    this page is also in Exhibit 3, but I wanted a complete
3    one.
4         It shows an entry for Mounds Mall beginning
5    October 27th and apparently running through the 31th.
6    Does that look right?
7         A    Yes.
8         Q    And did in fact Big Cat Rescue Entertainment go
9    to the Mounds Mall then?
10        A    That was one of the first dates that we worked,
11   coincide together.  I was out on a magic tour, and I met
12   up with them because they contracted both shows to be at
13   the same place.  So I was there strictly as a magic
14   entertainer.  I did not work behind the exhibit, because
15   it was Beth Corley's exhibit; and I still got slandered
16   by your client, because it was all me.
17        Q    What name was that exhibition operated under?
18        A    The poster said "Big Cat Rescue Entertainment,"
19   because we had the magic show there and the -- the cub
20   display.
21        Q    The truck that was used to transport the animals
22   to the Mounds Mall is whose truck?
23        A    Well, they're all owned by me.
24        Q    The revenues from the cub-petting exhibit at
25   Mounds Mall went where?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                 8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 289

1      A      I don't know how much Beth kept, because it was

2    her exhibit, and the rest of it she gave to the park.

3      Q      And when credit cards were used to pay for the

4    opportunity to pet the cubs or have the photos taken with

5    the cubs at Mounds Mall in October of 2010, was that run

6    under the G.W. name?

7      A      All credit cards are donated to the park.

8      Q      And if a customer at the Mounds Mall in

9    October 2010 wanted a receipt for tax purposes for

10   anything that they were paying for the cub-petting

11   exhibit, the receipt would say what?

12     A      It would depend.  Are you talking about October

13   the 10th --

14     Q      Yes.

15     A      -- show?

16     Q      October 2010, yes.

17     A      It would depend on what Beth Corley wrote them.

18   Again, I -- that display was under her license with her

19   animals; and I was on the other end of the mall doing

20   magic, and I don't know what she did.

21            That would be the same mall that you have her

22   standing on a platform doing her educational show.

23   That's why you don't have me on film doing that.

24     Q      Is -- in 2010 was Beth Corley an employee of

25   G.W.?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                    8bb2f77e-6b70-4e97-adba-d250cda2b29b

Case 8:11-cv-00209-MSS-SPF   Document 97-3   Filed 08/15/12   Page 92 of 96 PageID 1416

1    Halloween of 2011?

2        **A    Yes.**

3        Q    Is there a written, signed contract to that

4    effect?

5        **A    The way -- the way that we do our bookings is we**

6    **verbally confirm dates; and then closer to the date, we**

7    **sign contracts most generally.  And when it came time to**

8    **actually sign the contract, the property owners of that**

9    **mall refused to let us come back.**

10       Q    So there is no signed contract between the

11   defendants and Mounds Mall for the October 2011 time

12   frame?

13       **A    Correct.**

14       Q    Is there anything in writing that the defendants

15   received from the Mounds Mall management indicating the

16   reason why they did not wish to book the defendants for

17   October 2011?

18       **A    I believe those are in the e-mails that we're**

19   **trying to obtain passwords for.**

20       Q    So thus far we've not in production seen any of

21   those?

22       **A    It was my understanding that Bobbi forwarded all**

23   **of that to the lawyers when all of that was requested,**

24   **but I can't confirm that.**

25       Q    While we're on Exhibit 14, if we could,

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

```
                                              Page 294
 1        Q    Okay.

 2        A    I mean, whether it was Beth's contract or Mark's

 3   contract or --

 4        Q    I'm just asking what name was used.

 5        A    I'm not sure.

 6        Q    Okay.  Realizing that you're here speaking for

 7   the defendants, is there anyone other than you who would

 8   know what name was used?

 9        A    Not without looking at the contracts.

10        Q    Well, we've asked for the contracts, and I'll

11   say that I -- I don't believe we've received any signed

12   contracts.

13        A    I think -- I think we just sent you 5,000-some

14   papers that have every piece of paper for every mall in

15   them.

16        Q    Is it your contention that if there is a signed

17   booking agreement between the defendants and a mall, it

18   then identifies what the name will be for the exhibition?

19        A    It would be either Awakening Productions,

20   World Magic or Big Cat Rescue Entertainment or

21   G.W. Animal Park.

22        Q    Let's go through those just so I understand.

23        A    Okay.

24        Q    The first one was Awakening.

25        A    Awakening Productions was my first company name
```

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 298

1  understanding that there is a waiting list at G.W. for

2  tigers by other facilities.  Correct?

3       **A**    **Correct.**

4       Q    All right.  Is that -- strike that.

5            Does G.W. actively advertise its willingness to

6  transfer tigers?

7       **A**    **No, we don't.**

8       Q    What is your understanding as to how people

9  figure out that they can get tigers from G.W.?

10      **A**    **Because I have a good-enough bloodline, I'm**

11  **active enough in the industry that people know me, and**

12  **they know my reputation of providing good bloodlines.**

13      Q    And currently there is a waiting list to receive

14  tigers from your facility?

15      **A**    **Yes.**

16      Q    Okay.  Do you currently have a policy regarding

17  any charges to be paid for such tigers that are

18  transferred?

19      **A**    **Depends on who it is, why they want them, what**

20  **time of year it is, whether they're tabbies, whites,**

21  **standards, lions, hybrids.  It's just --**

22      Q    I think I got --

23      **A**    **Okay.**

24      Q    -- four -- four criteria.

25      **A**    **Okay.**

First Choice Reporting & Video Services
Worldwide Scheduling
www.firstchoicereporting.com                                    800.939.0093

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 299

1          Q      Who?

2          **A      Who.**

3          Q      What difference does it make on the who?

4          **A      Because if they're going to -- if it's a zoo --**

5     **and this is just my ethics.  If it's just a zoo and**

6     **they're just going to exhibit it, they're not going to**

7     **pay a higher price.  Then if they are a zoo and they're**

8     **going to profit off of it by photos and taking it out and**

9     **everything, they're going to pay a higher price because**

10    **the cat deserves a -- that's why most of my photo babies**

11    **live at my place.  They paid to live there, okay, and**

12    **that's why they're not in sanctuaries.**

13         Q      Are you not a sanctuary?

14         **A      I am not a sanctuary.**

15         Q      Okay.  So from the perspective of G.W., if the

16    cat is going to be transferred and used for exhibition

17    and petting or photos, you're going to charge more for

18    it?

19         **A      Yes.**

20         Q      Because the person who gets it is going to be

21    able to derive more revenue from that?

22         **A      Correct.**

23         Q      When they contact you to get -- you know, to put

24    in a request for a tiger, how do you know how they're

25    going to use the tiger?

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)                8bb2f77e-6b70-4e97-adba-d250cda2b29b

Joe Schreibvogel - 6/8/2012

Page 300

1        **A      Because I know who they are.  I don't sell to**
2    **just anybody.**
3        Q    And that would tie into the next criteria, which
4    is why they want the tiger.  Correct?
5        **A    Correct.**
6        Q    All right.  Are there entities or people who
7    sometimes want tigers just, for example, to maintain and
8    not exhibit and also tigers to exhibit and, you know,
9    maybe do petting or photos for?
10       **A    I've never had one that wanted them for not**
11   **exhibit.  That's the purpose of why they want them, okay,**
12   **is to make money off of them, okay?  I already forgot the**
13   **second half of your question.**
14       Q    I think you got it.
15       **A    Okay.**
16       Q    I'm there.  The time of year, you explained
17   that, you know, the breeding cycle is going to determine
18   whether cats are more in demand.  Correct?
19       **A    Cat -- you have a lot less babies during the**
20   **periods of November to March, so they're much more**
21   **valuable at that period.**
22       Q    So if you transfer a cat, a tiger, in that time
23   frame, you're going to ask for more money?
24       **A    Most generally.**
25       Q    Okay.  And again, the type of cat or tiger

Electronically signed by Beverly Replogle (401-094-245-9990)
Electronically signed by Beverly Replogle (401-094-245-9990)

8bb2f77e-6b70-4e97-adba-d250cda2b29b