BOBBI LYNN CORONA - 7/16/2012

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BIG CAT RESCUE CORP.,            *
a Florida not for profit         *
corporation,                     *
                                 *
        Plaintiff,               *
                                 *
VS.                              *    CASE NO.:
                                 *    8:11-cv-00209-MSS-MAP
BIG CAT RESCUE ENTERTAINMENT     *
GROUP, INC., et al.,             *
                                 *
        Defendants.              *

****************************************************

ORAL DEPOSITION OF

BOBBI LYNN CORONA

JULY 16, 2012

****************************************************

ANSWERS AND ORAL DEPOSITION OF BOBBI LYNN CORONA, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of July, 2012 from 9:20 p.m. to 11:45 a.m., before Deborah Marks, CSR in and for the State of Texas, reported stenographically, at the offices of Courtroom Sciences, Inc., 4950 N. O'Connor Road, Irving, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

```
 1                  A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:
           Mr. Frank R. Jakes
 4         JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
           403 E. Madison Street
 5         4th Floor
           Tampa, Florida 33602
 6         813.225.2500
           frankj@jpfirm.com
 7

 8     FOR THE DEFENDANTS:
           Mr. Daniel W. Anderson - BY TELEPHONE
 9         ANDERSON & ASSOCIATES
           13577 Feather Sound Drive
10         Suite 670
           Clearwater, Florida 33762
11         727.329.1999
           kleahy@floridalawpartners.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 INDEX

2 WITNESS PAGE
BOBBI LYNN CORONA
3
EXAMINATION
4    BY: Mr. Jakes.................................4

5 Changes and Signature..........................93, 94

6 Reporter's Certificate.............................95

7 EXHIBITS

8 NUMBER             DESCRIPTION             PAGE

9 Exhibit 1      Deposition notice....................37

10 Exhibit 2      Board minutes, 4/18/2010.............42

11 Exhibit 3      Press Release........................48

12 Exhibit 4      Consumer Complaint Form, 5/16/11.....74

13     ADDITIONAL DOCUMENTS/INFORMATION REQUESTED

14     Page 40/Line 17: E-mails between G.W. Exotic

15     Animal Park and Ms. Corona

16

17

18

19

20

21

22

23

24

25

BOBBI LYNN CORONA - 7/16/2012

Page 4

```
 1                    P R O C E E D I N G S
 2                      BOBBI LYNN CORONA,
 3    having been duly sworn, testified as follows:
 4                         EXAMINATION
 5    BY MR. JAKES:
 6         Q.   Would you please state your full, legal name
 7    for the record.
 8         A.   Bobbi Lynn Corona.
 9         Q.   And would you spell Bobbi for me.
10         A.   B-O-B-B-I, L-Y-N-N, C-O-R-O-N-A.
11         Q.   Where do you reside?
12         A.   At 5117 Slate Street, Fort Worth, Texas
13    76114.
14         Q.   And what is your phone number?
15         A.   (682)551-0472.
16         Q.   And how long have you resided at that
17    location in Fort Worth?
18         A.   About three months.
19         Q.   Prior to residing on Slate Street in Fort
20    Worth where did you reside?
21         A.   At 36021 East Private 1648 Drive in
22    Wynnewood, Oklahoma.
23         Q.   And what is located there?
24         A.   G.W. Exotic Animal Park.
25         Q.   Are you currently employed?
```

www.firstchoicereporting.com    First Choice Reporting & Video Services
Worldwide Scheduling    800.939.0093

Electronically signed by deborah marks (501-186-068-8645)    04c95107-b722-4ad8-8651-56dc65d760e5

BOBBI LYNN CORONA - 7/16/2012

Page 12

1     Q. Who did you understand Satrina McAnally to be
2 at the time you were interviewed?
3     A. **Office manager.**
4     Q. Did that change once you came on board?
5     A. **No.**
6     Q. Since you said you were office manager-ish, how did you interact with Satrina McAnally once you were employed?
9     A. **When I first started, I started just as gift shop help and helping the marketing person that was there. The marketing person that was there left shortly after and I assumed the position.**
13     Q. Who was the marketing person prior to you?
14     A. **I only remember her first name. It was Lorraine.**
16     Q. In terms of the work you undertook as officer manager-ish, what was that and how did it interact with Satrina McAnally's role?
19     A. **Satrina had left the company.**
20     Q. When did Satrina leave?
21     A. **I don't remember exactly when.**
22     Q. Let's start with a year.
23     A. **2011.**
24     Q. Can you give me a month?
25     A. **November or December.**

1  Q.  Were there times when you were marketing
2  director that you could not book the road show because
3  there was no young tiger cub available for interaction?
4  **A.  Yes.  I don't know the exact time, but I do**
5  **know that we couldn't because -- I don't remember**
6  **exactly when and where, but we couldn't because of the**
7  **age.  We didn't have an animal available within the**
8  **regulated age range to have public contact.**
9  Q.  Do you remember how often that happened?
10  **A.  I don't remember exactly.**
11  Q.  If I understand the duration of your time as
12  marketing director, was it about 18 months?  Is that
13  about right?
14  **A.  Sounds about right.**
15  Q.  In your investigation and research with USDA
16  regulations, were you aware of any regulations
17  pertaining to the appropriate age range for human
18  interaction with tiger cubs?
19  **A.  Yes.**
20  Q.  And what regulation do you recall?
21  **A.  I don't recall the specific regulation, but**
22  **it's eight to 12 weeks.**
23  Q.  But you remember seeing that in the
24  regulations?
25  **A.  Yes.**

Electronically signed by deborah marks (501-186-068-8645)        04c95107-b722-4ad8-8651-56dc65d760e5

BOBBI LYNN CORONA - 7/16/2012

Page 66

1  communications from my client, Big Cat Rescue, correct?
2      A.   Well, I'm not going to say a name and not
3  have the documents to prove it.  I mean, it was -- we
4  were being canceled left and right and it was always
5  for harassment and Capwiz alerts going out.  But to
6  which malls those Capwiz alerts were going to, I'm not
7  going to say without looking at the documents.
8      Q.   I'm going to try again because I'm not asking
9  you to remember things you can't remember.  I'm simply
10 asking, Sitting here today, Mounds Mall and Centerpoint
11 Mall are the only venues that you can specifically
12 recall were canceled you contend because of
13 communications with Big Cat Rescue, my client, correct?
14     A.   That I can remember sitting here today.
15     Q.   That's all I can ask.
16          Did there come a time in late 2011 or
17 early 2012 where Mr. Schreibvogel advised that the road
18 show would not be going out again?
19     A.   Specifically, no, not that he was -- that I
20 remember a conversation that I had with him that he was
21 canceling it.  We had bookings but we were not booking
22 anything further for 2012.
23     Q.   And you were told not to book anything
24 further by Mr. Schreibvogel?
25     A.   Past what we had, yes.

BOBBI LYNN CORONA - 7/16/2012

Page 67

1   Q.   Did he tell you why?
2   A.   **We didn't have a crew.**
3   Q.   Was this because Ms. Corley had to leave the
4   park to attend to her infirm parents?
5   A.   **I don't know the exact reason that Joe and**
6   **Beth discussed.**
7   Q.   Were you aware that Ms. Corley was no longer
8   available to go out on the road show?
9   A.   **I knew her mom was ill, yes.**
10  Q.   And to your understanding, that was one of
11  the reasons why you weren't booking any more?
12  A.   **I don't know if that was the specific reason.**
13  **I don't know.**
14  Q.   Were you involved in booking the road show at
15  two fairs in Florida in March of 2012?
16  A.   **Yes.**
17  Q.   Were those the first shows you had ever
18  booked in Florida?
19  A.   **Yes.**
20  Q.   Whose idea was it to book in Florida?
21  A.   **It wasn't anyone's idea.  We went to a**
22  **convention in Las Vegas and were approached by two**
23  **venues that asked us to come to Florida.**
24  Q.   And those venues were which venues?
25  A.   **I believe it was Sarasota, and I forget the**

BOBBI LYNN CORONA - 7/16/2012

Page 68

1  name of the other one. It was after Sarasota. I can't
2  remember the name of it.
3      Q.  Was that the Great Orlando area?
4      A.  I don't remember.
5      Q.  When was the convention in Las Vegas where
6  you were approached?
7      A.  It was, I believe, December 1 through 3 was
8  the IFE convention.
9      Q.  Were you approached by any other venues other
10 than these two Florida venues?
11     A.  Multiple.
12     Q.  Did you book them?
13     A.  I didn't.
14     Q.  Why not?
15     A.  I personally just -- I didn't book them. I
16 don't know what conversations Joe had with them. Joe
17 did most of the booking. I mean, it was his final
18 decision.
19     Q.  I apologize. You confused me a little bit
20 with that answer. I thought as director of marketing
21 you were in charge of scheduling.
22     A.  When we went to the convention, Joe was
23 scheduling everything. I did not do any specific
24 deals.
25     Q.  So the two venues in Florida were handled by