Susan Bass - 6/15/2012

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BIG CAT RESCUE CORP.,
a Florida not for profit corporation,

    Plaintiff,

-vs-                    CASE NO. 8:11-cv-209-MSS-MAP

BIG CAT RESCUE ENTERTAINMENT
GROUP, INC., et al.,

    Defendants.
_____/


| | |
|---|---|
| DEPOSITION OF: | SUSAN BASS |
| DATE TAKEN: | Friday, June 15, 2012 |
| TIME: | 8:53 a.m. to 11:58 a.m. |
| PLACE: | Johnson Pope Bokor Ruppel & Burns<br>403 East Madison Street<br>Suite 400<br>Tampa, Florida |
| REPORTED BY: | Beverly Replogle<br>Notary Public |

COPY


EXHIBIT 7

1   APPEARANCES:

2   FRANK R. JAKES, ESQUIRE
        Johnson, Pope, Bokor, Ruppel & Burns, LLP
3       403 East Madison Street
        4th Floor
4       Tampa, Florida 33602
        813-225-2500
5       frankj@jpfirm.com

6           Appearing on behalf of the Plaintiff

7
    ERIC C. PINKARD, ESQUIRE
8       Anderson Pinkard
        13577 Feather Sound Drive
9       Suite 670
        Clearwater, Florida 33762
10      727-329-1999
        epinkard@floridalawpartners.com
11
            Appearing on behalf of the Defendants
12

13
    ALSO PRESENT:
14
        Howard Baskin
15

16

17                          I N D E X

18  TESTIMONY OF SUSAN BASS:                               PAGE

19      Direct Examination By Mr. Pinkard............    4

20  CERTIFICATE OF OATH................................   88

21  CERTIFICATE OF REPORTER............................   89

22  LETTER TO ATTORNEY.................................   90

23  ERRATA SHEET.......................................   91

24
                            - - - - -
25

```
 1                         E X H I B I T S

 2                                                              PAGE

 3       Exhibit Number 1
             11/7/2010 Board of Directors Minutes
 4           of Big Cat Rescue Corp.......................    9

 5       Exhibit Number 2
             Ms. Bass's activity report................... 26
 6
         Exhibit Number 3
 7           9/25/09 e-mail from Julie Hanan.............. 37

 8       Exhibit Number 4
             Spreadsheet titled "Malls Banning
 9           Display Where Joe Had Exhibited"............. 78

10       Exhibit Number 5
             Media advisory............................... 79
11
         Exhibit Number 6
12           8/3/11 e-mail from Susan Bass,
             Subject: Tiger cub exhibit at Jackson
13           County Fair.................................. 82

14       Exhibit Number 7
             6/13/11 e-mail to
15           bigcatentertainment@ymail.com from
             cparrack@heartlandmall.net with
16           attached e-mails from Susan Bass............. 84

17       Exhibit Number 8
             12/12/11 e-mail to Stephanie at
18           Centerpointe Mall from Susan Bass............ 85

19       Exhibit Number 9
             7/13/11 e-mail from Susan Bass,
20           Subject:  Orchards Mall in Benton
             Harbor Hosting Abusive Tiger Cub
21           Display Today through Sunday................. 85

22

23

24

25
```

1        THE COURT REPORTER: Do you swear or affirm
2    that the testimony you are about to give in this
3    cause will be the truth, the whole truth, and
4    nothing but the truth?
5        THE WITNESS: Yes.
6                    SUSAN BASS,
7    having been first duly sworn, was examined and testified
8    upon her oath as follows:
9                 DIRECT EXAMINATION
10   BY MR. PINKARD:
11       Q    Tell me your name and address, please.
12       **A    Susan Bass, XXXXX XXXXXXX XXXX, XXXX XXXX,**
13   **XXXXXXX, XXXXX.**
14       Q    Okay. Have you ever had your deposition taken
15   before?
16       **A    Once.**
17       Q    Okay. All right. Well, I'm -- my name is
18   Eric Pinkard. I'm an attorney representing the
19   defendants in this action, including
20   Mr. Joe Schreibvogel, and I'm going to be asking you some
21   questions today. And if I ask you a question you don't
22   understand, I'll be happy to rephrase the question.
23   Okay?
24       **A    Okay.**
25       Q    Are you an officer of any corporations?

Susan Bass - 6/15/2012

Page 9

```
1    A    -- so we discussed it.
2    Q    All right.  And ultimately did you enter into
3    some sort of contract with them, or how did that work?
4    A    Just a verbal contract.
5    Q    And before that verbal contract was entered
6    into, did you have an understanding as to what kind of PR
7    work you would be doing for Big Cat Rescue?
8    A    Yes.
9    Q    And what was that?
10   A    Advocacy work, promoting Big Cat Rescue's --
11   their ideas and, you know, philosophies on different
12   exotic-cat issues.
13        MR. PINKARD:  I only brought one of these,
14        but I think you've seen it before, board meeting
15        minutes.
16        MR. JAKES:  You want it marked?
17        MR. PINKARD:  Yeah, please.
18        (Exhibit Number 1 marked for identification.)
19   BY MR. PINKARD:
20   Q    Take a look at Exhibit Number 1 there.  That was
21   used in some earlier depositions, including Mr. Baskin.
22   If you look at page 2 of the exhibit, I'm going to -- if
23   I can just have it back for a second and I'll show you
24   page 2.
25   A    Oh.  Sorry.
```

1    Q    That's okay. There's a paragraph there entitled
2    "Public Relations and Advocacy Assistance." Do you see
3    that?
4    A    Yes.
5    Q    And that below paragraph states, "Howard
6    reported that we have engaged Susan Bass, a very
7    experienced public relations executive we knew from her
8    work at the firm who did pro bono work for us back in
9    2003 and '4 on a part-time basis at a very large discount
10   to what a normal rate would be for this kind of work.
11   She will focus primarily on our efforts to educate venues
12   that allow tiger-cub displays, mostly Joe Schreibvogel's
13   mall exhibits, trying to convince them to adopt a policy
14   of not having exotic animals on display. Her work will
15   include generating media coverage about why this is
16   abuse. Secondarily she's assist in our efforts to obtain
17   more general coverage of BCR and have Carole increasingly
18   looked to by the media as an expert to call upon."
19        Reading that paragraph, does that fairly
20   articulate the tasks that you were hired to do by
21   Big Cat Rescue?
22   A    Yes.
23   Q    Okay. And it says here that there was a very
24   large discount offered. Was -- do you recall that?
25   A    Well, the -- the retainer agreement that we

1   Q   Did you discuss with Mr. Baskin what you would
2   be saying to these venues during that initial call?
3   A   Sometimes.  It really depended.
4   Q   What would you generally say to the venue during
5   the first phone call?
6   A   Again, it depended if it was several weeks out
7   for the exhibit or if it had, you know, already started.
8   I would say, you know, "Are you aware -- are you having
9   the cubs there?"
10      And if they said yes, I would, you know, again,
11  share with them the position of Big Cat Rescue that these
12  tiger-cub displays are abusive and should be stopped.
13  Q   Did you provide any information at that time as
14  to why it was the position of Big Cat Rescue that the
15  tiger-cub exhibits were abusive?
16  A   I usually would send our fact sheet that Howard
17  had created.
18  Q   Okay.  We'll get into that in a minute.  I'm
19  trying to figure out in the telephone calls, the initial
20  telephone calls, did you get into any details about why
21  Big Cat Rescue thought the tiger-cub displays were
22  abusive?
23  A   Again, it depended on the situation.
24  Q   Okay.  Well, let's say it's -- I think you
25  mentioned two different situations; one, if a show was

1  several weeks away and one if a show was going on.  If
2  the show was several weeks away, what, if any,
3  information would you give them about why Big Cat Rescue
4  thought that the tiger-cub displays were abusive?
5      A    I would tell them I'd like to send them some
6  information, if they'd please read it, and then I'd send
7  them the fact sheet.
8      Q    During these phone calls, did you give these
9  venues any information about Mr. Schreibvogel?
10     A    I don't recall.
11     Q    Okay.  What about the situation if the exhibit
12 was going on at that time that you were making the call,
13 in what way, if any, would your conversation with the
14 mall be any different?
15     A    It would be different in that if it was already
16 set up, it would generally be too late to cancel by the
17 time I would hear about it.  It might be the last day
18 that they were there.  So I was again, sending them the
19 fact sheet to educate them about possibly not having the
20 cubs back in the future at that point.
21     Q    But as far as your initial verbal communication
22 with the venue, did that alter or change in any way the
23 content of your conversation, the fact that the show was
24 ongoing versus would be happening at some time in the
25 future?

```
 1      A    Like I said, every conversation was different,
 2   so...
 3      Q    While during the conversation, would you
 4   identify yourself to the person at the -- who you were
 5   talking to?
 6      A    Yes.
 7      Q    And who would you say that you were?
 8      A    I would say I was Susan Bass, calling for
 9   Big Cat Rescue --
10      Q    All right.
11      A    -- in Tampa, Florida.
12      Q    And would you say anything about what
13   Big Cat Rescue in Florida is?
14      A    Sometimes.
15      Q    All right.  What would you normally say?
16      A    We're the largest accredited sanctuary in the
17   world dedicated to abused and exotic cats.
18      Q    Where did you get that information from?
19      A    From Howard and Carole Baskin.
20      Q    Okay.  After introducing yourself and
21   identifying yourself as from Big Cat Rescue, what did you
22   tell them the purpose of your call was?
23      A    To educate them about the cub exhibits.
24      Q    And you don't have any recollection about
25   anything you might have said about Mr. Schreibvogel
```

1  Q   So you just called these malls up and just asked
2  them what their experience was with the tiger cubs?
3  A   Right.
4  Q   You didn't try to influence them to cancel Joe's
5  shows?
6  A   No.
7  Q   What did they tell you about their experiences
8  with the tiger displays?
9  A   It varied. Some told me they'd never had them
10 there. Some said -- you know, I recall one saying, "Oh,
11 when they left, they left such a mess on the floor of the
12 mall that it took us days to clean it up, so we'll never
13 have them back."
14     Really every situation was different.
15 Q   Any of them relate a positive experience with
16 the exhibits?
17 A   I think some of them said that they, you know,
18 didn't have any problem with it, put it that way.
19 Q   Well, did you use this list as a means -- as a
20 starting point to be able to track where Mr. Schreibvogel
21 might be going in the future on his exhibits?
22 A   Yes.
23 Q   Do you know how Mr. Baskin acquired the list?
24 A   I believe it was a Freedom of Information Act
25 list, but I'm not sure. You'd need to ask him.

1  brings the cubs to the mall' and 'done his own research,'
2  although he didn't tell me what research he had conducted
3  and was not interested in contacting USDA or any of my
4  other sources when I offered the suggestion. He has
5  heard people like me before say the exhibit is abusive,
6  but it's his decision to have the exhibit and he is not
7  going to change his mind. I told him that it was then my
8  job to then contact the local media as well as have our
9  supporters contact the mall. He said that was fine."
10     Do you see that sentence?
11  A  I see that.
12  Q  And was it your job to contact the local media
13  and have supporters contact the mall?
14  A  **Yes, when I got a response like that in that he
15  had no interest in canceling or learning about the
16  abusive tiger exhibits.**
17  Q  By what means would you have the supporters
18  contact the mall?
19  A  **That would have been an alert that Carole would
20  have sent out.**
21  Q  Did you have any involvement in the content of
22  those words?
23  A  I don't recall.
24  Q  All right. The fourth bullet point down on this
25  page, Exhibit Number 30 -- Exhibit Number 2 --

1       Do you remember what information you had given
2  or what your discussions were with Orchards Mall about
3  how abusive the cub displays -- displays are?
4       A   No.  The only thing I recall from our earlier
5  bullet points here is talking to her.  That was that
6  Ammy Jannert that was on the previous page.
7       Q   Well, what did you say to her about how abusive
8  the cub displays are?
9       A   Well, I didn't get a chance to talk to her.  She
10 was on leave.  See the next sentence, "I called her."
11 That must mean I called her, but she wasn't in.
12      Q   But it says in the previous sentence, "whom I've
13 spoken to several times in the last few months"?
14      A   Right.
15      Q   When you spoke to her several times in the last
16 few months, what, if anything, did you say about how
17 abusive the cub displays are?
18      A   I don't recall what I said.  I would have sent
19 her my -- the fact sheet.
20      Q   And the next sentence says, "She said JS has
21 been exhibiting there for years and she sees no abuse."
22          Next sentence, "She said she has researched them
23 by checking of their own website."
24          Then it says, "Carole added her e-mail address
25 to the alert that went out on July 8th about Concord

Page 80

```
 1    "Wisconsin citizens who are opposed to abusive tiger
 2    cub displays at malls - including the tiger cub
 3    exhibit currently taking place at Cedar Creek Mall in
 4    Rothschild - will be peacefully protecting outside the
 5    mall on Saturday morning."
 6              How did you know that information?
 7       A    I don't recall at this point.  And I note
 8    there's no date on the top of it, so it may not have
 9    actually been sent out.
10              I would have put a date under my e-mail address
11    for the date I would have sent it.
12              (Mr. Baskin left the room.)
13    BY MR. PINKARD:
14       Q    Halfway down the exhibit, it indicates, "When:
15    Saturday, November 19, 10 a.m. to 11 a.m."
16              Was that going to be the time for the protest?
17       A    Yes.
18              (Mr. Baskin entered the room. )
19    BY MR. PINKARD:
20       Q    What was the purpose of the protest?
21              MR. JAKES:  Object to the form.  Go ahead.
22       A    All right.  It appears that Wisconsin citizens
23    were going to protest the tiger-cub display at that
24    particular mall.
25    BY MR. PINKARD:
```

Susan Bass - 6/15/2012

Page 81

1  Q  Do you know whether Big Cat Rescue had organized
2  the protest?
3  **A  We did not.**
4  Q  How do you know from reading this that you did
5  not?
6  MR. JAKES: Object to form.
7  **A  I didn't organize any protests.**
8  BY MR. PINKARD:
9  Q  Okay. Do you know whether anybody else at
10 Big Cat Rescue organized a protest?
11 **A  No, no one else at Big Cat Rescue.**
12 Q  The information contained in this second and
13 third paragraph of the media advisory, is that
14 information you had been instructed to place in the media
15 advisory by Mr. Baskin?
16 **A  I don't recall.**
17 Q  Do you know where you got the information that's
18 contained in paragraph 2 and 3?
19 **A  It's -- it's wording that Howard and I probably**
20 **discussed it. I would have gotten it from either Howard**
21 **or Carole.**
22 Q  Do you know whether the information in
23 paragraph 2 and 3 of this is true information?
24 **A  Well, I believe tiger cubs do not belong in**
25 **malls.**