IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BIG CAT RESCUE CORP.,
A Florida not for profit corporation,

    Plaintiff,                                        CASE NO.: 8:11-cv-209-MSS-MAP

vs.

BIG CAT RESCUE ENTERTAINMENT
GROUP, INC., et al.,

    Defendants.
_____/

**DEFENDANTS'/COUNTER-PLAINTIFFS' RESPONSE IN OPPOSITION TO PLAINTIFF'S/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS'/COUNTER-PLAINTIFFS' SECOND AMENDED COUNTERCLAIM**

COME NOW Defendants/Counter-Plaintiffs, BIG CAT RESCUE ENTERTAINMENT GROUP, INC., G.W. EXOTIC MEMORIAL ANIMAL FOUNDATION d/b/a Big Cat Rescue Entertainment Group, and JOE SCHREIBVOGEL, (collectively "Defendants/Counter-Plaintiffs" or "BCREG") by and through their undersigned counsel, hereby respond in opposition to the Motion for Summary Judgment on Defendants'/Counter-Plaintiffs' Second Amended Counterclaim [DE 97] filed by Plaintiff/Counter Defendant, Big Cat Rescue Corp. ("Plaintiff/Counter-Defendant" or "BCR"), and request that the Court DENY BCR's motion in its entirety because BCR has failed to meet its burden of demonstrating that there is no genuine issue of material fact as to Defendants'/Counter-Plaintiffs' claims for slander, libel, and tortious interference, and as grounds therefore state as follows:

**I.**        **SUMMARY OF ARGUMENT**

Early in this case, the Court concluded that "the whole notion that the Plaintiff is free to say whatever it wants to say, of course, is false. The Plaintiff can only say what is true or what is

fair opinion." (Doc 58 at 85:7-9). Nevertheless, BCR continues to make the same argument in support of its Motion for Summary Judgment that it did in its Motion to Dismiss BCREG's Second Amended Counterclaim, namely, that BCR can say whatever it wants to say regardless of whether or not it is true or fair opinion. As the Court has already stated, such a notion is false.

According to BCR, it could not possibly have engaged in any actionable conduct because its mission and purpose is to put individuals and companies like Defendants/Counter-Plaintiffs out of business, and it has the unfettered privilege to do so. As it has before, BCR argues that the counterclaims of Defendants/Counter-Plaintiffs cannot be maintained because BCR made the defamatory statements under the shelter of this privilege and Defendants/Counter-Plaintiffs cannot maintain an action against BCR for making such statements. (Compare DE 56 at p. 11-12 to DE 57 at p. 5-6). However the Court has already rejected this argument, finding that at least 15 of the statements made by BCR are, in fact, actionable for libel and at least 9 statements are actionable for slander.. (DE 103 at p. 4-7).

Similarly, BCR argued that the allegations contained in BCREG's Second Amended Counterclaim ("Counterclaim"), if true, do not constitute actionable tortious interference. (DE 56 at p. 553). Again, the Court rejected this argument finding that "Plaintiff's use of slander and/or libel constitutes unjustified interference" and that "Defendants sufficiently pled the elements of a claim for intentional interference with an advantageous business relationship." (DE 103 at p. 8).

Additionally, the Court rejected BCR's argument that BCREG had failed to adequately plead a claim for injunctive relief. (DE 103 at p. 9). Finally, the Court also rejected BCR's argument that BCR's defamatory statements are privileged because Court found that whether or not it is true that BCR's defamatory statements were not made in good faith but with malice and

in an effort to injure the reputation and operation of BCREG "is left to a determination in the litigation and trial of this matter." (DE 103 at p. 10-11).

As BCR has acknowledged, it is BCR, and not BCREG, that maintains the initial burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (DE 97 at p. 3). Rather than meet this burden, BCR sets forth a sparse recitation of "undisputed facts," none of which demonstrate the nonexistence of a genuine dispute as to a material fact. (DE 97 at p. 2-3). On the contrary, BCR has now filed its Answer and Affirmative Defenses [DE 106] in which BCR denies the material allegations contained in the Counterclaim filed by Defendants/Counter-Plaintiffs, and raises nine (9) affirmative defenses. The affirmative defenses filed by BCR serve only to demonstrate the genuine existence of numerous disputed factual issues that require resolution by a jury making summary judgment improper.[1] For these reasons, and for those that follow, BCR's Motion for Summary Judgment should be DENIED.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate where "'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.,* 247 F.3d 1262, 1271 (11th Cir. 2001)(quoting Fed. R. Civ. P. 56(c)). A District Court "'must view the movant's evidence and all factual inferences arising

---

[1] Defendants/Counter-Plaintiffs are filing a Motion to Reopen Discovery contemporaneously with the filing of this Response to permit Defendants/Counter-Plaintiffs time to conduct discovery as to the Answer and Affirmative Defenses filed by Plaintiff. Defendants/Counter-Plaintiffs therefore request that: (1) the Motion for Summary Judgment be denied as premature; and,, (2) the Court reopen discovery as requested in the motion. Additionally, Defendants/Counter-Plaintiffs request that the Court enlarge the time for Defendants/Counter-Plaintiffs to respond to Plaintiff's Motion for Summary Judgment such that it does not become due until after the additional discovery has been completed, or, alternatively, that Defendants/Counter-Plaintiffs be permitted to supplement their response in opposition to Plaintiff's Motion for Summary Judgment.

from it in the light most favorable to the nonmoving party.'" *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004)(*quoting Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). "'All reasonable doubts about the facts should be resolved in favor of the non-movant.'" *Id.* (*quoting Burton v. City of Belle Glade,* 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

Under Rule 56, a District Court "must seriously consider whether the parties have had equal access to evidence relevant to the motion." *Ferguson v. DeStefano,* 2010 U.S. Dist. LEXIS 122969, *3-5 (S.D. Fla. 2010)(*citing Alabama Farm Bureau Mut. Cas. Co., Inc. v. American Fid. Life Ins. Co.,* 606 F.2d 602, 609 (5th Cir. 1979) and *Farm Bureau Mut. Cas. Co., Inc. v. American Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979). In the Eleventh Circuit, a party opposing a motion for summary judgment should be permitted "an adequate opportunity to complete discovery prior to consideration of the motion*." Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997) (*citing Snook v. Trust Co. of Ga. Bank of Savannah, N.A*., 859 F.2d 865, 870 (11th Cir. 1988)). As the Southern District has noted, "this is an important consideration because the 'party opposing a motion for summary judgment has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits.'" *Ferguson,* 2010 U.S. Dist. LEXIS at *4 (*citing Snook*, 859 F.2d at 870 and Fed.. Civ. P. 56(d)(2)).

"If a party moves for summary judgment prior to the expiration of an adequate discovery period, the court may deny the motion as premature should the non-moving party bring it to the court's attention that, as a consequence, he cannot present the facts necessary to support an appropriate response in opposition." *Id.* at *4-5 (*citing* Fed. R. Civ. P. 56. and *Rodgers v. Global*

*Prophets, Inc.,* 2009 U.S. Dist. LEXIS 100605 (S.D. Fla. 2009) ; *QBE Ins. Corp. v. Griffin*, 2009 U.S. Dist. LEXIS 47564 (M.D. Ala. 2009); *Williams v. Le Crewe De Spaniards,* 2009 U.S. Dist. LEXIS 97811 (S.D. Ala. 2009); *Ramos v. Goodfellas Brooklyn's Finest Pizzeria, LLC*, 2008 U.S. Dist. LEXIS 87368 (S.D. Fla. 2008). "Rule 56(f) allows the non-moving party to provide the court with this notice by filing an affidavit, but the mere written representation by the non-moving party's counsel will suffice." *Ferguson,* 2010 U.S. Dist. LEXIS at *4 (*citing Snook*, 859 F.2d at 871).

### III. ARGUMENT

**1. BCR Has Not Met Its Burden Of Demonstrating That There Is No Genuine Issue Of Material Fact Regarding The Amount Of Damages Suffered By BCREG**

*a. A jury should decide whether and to what extent Defendants/Counter-Plaintiffs suffered damages*

BCR claims that "Counterclaimants' proof of damages is completely lacking." (DE 97 at p. 6). According to BCR, Defendants/Counter-Plaintiffs could not have been damaged because "all proceeds from Counterclaimants' operations pass to G.W. Exotic." (Id.). BCR ignores its own "statement of undisputed facts" in making such a claim, however, because BCR acknowledges that: (1) Defendant/Counter-Plaintiff Schreibvogel is the principal of G.W. Exotic; and (2) G.W. Exotic and Schreibvogel created BCREG. (Id. at p.2-3). Accordingly, BCR has explicitly acknowledged that any damage suffered by G.W. Exotic is also suffered by Schreibvogel as a principal of G.W. Exotic. Furthermore, none of the "evidence" BCR cites supports such an argument. Beth Corley only testified that revenue from the "play cage" is sent to GW Animal Park. (DE 97at Exh. "1, 24:7-14). Ms. Corley provided no testimony about what happens to the money after it is sent to GW Animal Park, whether the money is given to G.W. Exotic, or whether the money is deposited into the accounts of Schreibvogel, BCREG, or both.

Similarly, Mr. Schreibvogel testified only that the money derived from road shows goes back to maintaining the property, paying the staff, and feeding animals. (DE 58 at 46:4-11). There is no indication from Mr. Schreibvogel as to whether this money is distributed to himself or BCREG. Simply put, BCR has offered no evidence that would indicate that Defendants/Counter-Plaintiffs have not suffered any damages.

On the contrary, BCR cites evidence of damages suffered by Defendants/Counter-Plaintiffs when, later its Motion, BCR unsuccessfully attempts to argue that the claims suffered by G.W. Exotic are "speculative and not readily ascertainable." (DE97 at p. 7). There, BCR acknowledges that there is testimony in the record from Mr. Schreibvogel "that BCR had damaged Counterclaimants to the tune of $15 million." (Id.). BCR also refers to deposition testimony from Mr. Schreibvogel that Defendants/Counter-Plaintiffs suffered damages of "$30 million or more." Accordingly, BCR has itself cited evidentiary support for the fact that Defendants/Counter-Plaintiffs suffered damages.

Additionally, BCR ignores the report of Lee Bell, expert witness for Defendants/Counter-Plaintiffs which quantifies the damages suffered by Defendants:

> We have been requested to provide our preliminary opinion regarding the following:
>
> - Monetary damages to the Defendants caused by actions of the Plaintiff, as a result of the Plaintiff's interference with the business relationships of the Defendants.
>
> **Expert Opinion**
>
> Following is our expert opinion:
>
> 1. We calculated average revenue and average variable expense per day of activity during 2011. Days of activity are days when the Traveling Shows operated and earned revenue.
>
>    - The average revenue per Traveling Show day of activity in 2011 is computed as $1,487.22.
>    - The average variable expenses per Traveling Show day of activity in 2011 is computed as $574.90.
>
> 2. Counsel for the Defendants has asked that we assume that the revenue and variable expenses for 2011 as presented at Exhibit B are a complete presentation of the Defendants' Traveling Show financial activity for 2011, and that this level of financial activity is achievable by the Defendants in future periods. Under this assumption, the monetary damages per day of activity in the future to the Defendants may be calculated as average revenue per day of activity for 2011 ($1,487.22) less average variable expenses per day of activity in 2011 ($574.90), or $912.32 per day of activity.

(Export Report of Lee Bell, attached hereto as Exhibit "1," at p. 2).

Based on the foregoing, the issues of whether Defendants/Counter-Plaintiffs suffered damages, and the total amount of such damages, are genuine issues of material fact in dispute and these issues should be resolved by a jury, not by summary judgment.

Finally, BCR claims that Schreibvogel has publicly commented that BCR has actually helped rather than damaged Counterclaimants. (DE 97 at p. 7). However the only "evidence" BCR offers in support of such an argument is the affidavit of Howard Baskin, which is predicated upon inadmissible hearsay, e.g. an unauthenticated YouTube video where Mr. Schreibvogel allegedly made such statements. (DE 45 at p. 14 and Exh. A). However, BCR cannot rely on inadmissible hearsay in support of its Motion for Summary Judgment and any reference to such hearsay should be stricken. *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1268 n.10 (11th Cir. 2010); *Rojas v. Florida*, 285 F.3d 1339, 1342 n.3 (11th Cir. 2002); *Zaben v. Air Prods. and Chems., Inc.*, 129 F.3d 1453, 1455-57 (11th Cir. 1997).

> b. *A jury should decide whether or not BCR caused the damages suffered by Defendants/Counter-Plaintiffs.*

BCR next argues that Defendants/Counter-Plaintiffs have failed to attribute any damages to BCR's defamatory or tortious words or conduct. (DE 97 at p. 8). Once again, BCR does not offer any evidence demonstrating that there is no genuine issue of material fact in dispute as to this issue, but rather, attempts to place the burden on Defendants/Counter-Plaintiffs to demonstrate that there *is* evidence of causation. As previously noted, **it is BCR's burden** to demonstrate the non-existence of a factual dispute with regard to causation, and Defendants/Counter-Plaintiffs are not required to present evidence in support of such a claim except to the extent necessary to rebut evidence presented by BCR. Instead, BCR simply makes the *ipse dixit* argument that "the record is devoid of any admissible evidence that any of the

alleged statements of BCR caused the cancellation or termination of any of Counterclaimants' exhibitions." (DE 97 at p. 8)(emphasis omitted). BCR fails to recognize that it maintains the burden of showing that there *is* evidence in the record to support its claim – Defendants/Counter-Plaintiffs are not required to demonstrate the non-existence of such evidence in the record.

Put another way, if BCR intended to demonstrate that there was no genuine issue of material fact as to whether the defamatory statements made by BCR caused the damages suffered by Defendants/Counter-Plaintiffs, then BCR should have deposed representatives of malls identified by Defendants/Counter-Plaintiffs as having cancelled shows based on the defamatory statements to prove that the malls did *not* cancel such shows as a result of the defamatory statements. As shown in their interrogatory responses, a copy of which is attached hereto as Exhibit "2," Defendants/Counter-Plaintiffs provided BCR with a very detailed list of the venues with which Defendants/Counter-Plaintiffs had ongoing relationships and that cancelled shows as a result of the defamatory statements by BCR. (Exh. "2").

Defendants/Counter-Plaintiffs have also provided BCR with a witness list, a copy of which is attached hereto as Exhibit "3," showing the names and addresses of individuals Defendants/Counter-Plaintiffs intend to call as witnesses at trial as to the cancellations resulting from the defamatory statements made by BCR. Despite having had access to all of this information, BCR has not taken a single deposition of any mall representative nor has BCR presented any affidavits from any mall representative indicating that the mall did not cancel a show to be put on by Defendants/Counter-Plaintiffs as a result of the defamatory statements made by BCR. Accordingly, BCR simply has not met its burden of demonstrating that there is no genuine issue of material fact as to whether BCR caused the damages suffered by Defendants/Counter-Plaintiffs.

Additionally, BCR employee, Susan Bass, has testified that she was hired in November, 2010, for the specific purpose of getting venues to cancel shows that were to be performed by Defendants/Counter-Plaintiffs. (Deposition of Susan Bass, June 15, 2012, attached hereto as Exhibit "3," at 8:13-11:23; 13:13-15:12). According to Ms. Bass, she kept a log of her activities and was specifically told by BCR principal, Howard Baskin, to stop keeping the log once this lawsuit started. (Id. at 25:21-27:24). Those activities included calling malls and asking them to cancel shows where Defendants/Counter-Plaintiffs performing shows. (Id. at 43:12-21). On at least two occasions, Ms. Bass reported that malls would not be permitting Defendants/Counter-Plaintiffs to perform any more shows as a direct result of her contact with the malls. (Id. at 45:23-46:10). Ms. Bass and BCR principal, Carole Baskin, used tactics such as putting out "alerts" on Facebook and contacting local newspapers to put pressure on malls that refused to cancel shows where Defendants/Counter-Plaintiffs were scheduled to perform. (Id. at 53:6-22; 62:8-67:20; 67:12-20). Ms. Bass also testified that she was aware that at least one of the venues she was actively pressuring to cancel a show had a contract for the show with Defendants/Counter-Plaintiffs. (Id. at 61:16-21).

This testimony, from a BCR employee, corroborates the testimony of Mr. Schreibvogel at the hearing held before this Court on January 12, 2012. (See hearing transcript attached hereto as Exhibit "5"). Among other things, Mr. Schreibvogel testified that:

a. Defendants/Counter-Plaintiffs performed shows at Courtland Center Mall in Burton, Michigan, before the show was canceled after receiving a defamatory e-mail from BCR; (Exh. "5" at 13:4-18:11; Exh. "3" at p. 6, ¶ 44);

b. Mounds Mall, in Anderson, Indiana, canceled a show after receiving a defamatory e-mail from BCR; (Id. at 19:8-21:5);

   c. Heartland Mall, in Brownwood, Texas, canceled a performance by Defendants/Counter-Plaintiffs after receiving a defamatory e-mail from BCR; (Exh. "5" at 21:6-23:18; Exh. "3" at p. 7, ¶ 51); and,

   d. Centerpointe Mall, in Grand Rapids Michigan, and several other malls owned by the same company, canceled their contracts with Defendants/Counter-Plaintiffs after receiving a defamatory e-mail and pressure from BCR. (Exh. "5" at 23:20-27:23; Exh. "3" at p. 6, ¶ 49-50).

Rather than meet its burden of showing that there *is not* a genuine issue of material fact in dispute as to whether certain venues canceled their contracts with Defendants/Counter-Plaintiffs as a result of the defamatory statements made by BCR, BCR attempts to improperly require Defendants/Counter-Plaintiffs to carry the initial burden of showing that there *is* a genuine issue of material fact in dispute. As BCR acknowledges in its own Memorandum, however, that is not the way a motion for summary judgment works. (DE 97 at p. 3).

Under the case law cited in its Memorandum, BCR "must first identify grounds that show the **absence** of a genuine issue of material fact." (Id. *citing Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006)(emphasis added). Only then does the burden shift to Defendants/Counter-Plaintiffs to present affirmative evidence to show that a genuine issue of material fact **does** exist. (Id.). Here, BCR argues that Defendants/Counter-Plaintiffs have failed to place evidence in the record that events *were* cancelled by venues with which Defendants/Counter-Plaintiffs had contractual relationships, or that such cancellations were "a direct result of some improper conduct by BCR." (DE 97 at p. 8). Even more astonishingly, BCR appears to argue that it was the responsibility of Defendants/Counter-Plaintiffs to depose these venues in order to create record evidence of the cancellations. (Id.). As stated above, that is not the way summary

judgment works. It is BCR's burden on a motion for summary judgment to create record evidence showing that these venues *did not* cancel exhibits as a result of the defamatory statements made by BCR, and BCR has simply failed to do so.[2]

     c. *The Court has already ruled that the statements made by BCR are not protected as privileged.*

BCR next argues that each of its defamatory statements are privileged. (DE 97 at p. 10). As discussed *supra*, this is the same argument that BCR made in its Motion to Dismiss Defendants'/Counter-Plaintiffs' Second Amended Counterclaim. (DE 56 at p. 13). The Court has already rejected this argument in its Order denying BCR's Motion. (DE 103 at p. 10-11). As such, the Court's prior ruling is the law of the case and BCR is precluded from rearguing the same points of law that it did in its Motion to Dismiss. *Acciard v. Whitney*, 2011 U.S. Dist. LEXIS 113107 (M.D. Fla. 2011)(*quoting Aldana v. Del Monte Fresh Produce N.A., Inc.,* 578 F.3d 1283, 1288-89 (11th Cir. 2009)("Under the law of the case doctrine, 'an issue decided at one stage of a case is binding at later stages of the same case.'"). Accordingly, the Court should not again consider this argument because it has already ruled that the defamatory statements made by BCR are not privileged.

Even if the Court were to consider the argument for a second time, however, BCR has presented no evidence that would show that there is no genuine issue of fact as to whether or not the defamatory statements are privileged and therefore summary judgment must be DENIED on this basis.

     d. *The Court has already ruled that the statements made by BCR are not protected as BCR's opinion and there are genuine issues of material fact in dispute as to whether or not the statements are true.*

---

[2] To the extent that BCR argues that some venues may have canceled exhibits for other reasons (DE 97 at p. 9), such an argument only creates a question of fact to be resolved by a jury as to why a particular venue canceled an exhibit.

As it did before, BCR argues that its defamatory statements are protected as non-actionable opinion. (Compare DE 56 at p. 11-12 to DE 97 at p. 10-18). And, as discussed *supra*, the Court has already rejected this argument, (DE 103 at p. 3-4), and BCR is prohibited of making the same argument again under the law of the case doctrine. *Acciard v. Whitney*, 2011 U.S. Dist. LEXIS 113107 (M.D. Fla. 2011). Accordingly, BCR's Motion should be DENIED on the basis that the Court has already ruled that BCR's defamatory statements are **not** protected as BCR's opinion.

With regard to whether or not the defamatory statements made by BCR are true, BCR has succeeded only in demonstrating that there are genuine issues of material fact in dispute that must be resolved by a jury. Additionally, BCR attempts to take the defamatory statements out of context and apply its own interpretation of the statements in arguing that the statements are true. As the Court has already noted, however:

> [I]n determining whether an alleged libelous statement is pure opinion, the court must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication. The court must consider the context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement. If the statements are not pure opinion, the speaker may be held liable for a libel action.

(DE 103 at p. 4)(*citing Hay v. Indep. Newspapers, Inc*., 450 So. 2d 293, 295 (Fla. 2d DCA 1984)(internal citations omitted).

    i.    There is a genuine issue of material fact in dispute as to whether or not Defendants/Counter-Plaintiffs operate a "deadly, dangerous business."

Assuming *arguendo* it is true that the animals exhibited by Defendants/Counter-Plaintiffs are dangerous (DE 97 at p. 11), and some of the animals die (Id.), that does not make the business operated by Defendants/Counter-Plaintiffs a "dangerous, deadly business." (Id.). Under that logic, almost any business would qualify as "deadly and dangerous." Moreover, a jury is

entitled to consider the context in which the statement was made to determine whether or not the statement was defamatory.

As noted in the Second Amended Counterclaim, the statement that Defendant Schreibvogel is involved in a "dangerous, deadly business," is only one of nine (9) statements made in a scathing e-mail sent by BCR employee/agent, Julie Hanan, to Courtland Center Mall with copies to the headquarters of JCPenney's, Staples, JoAnn Fabric, and Dunham's Sports. (DE 54 at ¶ 28). A reasonable jury could conclude that this statement, when combined with the others made by Ms. Hanan, was intended to be part of an overall false and defamatory attack on Defendants/Counter-Plaintiffs with the intent (as Susan Bass testified) of causing Courtland Center Mall to cancel any scheduled or future exhibitions by Defendants/Counter-Plaintiffs. Accordingly, the question of whether or not this statement is true cannot properly be resolved on summary judgment and should be submitted to a jury.

> ii. There is a genuine issue of material fact in dispute as to whether or not Defendants/Counter-Plaintiffs operate a "puppy mill."

Similarly, the question of whether BCR statements that Schreibvogel operates "puppy mills" where Schreibvogel "churns out dangerous carnivores" and that Defendants/Counter-Plaintiffs are "incessant," "notorious," and/or "unscrupulous breeders" (DE 97 at p. 11) should be submitted to a jury. As explained by one of the rebuttal experts for Defendants/Counter-Plaintiffs, Dr. Bhagavan Antle, any analogy to the operation of Defendants/Counter-Plaintiffs to a "puppy mill" is "arbitrary and is an uneducated idea of what the activity of G.W. Exotic Animal Memorial Foundation is doing and what the cages are really like and what the needs of the exotic animals really are." (See Notice of Disclosure of Rebuttal Expert Witnesses and Notice of Service of Rebuttal Expert Reports attached hereto as Exhibit "6," at Exhibit "A" ("Antle Report"), p. 6-7, ¶ I; p. 13-14, ¶ f; p. 20-21, ¶ f). According to Dr. Antle, "G.W. Exotic

Animal Memorial Foundation and Mr. Schreibvogel's cages surpass what is asked by the only real regulatory agency in the USA (the USDA - the agency charged with enforcing the animal welfare act made by the U.S. Congress and carried out by GOV veterinarians with unannounced inspections regularly throughout each year." (Id.).

Likewise, Defendants'/Counter-Plaintiffs' rebuttal expert, Lynn Culver, testified that facilities that at one time met the description of a "puppy mill" have been closed down, and that Defendants/Counter-Plaintiffs "have an abundance of female tigers, and would not have to continuously breed them, even if they wanted a continuous supply of cubs." (Exh. "6" at Exh. "B" ("Culver Report"), p. 17). Moreover, Ms. Culver stated that ""puppy mills" "is a negative term used to describe large-scale breeding-only facilities that produce offspring to sell to pet stores and people, and do not keep offspring for exhibit. Puppy mills are not open to the public, and do not rescue mistreated animals, and give refuge to dogs loosing their homes." (Id.).

Conversely, Ms. Culver stated, "GW is a multi-purpose facility, combining breeding and exhibiting and doing rescue work as well. The cages and habitats at GW are large, diverse, clean, and enriched. The facility is open to the public and must meet the expectations of visitors. Rows of barren cages would never build the loyal following of supporters that G.W. Animal Park has. **This is a deliberately non-factual description of G.W. Exotic Animal Park."** (Id.)(emphasis added). Finally, in response to the description of G.W. Exotic Animal Park as a "puppy mill" by BCR's purported experts, Ms. Culver stated: "I have seen G.W. Exotic Animal Park and this does not describe [Schreibvogel's] facility." (Id. at p. 30, 41).

Based on the foregoing, there is, at the very least, a genuine issue of material fact in dispute as to whether Defendants/Counter-Plaintiffs operated a "puppy mill" as BCR claimed in statements it disseminated to the public.

    iii. There is a genuine issue of material fact in dispute as to whether or not Schreibvogel is a "major supplier fueling the exotic animal trade."

BCR next unsuccessfully attempts to argue that it is true that Mr. Schreibvogel is a "major supplier fueling the exotic animal trade." (DE 97 at p. 12). Yet none of the evidence cited by BCR supports such a claim and, if anything, BCR only further underscores the numerous disputed factual issues in this case that preclude summary judgment. Contrary to the scant, incomplete, and inapplicable evidence relied upon by BCR, Mr. Schreibvogel was actually asked under oath, in open Court, whether he was a major supplier fueling the exotic animal trade and replied unequivocally that he was not. (Exh. 5 at 14:9-18). When asked what the term "exotic animal trade means to him, Mr. Schreibvogel testified that it meant to "buy and sell and breed and sell exotic animals to the general public, to take them to public auctions for sales, to sell them off newspapers, off the Internet, to put them into the animal trade," just as BCR alleges. (Id. at 14:19-25). Mr. Schreibvogel went on to describe, however, precisely why he is **not** engaged in the exotic animal trade, stating: "**[a]ll** of our animals that we ship out of our facility go to USDA licensed exhibitors." (Id. at 14:25-15:1)(emphasis added).

  This testimony is supported by the expert report of Dr. Antle who states that "[t]he United States has a very small nearly non-existent breeding group of tigers. There is not a serious supply of tigers in need of homes each year." (Antle Report at p. 6, ¶ h; p. 13 ¶ g, p. 20, ¶ g). Similarly, Lynn Culver stated in her report that the question of whether a facility is a "major supplier fueling the exotic animal trade" is a complex one that involves many factors, and that there are other plausible explanations for the breeding of tigers by Defendants/Counter-Plaintiffs. (Culver Report at p. 16-17, ¶ h; 41-42, ¶ g). Among the other explanations, none of which BCR has refuted, are the higher costs of production and a reduction in the number of facilities breeding large cats. (Id.). According to Ms. Culver, in today's world, "[o]nly a few facilities

breed tigers, and G. W. with its great number of animals coming from bloodlines all across the country is a logical breeding center." (Id.). Ms. Culver also states that any reference "exotic animal trade" by organizations such as BCR to refer to "competitors" such as G.W. Exotic Animal Park is "deliberately misleading." (Id. at p. 29, ¶ e).

Based on the foregoing, there is a genuine issue of material fact as to whether or not Schreibvogel is a "major supplier fueling the exotic animal trade," and this issue should be submitted to a jury.

> iv. There is a genuine issue of material fact in dispute as to whether or not cute cubs being pet at Schreibvogel's shows "will end up as a backyard breeder, shot for a price at a canned hunting facility, killed and the parts sold off as ingredients for the Asian medicinal trade which values them highly."

Not surprisingly, BCR does not even attempt to argue that it is true that cute cubs being pet at Schreibvogel's shows "will end up as a backyard breeder, shot for a price at a canned hunting facility, killed and the parts sold off as ingredients for the Asian medicinal trade which values them highly." (DE 97 at p. 12). Instead, BCR relies solely on the claim that this statement is "BCR's opinion based on available information." (Id.). However, as discussed *supra*, any claim that such a statement is protected opinion has already been rejected by the Court. As importantly, BCR offers no evidence to support any claim that this statement is true. Perhaps that is because, as Dr. Antle opined, the U.S. Fish and Wildlife Service has found that "no proof exists that any tiger from the United States has ever made its way into international markets." (Antle Report at p. 8, ¶ m; p. 15, ¶ l; p. 22, ¶ l).

Likewise, Lynn Culver opined that "[t]here is no state in the US that has legal lion, tiger or other big cat species hunts" because "[t]he high fence hunting ranch regulations in every state prohibit hunting of carnivores." (Culver Report at p. 20-21, ¶ m). According to Ms. Culver, "[i]n

all the decades of claims of canned hunts, no actual locations, or arrests exist to back up this urban legend. **This is entirely manufactured by animal rights extremists to further their political agenda**." (Id.)(emphasis added). Ms. Culver also opined that any claim that cubs used in petting exhibits by Defendants/Counter-Plaintiffs might wind up in food products is also patently false. (Id.).

Based on the foregoing, BCR has failed to meet its burden of showing that no genuine issue of material fact exists as to whether the statements made by BCR, as alleged in Paragraph 28(e) of the Second Amended Complaint, are true, therefore BCR's Motion for Summary Judgment should be DENIED.

> (v.) through (xviii.) There is a genuine issue of material fact in dispute as to whether or not the remaining defamatory statements made by BCR are true.

As with the previous defamatory statements, BCR continues to offer no undisputed and dispositive evidence in support of its motion as it unsuccessfully attempts to defend claims such as: "Schreibvogel is 'a modern day snake oil salesman making money off the backs of innocent animals'" (DE 97 at p. 13); "Schreibvogel is 'exposing the public and animals to danger and cruelty'" (Id.); "Schreibvogel has a 'horrendous reputation,' his organization is 'dirty' and any association with Schreibvogel's operation will result in Courtland Center Mall's reputation being smeared'" (Id.); "G.W. Exotic has a 'long, notorious history of USDA violations, suspensions, and fines for animal abuse and public endangerment;" (Id. at p. 14); and the remaining statements addressed by BCR in pages 15 through 18 of its Memorandum.[3] The Court need look

---

[3] Due to page limitations, each of these defamatory remarks cannot be addressed in detail, therefore Defendants/Counter-Plaintiffs rely upon the rebuttal expert opinions of Dr. Antle and Lynn Culver, attached as Exhibit "6," which refute any claim by BCR that the statements contained in these paragraphs are true, along with the evidence recited above and the affidavit of Joe Schreibvogel which is attached hereto as Exhibit "7."

no further than the expert opinions rendered by Dr. Antle and Lynn Culver, however, as well as the evidence and testimony referenced above, to determine that each of these arguments are without merit. At the very least, there is a genuine issue of material fact in dispute as to whether or not these statements are true, and these issues should be submitted to a jury for resolution. Accordingly, BCR's Motion for Summary Judgment should be denied.

> *e. Defendants/Counter-Plaintiffs are not required to prove identifiable business relationships with various third parties and BCR has failed to meet its burden of demonstrating an absence of any genuine issue of material fact as to such relationships.*

As before, BCR once again attempts to shift the burden of proving the existence of business relationships with identifiable people or entities to Defendants/Counter-Plaintiffs rather than meeting **BCR's burden** of demonstrating that there is no genuine issue of material fact as to whether or not such relationships exist. (DE 97 at p. 19). Inexplicably, BCR argues that "Counterclaimants have failed to take any depositions or conduct discovery directed to venues with which they allege to have business relationships," (Id.), as though Defendants/Counter-Plaintiffs are required to do so.[4] Apparently BCR is operating under the mistaken belief that Defendants/Counter-Plaintiffs are required to produce evidence of such relationships at the summary judgment stage without BCR ever having shifted the burden to produce such evidence to Defendants/Counter-Plaintiffs as required under the authority cited by BCR in its brief. Once again, this is simply not the way the burden shifting approach to the resolution of a motion for summary judgment works.

Even if it did, however, there is ample evidence recited above that such relationships **did** exist, that BCR **knew** about those relationships, and that BCR intentionally interfered with the

---

[4] Astonishingly, it is BCR that should have, but did not, take depositions and conduct discovery as to these venues given that it is BCR's burden to demonstrate the non-existence of any genuine issues of material fact as the movant for summary judgment.

contractual relationships between Defendants/Counter-Plaintiffs and their clients. (See, e.g. Exh. "3" at 61:16-21; Exh. "5" at 23:20-27:23; Exh. "3" at p. 6, ¶ 49-50). Additionally, BCR's entire argument ignores the possibility that some of these contracts may have been oral, therefore no written contract would exist.  Based on the foregoing, BCR has once again failed to meet its burden of demonstrating that there is no genuine issue of material fact in dispute as to the existence of contractual relationships between Defendants/Counter-Plaintiffs and the venues with which BCR intentionally and deliberately interfered, and BCR's Motion for Summary Judgment should therefore be DENIED

> f. The Court has already rejected BCR's claim that some of the defamatory statements made by BCR are barred by the statute of limitations and BCR is prohibited from raising this issue again under the law of the case doctrine.

As it did its Motion to Dismiss Defendants'/Counter-Plaintiffs' Second Amended Counterclaim, (DE 56 at p. 5-6), BCR again claims that some of the defamatory statements made by BCR are not actionable because they are barred by the statute of limitations. (DE 97 at p. 20). And, as before, the Court has already rejected this argument. (DE 103 at p. 4).  BCR offers no evidence in support of its claim that the statute of limitation applies, but rather simply copied and pasted the same argument it made in its Motion to Dismiss to its Motion for Summary Judgment. (Compare DE  56 at p. 5-6 to DE 97 at p. 20-21).  Because BCR has not submitted any evidence in support of its contention, it has failed to meet its burden under the summary judgment standard and the law of he case controls.

## IV. CONCLUSION

For the foregoing reasons, BCR has failed to meet its burden of demonstrating that there is no genuine issue of material fact in dispute and BCR's Motion for Summary Judgment should therefore be DENIED.

Respectfully submitted this 14th day of September, 2012.

**ANDERSON LAW GROUP**

/s/Daniel W. Anderson
Daniel W. Anderson, Esq.
Florida Bar No. 490873
13577 Feather Sound Drive, Suite 670
Clearwater, FL 33762
Telephone No.: (727) 329.1999
Facsimile No.: (727) 329.1499
Email: danderson@floridalawpartners.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of September, 2012, a true and correct copy of the foregoing was filed electronically in the ECF system. Notice of this filing will be sent to the parties of record identified below by operation of the Court's electronic filing system, including counsel as described below. Parties may access this filing through the Court's system.

Frank R. Jakes, Esq.
Aleksas A. Barauskas, Esq.
Johnson, Pope, Bokor, Ruppel, & Burns, LLP
403 East Madison Street, Suite 400
Tampa, Florida 33602

/s/Daniel W. Anderson
Daniel W. Anderson, Esq.
Florida Bar No. 490873