# EXHIBIT 5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BIG CAT RESCUE CORP.,        CASE NO: 8:11-CV-209-T-35MAP
a Florida not-for-profit
corporation,

        Plaintiff,

VS.                          Tampa,
BIG CAT RESCUE ENTERTAINMENT  2:00 p.m.
GROUP, INC., an Oklahoma     January 12, 2012
corporation, et al,

        Defendants,

        Defendants.
_____/

    TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND
                    PRELIMINARY INJUNCTION
            BEFORE THE HONORABLE MARY S. SCRIVEN
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

Counsel for Plaintiff:    FRANK R. JAKES, ESQUIRE
                          ALEKSAS A. BARAUSKAS, ESQUIRE
                          Johnson, Pope, Bokor, Ruppel &
                          Burns, LLP
                          403 East Madison Street
                          Suite 400
                          Tampa, Florida  33602-4606
                          (813)225-2500
                          frankj@jpfirm.com
                          aleksasb@jpfirm
Counsel for Defendant:    ERIC C. PINKARD, ESQUIRE
                          MS. TRACY HENRY
                          DANIEL W. ANDERSON
                          Anderson Pinkard
                          13577 Feather Sound Drive
                          Suite 670
                          Clearwater, Florida  33762
                          (727)392-1999
                          epinkard@floridalawpartners.com
                          thenry@floridalawpartners.com
                          danderson@floridalawpartners.com


        CLAUDIA SPANGLER-FRY, OFFICIAL U. S. COURT REPORTER

```
 1   Court Reporter:              CLAUDIA SPANGLER-FRY, RPR, CM
                                  Official Court Reporter
 2                                801 North Florida Avenue
                                  7th Floor
 3                                Tampa, Florida  33602
                                  (813)301-5575
 4                                cookiefry@aol.com

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2                       January 12, 2012

 3                        * * * * * *

 4           THE COURT:  Please have a seat.

 5           Please call the case.

 6           THE CLERK:  In the matter of Big Cat Rescue

 7  Corporation versus Big Cat Rescue Entertainment, Exotic

 8  Memorial Entertainment and Joe Schreibvogel, 8:11-CV-209.

 9           Counsel please state your appearances starting with

10  the Plaintiff.

11           MR. JAKES:  Good afternoon, Your Honor, Frank Jakes,

12  from Johnson Pope in Tampa, Florida.

13           MR. BARAUSKAS:  Aleksas Barauskas with Johnson Pope.

14           MR. JAKES:  With us today is the corporate

15  representative of Big Cat Rescue Corporation, Howard Baskin.

16           THE COURT:  Good afternoon.

17           For the defense?

18           MR. PINKARD:  Eric Pinkard on behalf of the

19  Defendants.  This is Paris Davis, an associate with our firm.

20  That is Mr. Schreibvogel and that's Karen Levy, a paralegal

21  with our office.

22           THE COURT:  Thank you.  We're here for the purpose of

23  hearing this motion for preliminary injunction, with notice, to

24  seek to enjoin defamation, libel, slander and tortuous

25  interference filed by the Defense Counter Plaintiff in the
```

1   case.  I've reviewed the materials submitted, and I don't know

2   if I'm hearing the response correctly, that the defense seems

3   to concede the prior restraint issue, but wishes to pursue the

4   injunction as it relates to the underlying tortuous

5   interference claim; is that right?

6          MR. PINKARD:  That's correct, Your Honor.

7          THE COURT:  Let me hear you on that motion.

8          MR. PINKARD:  All right.

9          Your Honor -- well, I have testimony to present and we

10  also think both parties have brought to Court with us some

11  exhibits as part of the motions and the response.  I believe

12  after talking with counsel that we reached an agreement that we

13  could introduce those into evidence and they would be received

14  by the Court, if I'm correct, counsel.

15         MR. JAKES:  Your Honor, I think apart from the issues

16  as to what they mean and significance to derive from the

17  exhibits, we have no problem in the admission of both the

18  Plaintiff's -- or excuse me -- the movant's and the Plaintiff's

19  Exhibits into evidence for purposes of this hearing.

20         THE COURT:  All right.

21         They'll be received.

22         Do we have them by some designated number or reference

23  system.

24         MR. PINKARD:  No, Your Honor, ours are numbered 1

25  through 15, and there's an exhibit list at the front, so...

 1          THE COURT:  All right.

 2          MR. JAKES:  And for the benefit of the record, ours

 3  run 1 through 12.

 4          THE COURT:  All right.

 5          So we will admit Defendants' 1 through 15 and

 6  Plaintiff's 1 through 12.

 7      (Thereupon, Defendants' Exhibit Numbers 1 through 15 and

 8  Plaintiff's Exhibit Numbers 1 through 12 were so designated for

 9  EVIDENCE.)

10          You can present them -- are those courtesy copies or

11  Court copies?

12          MR. PINKARD:  I have a copy for the Court.  I think

13  the parties gave the Court a courtesy copy.

14          THE COURT:  All right.

15          You may place them on the witness stand if your

16  witnesses are going to refer to them.  And then you may put

17  those on the front table for the Plaintiffs.

18          And you intend to introduce witnesses to testify as to

19  what salient issues, facts, are going to what aspect of your

20  claim?

21          MR. PINKARD:  The tortuous interference with the

22  business relations claim which we believe is part and parcel of

23  the defamation claims, also.

24          THE COURT:  And who are the witnesses you intend to

25  call?

Case 8:11-cv-00209-MSS-MAP   Document 58   Filed 02/23/12   Page 6 of 91 PageID 6715

 1            MR. PINKARD:  Well, Mr. Schreibvogel.

 2            THE COURT:  That's the only witness?

 3            MR. PINKARD:  That's the only witness, Your Honor.

 4            THE COURT:  Does the defense intend to call any

 5   witnesses; the defense as the motion Plaintiff?

 6            MR. JAKES:  Your Honor, we would reserve the right to

 7   call Mr. Baskin, we don't know if it will be necessary.

 8            THE COURT:  Do the parties wish to invoke the rule

 9   with respect to the witnesses?  Mr. Baskin is the client

10   representative, so it doesn't matter.

11            MR. JAKES:  Right.

12            THE COURT:  All right.

13            Please call your first witness.

14            MR. PINKARD:  We'll call Joe Schreibvogel.

15            THE COURT:  Please come forward, sir, to be sworn.

16   Thereupon,

17                    JOSEPH ALLEN SCHREIBVOGEL,

18   having first been duly sworn to tell the truth, the whole

19   truth, and nothing but the truth, was examined and testified as

20   follows:

21            THE WITNESS:  Yes, ma'am, I do.

22            THE CLERK:  Please take a seat in the witness box.

23            THE COURT:  I'm sorry, I didn't hear the witness.  Is

24   that a yes?  I didn't hear you.

25            THE WITNESS:  I'm half deaf, I said, yes, ma'am, I do.

1        THE COURT:  Do you need a hearing device?

2        THE WITNESS:  No.

3        THE COURT:  All right.

4        Sir, you're under oath, you must give truthful answers

5   to the questions that are asked.  If you give false answers,

6   you face penalties of perjury, false statement and obstruction

7   of justice.

8        Do you understand that?

9        THE WITNESS:  Yes, ma'am.

10       THE COURT:  If counsel is speaking, wait until he

11  completes his questions before you start to answer so you're

12  not talking over him.  And if you see opposing counsel stand to

13  object, wait until I rule on the objection before you start

14  your answer.

15       Do you understand that?

16       THE WITNESS:  Yes, ma'am.

17       THE COURT:  Counsel, you may proceed.

18                    DIRECT EXAMINATION

19  BY MR. PINKARD:

20  Q.  Would you tell us your name, please, sir?

21  A.  Joseph Allen Schreibvogel.

22  Q.  And what is your profession?

23  A.  I'm the president of the GWE Exotic Foundation in

24  Wynnewood, Oklahoma.

25  Q.  How long have you held that position?

 1    A.  Since October 14th of 1999.

 2    Q.  Can you describe to the Court, in general, what that

 3    foundation consists of?

 4    A.  We're licensed as an exhibitor by the USDA and we are

 5    opened to the public to exhibit animals such as any zoo is and

 6    we house unwanted exotic animals.

 7    Q.  Could you tell us how many unwanted exotic animals you

 8    presently have to this date?

 9    A.  Approximately 1,000.

10    Q.  Could you break that down, generally, as to the different

11    kinds of animals that you have?

12    A.  We have approximately 128 species, ranging from tigers and

13    lions and leopards to snakes and alligators and birds and

14    hissing cockroaches.

15    Q.  And what is the underlying purpose of the foundation?

16    A.  Well, the foundation was built in memory of my brother who

17    was killed in 1997 by a drunk driver.  We started the

18    foundation in honor of him to rescue animals he always wanted

19    to go see in the wild.  And we incorporated my magic show

20    within the foundation to educate kids and adults about the

21    hazards of drink and driving.

22    Q.  All right.

23         As part and parcel of your operation, have you been

24    putting on the magic shows that you referred to?

25    A.  Yes, sir.

1  Q.  And when did you start doing that?

2  A.  I started doing that in the early 2000s.

3  Q.  And at some point as part of the magic show, did you also

4  start exhibiting some cubs at various venues?

5  A.  Yes.

6  Q.  Approximately when did that start?

7  A.  We started educating, taking the cubs and different animals

8  to school from when we opened in 1999.

9  Q.  And specifically as to taking tiger cubs to various venues,

10  when did you start doing that?

11  A.  Repeat that again.

12  Q.  As far as taking the tiger cubs to malls and different

13  places, when did you start doing that?

14  A.  We started taking cubs, I would comfortably say, in 1999.

15  Q.  What is the purpose of these exhibits that you bring the

16  cubs on?

17  A.  We educate the public, the hazards, the dangers of going

18  and purchasing or acquiring an exotic animal without them

19  knowing how to take care of them, the responsibilities of it,

20  and we believe that hands-on education to teach somebody in

21  America about how to save something in a third world country

22  that they would never see, is the best way to educate.

23  Q.  And the monies and donations that you would get from these

24  exhibits, what are they used for?

25  A.  To fund and pay for the bills at the park, to help us pay

1   to rescue and re-home adult animals that cannot go out and earn

2   their keep.

3   Q.  And getting back to the operation of the park, could you

4   describe how large the park is?

5   A.  Today, it's close to 45 acres.  We have 120 rented acres 30

6   miles south of us that we use for our domestic stock rescue,

7   for horses and cows and goats, and stuff like that, so we're

8   close to 165 acres today.

9   Q.  And do you have a staff working at the foundation?

10   A.  Yes, sir.

11   Q.  How many people work there?

12   A.  Between volunteers, interns and paid staff, approximately

13   21 people.

14   Q.  At the foundation, do you ever sell any of the tigers to

15   private owners?

16   A.  Never.

17   Q.  Do you ever place any of the tigers to other institutions?

18   A.  We place a lot of animals, tigers and other species that we

19   have at other USD licensed facilities.

20   Q.  In regard to tigers, do you have any idea approximately how

21   many you place at other institutions?

22   A.  Last year, just on young tigers, we placed 17 in 11

23   facilities.

24   Q.  And when you say "placed," do you mean you sold them to

25   these facilities?

1  A.  These were all donated to USD licensed facilities.

2  Q.  And when you do the donations to the USD licensed

3  facilities, what safeguards are in place with regard to what

4  happens to the tiger after you do that placement?

5  A.  Well, when we transfer a tiger out of our possession to

6  another facility, because it's illegal to sell a tiger to a

7  private individual without a USD license, to my knowledge, we

8  fill out a disposition form for that animal, and our inspector

9  takes a copy of that to the USD Office and the receiving

10  facility has a copy of the exact same disposition form and

11  their USD inspector keeps an eye on that animal in their care

12  from that point on, and if they were to ship it out to another

13  facility, a disposition form must be filled out so there's a

14  paper trail with that animal, even after it dies.

15  Q.  And taking the time frame of the last five years, about how

16  many of the magic shows and the cub exhibits have you done in

17  the various venues?

18  A.  Pardon?

19  Q.  Approximately how many per year of the exhibits where you

20  used the tiger cubs do you do on a yearly basis?

21  A.  Sometimes we don't have tiger cubs to use for the exhibit,

22  but we still perform our shows and our educational exhibits and

23  our show is out year round, it's continuously out.

24  Q.  Could you put a number on it?

25  A.  Approximately 45 shows because they're all five days long.

 1          THE COURT:  Is that 45 shows using tiger cubs or 45

 2  shows total?

 3          THE WITNESS:  45 shows total.

 4          THE COURT:  How many using tiger cubs?

 5          THE WITNESS:  Probably three quarters of those.

 6  BY MR. PINKARD:

 7  Q.  Is it your intent when you use the tiger cubs, do you ask

 8  for donations?

 9  A.  Yes.

10  Q.  And to what charitable or what organizations are the

11  donations made to?

12  A.  They're made to the GWE Exotic Animal Foundation and then a

13  percentage of what we raise we try and send to the Rare Species

14  Fund which helps conservation in seven other continents.

15  Q.  Is it your intent on putting on the exhibits with the tiger

16  cubs to make a personal profit?

17  A.  No.  In fact, in --

18          THE COURT:  That's the only question pending.

19          THE WITNESS:  Okay.

20  BY MR. PINKARD:

21  Q.  Sir, sitting in front of you should be a booklet with some

22  exhibits contained therein.  And if you could take a look at

23  Exhibit Number 2, which appears to be an e-mail sent Friday,

24  September 25th, 2009, from a Julie Hanan.  Do you know who

25  Julie Hanan is?

1  A.  I've never met her, but I've heard of her.

2  Q.  Okay.  To your knowledge, who does she work for?

3  A.  Big Cat Rescue of Tampa, Florida.

4  Q.  And it looks like the recipient of this e-mail or topic of

5  this e-mail is Courtland Center Mall.  Do you know where that

6  mall is located?

7  A.  In Burton, Michigan.

8  Q.  And have you in the past put on your tiger cub display at

9  that mall?

10  A.  We did do one display at that mall before they were

11  canceled.

12  Q.  And could you describe how you get the tiger cubs to the

13  display locations and how they're kept at the display location

14  and what happens to them at the display locations?

15  A.  They're transported to the location wherever the venue is

16  in an 18-wheeler that is USDA-approved, with central air and

17  heat.  We arrive at the location and they are all built, most

18  generally, 10 foot by 10 foot cages inside the mall and there

19  is public barriers put up around the display to keep the people

20  away from the cages and that's USDA Law.

21       And the animals are on display, some of the animals,

22  if they're the age that is allowed to be, people are allowed to

23  interact with them.  The Federal Government requires them to

24  have as much rest time as they have exhibit time.

25       And then at night, depending on the location, they're

1  either housed back at the semi or if they're young cubs and

2  they have to be fed during the night, they're taken to the

3  motels and fed with the staff, or if it's at all feasible, most

4  malls or venues provide us large rooms to build holding cages

5  inside so they're protected.

6  Q.  And does the USDA inspect these traveling shows?

7  A.  Quite often.

8  Q.  All right.

9       Taking a look at the e-mail, Exhibit Number 2 in the

10  booklet that you have in front of us, if you look down at the

11  fifth paragraph, I'd like to read to you the fifth paragraph.

12  It says, "what you know as puppy mills is what Schreibvogel

13  really runs, the difference being he churns out dangerous

14  carnivores.  The show is a major supplier of fueling the exotic

15  animal trade".

16       Are you a major supplier of fueling the exotic animal

17  trade?

18  A.  No, I'm not.

19  Q.  When you hear the term "exotic animal trade," what does

20  that mean to you?

21  A.  The exotic animal trade, just the term "trade" to me would

22  mean to buy and sell and breed and sell exotic animals to the

23  general public, to take them to public auctions for sales, to

24  sell them off newspapers, off the Internet, to put them into

25  the animal trade.  All of our animals that we ship out of our

1  facility all go to USDA licensed exhibitors.

2  Q.  Now the next sentence in that paragraph, it says, "the cute

3  cub you're petting today will end up as a backyard breeder,

4  shot for a price at a canned hunting facility, killed and the

5  parts sold off as ingredients for the Asian medicinal trade,

6  which values them highly."

7         Have you ever sold any of your tiger cubs that you use

8  on your display so that they could be killed, butchered and

9  their ingredients sold on the Asian medicinal trade?

10  A.  No.

11  Q.  To your knowledge, has anything like that happened to any

12  of the tigers, other tigers that you have donated to other

13  facilities?

14  A.  Considering that canned hunts are illegal in the United

15  States, and the paper trail on tigers is so tightly regulated,

16  I could almost guarantee you that none of my cats have ever

17  ended up in any of these places.

18         MR. JAKES:  Objection, speculation.

19         THE COURT:  Overruled.

20  BY MR. PINKARD:

21  Q.  And the next paragraph, second sentence of the next

22  paragraph, it says, "but, make no mistake, this is a modern day

23  snake oil salesman making money off the backs of these innocent

24  animals with more and more being churned through his park".

25         Do you make money off of these innocent animals?

Case 3:11-cv-00209-MSS-RPF Document 1-65 Filed 02/24/12 Page 16 of 91 PageID 6315
Case 3:11-cv-00209-MSS-MAP Document 56 Filed 02/24/12 Page 16 of 91 PageID 631

16

 1 | A.   Since I've started my park, I have put in my entire trust

 2 | fund of $250,000 to keep the doors open and to keep rescuing

 3 | animals, and today, I owe $53,000 worth of back bills and I

 4 | have yet to make my first dollar of profit.

 5 |         THE COURT:  You draw a salary from the business?

 6 |         THE WITNESS:  Pardon?

 7 |         THE COURT:  Do you draw a salary from the business?

 8 |         THE WITNESS:  No, ma'am.

 9 |         THE COURT:  Have you been paid any amount of money for

10 | operating the business?

11 |         THE WITNESS:  No, ma'am.

12 |         THE COURT:  How do you pay for your personal expenses?

13 |         THE WITNESS:  I live on the facility and I don't pay

14 | the electric or water, the park does for the entire staff, and

15 | I live off my grandfather's oil wells, estates, that we get

16 | monthly.

17 | BY MR. PINKARD:

18 | Q.   You mentioned that this particular venue canceled you after

19 | this e-mail; is that correct?

20 | A.   Yes, sir.

21 | Q.   Did they give you a reason why they canceled?

22 | A.   From the harassment of the e-mails and the phone calls.

23 |         MR. JAKES:  Hearsay.

24 |         THE COURT:  Sustained.

25 |         MR. PINKARD:  Judge, I believe at the stage that we're

 1  at, at the preliminary injunction, that the Court is, at this

 2  stage, may rely upon affidavits and hearsay materials which

 3  would not be admissible when you're going for the permanent

 4  injunction.

 5         THE COURT:  Do you have an affidavit?

 6         MR. PINKARD:  I don't have an affidavit, no, Your

 7  Honor.

 8         THE COURT:  Sustained.

 9  BY MR. PINKARD:

10  Q.  Was your exhibit canceled in close proximity to when this

11  e-mail was sent?

12  A.  I was in the middle of a tour with this company that is

13  called General Growth Properties, and we were in the process of

14  doing a tour of their entire company which has something like

15  180 --

16         THE COURT:  The question, sir, was, was the tour

17  canceled in close proximity to the --

18         THE WITNESS:  It was canceled the last day of the

19  show, the whole tour.

20         THE COURT:  So what day was the e-mail sent in

21  reference to the day the tour was canceled?

22         THE WITNESS:  I would have to look at a calendar to

23  give that you exact answer.

24         THE COURT:  So the answer is you don't know?

25         THE WITNESS:  No.

```
 1   BY MR. PINKARD:
 2   Q.  Would it have been within a matter of days or weeks or can
 3   you answer that?
 4   A.  It was within days.
 5   Q.  And have you been invited back to that venue or allowed to
 6   --
 7            THE COURT:  Well, everything is within days; how many
 8   days?
 9            THE WITNESS:  Well, this e-mail was sent on a Friday,
10   and we performed Tuesdays through Sundays, so this would have
11   been sent two days before our show is canceled.
12   BY MR. PINKARD:
13   Q.  Do you run a puppy mill at your foundation?
14   A.  Absolutely not.
15   Q.  Do you, in fact, breed some of the exotic cats at your
16   facility?
17   A.  We do.
18   Q.  And could you tell the Court about that in regard to how
19   often you do that and what the purpose is?
20   A.  We're involved in several different species breeding
21   programs, one is the Barbary Lion Breeding Program, which is --
22   they're extinct in the wild, so we take great pride in being
23   involved in that.
24            We're involved in the singing -- New Guinea Singing
25   Dog Program, which we are very proud of that.  We are involved
```

1  in the Rare Species Fund of breeding tigers, and contrary to

2  beliefs of white tigers and golden tabby tigers, we take part

3  in that Rare Species Fund, and we're very proud of that.

4       And we only breed select few blood lines out of the

5  entire population of tigers and lions that we have. And their

6  blood lines are very closely followed to make sure we're not

7  cross breeding mother and father and daughter and son.

8  Q.  Okay.  Sir, if you could turn to Exhibit Number 6 in the

9  booklet that you have before you.  And this appears to be a

10 e-mail dated November 1st, 2010, to the Mounds Mall.  What is

11 the Mounds Mall?

12       THE COURT:  I'm sorry, Exhibit Number 6 in the

13 notebook or Exhibit Number 6 attached to the e-mail?

14       MR. PINKARD:  I'm sorry, I didn't understand your

15 question, Your Honor.  Exhibit Number 6 in the attachments to

16 Mr. Schreibvogel's affidavit, which I believe is Exhibit Number

17 6 in the booklet.

18       THE WITNESS:  I have an e-mail here from the Mounds

19 Mall.

20       THE COURT:  Continue.

21       MR. PINKARD:  Yes, I'm sorry, Your Honor.

22 BY MR. PINKARD:

23 Q.  This appears to be an e-mail sent from Carole Baskin,

24 Friday, October 29th, 9:59 p.m., and you'll note the third

25 paragraph down, it indicates that she wants "to see an action

20

1    taken before I post on YOUTube on our main YOUTube site which

2    has been the number two most viewed non-profit in the world in

3    the past couple of days and always in the top six.  Several of

4    our videos have had more than a quarter of a million views

5    each, and some nearly a million.  We have much more footage".

6         And further down that paragraph, "we had much more

7    footage and several eye witness accounts and all of it would be

8    very embarrassing for the mall and your store".

9         And then further down, it says, "please let us know

10   that you have sent Mr. Joe Schreibvogel and his band of big cat

11   abusers home."  And also in the sentence after the photograph I

12   cited before, "if you won't do the right thing to protect the

13   animals, hopefully you will do the right thing to protect your

14   reputation".

15        What is the Mounds Mall?

16   A.   It's a mall located in Anderson, Indiana, I believe.

17   Q.   And had you done your exhibits of the tiger cubs and magic

18   show at that venue?

19   A.   Yes.

20   Q.   And after this e-mail of November 1st, 2010, did they

21   cancel your show?

22   A.   We had a show scheduled for Halloween of this year and they

23   canceled, yes.

24   Q.   And is this an example of the kind of direct contact from

25   Carole Baskin to some venues that you had business relations

1  with?

2  A.  Yes.

3  Q.  And to your knowledge, who is Carole Baskin?

4  A.  The CEO and founder of Wildlife on Easy Street known today

5  as Big Cat Rescue.

6  Q.  Okay.  Sir, if you could skip over to Exhibit Number 13 in

7  that packet that you have.  And the first page of that exhibit

8  appears to be an e-mail from the Heartland Mall to Big Cat

9  Entertainment which is your company.  Did you receive this

10  e-mail?

11  A.  You're on number 13?

12  Q.  Number 13, the first page of Number 13.

13  A.  Mine doesn't say Heartland Mall in any way, okay.  Sorry.

14  Q.  Did you receive this e-mail from the Heartland Mall?

15  A.  It was received to our office, yes, sir.

16  Q.  Okay.  And within that e-mail it says that they started

17  receiving phone calls about a week before the cats showed up

18  there from a Susan Bass.

19  A.  Yes, sir.

20  Q.  And that she called the mall's landlord and followed up

21  with a couple of long e-mails.

22  A.  Yes, sir.

23  Q.  And she proceeded to put a scathing letter on her website

24  for everybody to send them e-mails.

25  A.  Yes, sir.

Case 8:11-cv-00209-MSS-MAP   Document 156   Filed 02/28/12   Page 22 of 90 PageID 631
Case 8:11-cv-00209-MSS-MAP   Document 156   Filed 02/28/12   Page 22 of 90 PageID 637

22

1  Q.  And she received several phone calls and hundreds of

2  e-mails flooding her in-boxes.

3  A.  Yes, sir.

4  Q.  Did you have a business relationship with Heartland Mall to

5  put your exhibit there?

6  A.  For years.

7  Q.  And as a result of the facts they put in the e-mail, did

8  they cancel your contract with them?

9  A.  Yes, sir.

10  Q.  I think if you look at the second page of Exhibit Number

11  13, which appears to be an e-mail from Susan Bass, and the

12  second paragraph down, at the end of the paragraph, they say,

13  "but the truth is they breed and exhibit cubs only to make

14  money".

15       Is that true, do you breed and exhibit cubs only to

16  make money?

17  A.  No, sir.

18  Q.  Do you make any money by breeding and exhibiting cubs?

19  A.  I haven't yet.

20  Q.  And in the second paragraph down, second sentence in the

21  second paragraph down, it says, "but in reality, these cubs

22  endure a miserable existence while traveling and on display at

23  a very young age without their mothers, and then in most cases,

24  spending their lives in deplorable conditions such as foreign

25  zoos or even being killed as part of the illegal trade in tiger

1  parts".

2         Have any of the animals that you placed to the

3  USDA-approved facilities ever been killed as a part of the

4  illegal trade in tiger parts?

5  A.  Absolutely not, to my knowledge.

6  Q.  And have any of these been sent to -- anywhere where

7  there's deplorable conditions in foreign zoos?

8  A.  Every one of them are still open and licensed by the USDA

9  which is the Animal Welfare Act, yes, sir.

10 Q.  How many shows a year would you normally put forth at the

11 Heartland Mall?

12 A.  Unless we have contracts with --

13        THE COURT:  How many shows?

14        THE WITNESS:  It's hard to tell.  I mean, on the year

15 that we don't have contracts with companies with 50 malls, we

16 would perform two to three times a year.  If we have contracts

17 like this year, we would only do one each place one time a

18 year.

19 BY MR. PINKARD:

20 Q.  Okay, sir.  If you could take a look at Exhibit Number 14,

21 which appears to be an e-mail sent from Susan Bass at

22 bigcatrescue.org Monday, December 12th of last year, 2011,

23 subject, tiger cub exhibit at Centerpointe Mall.  And can you

24 tell us where Centerpointe Mall is located?

25 A.  I believe Grand Rapids, Michigan.

1  Q.  And during this time frame, did you have an agreement with

2  them or contractual understanding to put your tiger cub exhibit

3  at their mall?

4  A.  Yes, sir.

5  Q.  If you take a look at page 2 of the e-mail from Susan Bass,

6  found at the third paragraph, about halfway down, it says, "but

7  the truth is they breed and exhibit cubs only to make money".

8  Is that a true statement?

9  A.  No, sir.

10  Q.  And then, in the last paragraph of the second page of the

11  e-mail from Susan Bass to the mall, second sentence in that

12  paragraph, "breeding more tigers essentially adds to the number

13  of big cats that end up living in roadside zoos or being

14  destroyed to supply the illegal trade in tiger parts".

15        Again, have any of your animals --

16        THE COURT:  Asked and answered.

17        MR. PINKARD:  Okay.

18  BY MR. PINKARD:

19  Q.  The last sentence refers to "the contribution to the ease

20  in which people can purchase tiger cubs over the Internet as

21  pets".

22        THE COURT:  Last sentence, same page, last sentence,

23  different page?

24        MR. PINKARD:  Same page, very last sentence of that

25  page, Your Honor.

BY MR. PINKARD:

Q.  Have any of activities at your facility contributed to the ease in which people can purchase tiger cubs over the Internet as pets?

A.  No, sir.

Q.  Why is that, sir, why is that?

A.  Why they can't purchase tigers from over the Internet?

Q.  Is it possible to purchase tiger cubs over the Internet?

A.  From anybody?

Q.  Right.

A.  To the best of my knowledge, it's highly illegal for a USDA facility to sell a tiger cub to a private individual, so there's no need to run any kind of ads on Google to sell tigers.

Q.  Did the Centerpointe Mall cancel your exhibit?

A.  In the middle of our show, yes, sir.

Q.  That occurred in close proximity to December 12th of 2011?

A.  December 12th -- within two days.

Q.  If you go to two pages beyond that particular e-mail from Susan Bass, this one is dated December 15th, 2011, concerning the tiger cub display at the Centerpointe Mall, she states, "me again.  Although you said there's a penalty for canceling the exhibit, we would be happy to have our lawyers review the contract and see if there's any way you can send them home early without paying the penalty.  The abuse these cubs will

1   endure the next 10 days at your mall and the negative publicity

2   the mall is receiving should outweigh the penalty".

3          Do you see that statement from Ms. Bass?

4   A.  Yes, sir.

5   Q.  And, in fact, did they cancel your contract?

6   A.  Yes, sir.

7   Q.  Did they pay a penalty?

8   A.  No, sir.

9          THE COURT:  Why didn't they pay a penalty?

10         THE WITNESS:  I can't afford to hire a lawyer to take

11  them to Court.

12         THE COURT:  Was a cub sick?

13         THE WITNESS:  Pardon?

14         THE COURT:  Was one of the cubs sick?

15         THE WITNESS:  No.

16         MR. PINKARD:  Your Honor, there's a continuation of

17  that e-mail that was cut off from our exhibit list, but I've

18  shown this to opposing counsel.  I'd like to include that in

19  the exhibit, also show it to the witness.  I don't believe

20  counsel has any objection.

21         MR. JAKES:  No objection, Your Honor.

22         THE COURT:  Be received.

23     (Thereupon, Defendants' Exhibit 14-B was so designated for

24  EVIDENCE.)

25         As part of this same e-mail?

1    MR. PINKARD:  Yes, as part of the continuation of this
2    same e-mail, Your Honor.  If I could approach the witness and
3    show it.
4         THE COURT:  You may.
5         MR. PINKARD:  I'll include it in the packet.  If you
6    could take a look at that e-mail, sir.
7    BY MR. PINKARD:
8    Q.  And you note in this e-mail that the second to last
9    paragraph, or the last two paragraphs, "please respond to me in
10   writing if this is the case, otherwise my sanctuary plans to
11   alert our 53,000 supporters to begin calling and e-mailing you,
12   Jane Fowler, your tenant stores at Centerpointe Mall and your
13   ownership group Lormax Stern.  We will not alert our supporters
14   if you will please confirm that Centerpointe and the other 17
15   malls Lormax Stern operates will no longer host tiger cub
16   exhibits".
17        You see that language, sir?
18   A.  Yes, sir.
19   Q.  Again, was your -- did you have some shows set up at some
20   of the other malls owned by that corporation?
21   A.  Yes, sir.
22   Q.  And were all those opportunities canceled?
23   A.  The entire company.
24        THE COURT:  Just for the record, we'll call that
25   Exhibit 14-B, Defense Exhibit 14-B.

 1  BY MR. PINKARD:
 2  Q.  Has your foundation sustained an economic harm from the
 3  cancellations of these various malls and venues for your tiger
 4  cub exhibits?
 5  A.  Since the harassment started by Big Cat Rescue in 2006 to
 6  date, we estimate it to be over $15 million.
 7  Q.  And do you anticipate loss -- economic losses in the future
 8  as a result of cancellations of shows if this kind of direct
 9  contact between Big Cat Rescue and your business partners, the
10  malls, continues?
11  A.  They've already started harassing our clients for 2012, so
12  yes, sir.
13          MR. PINKARD:  If I could have one moment, Your Honor.
14          THE COURT:  Yes, sir.
15          (Brief pause.)
16          MR. PINKARD:  Pass the witness.
17          THE COURT:  Yes, sir.
18                       CROSS-EXAMINATION
19  BY MR. JAKES:
20  Q.  Good afternoon, Mr. Schreibvogel?
21  A.  Good afternoon.
22  Q.  I'm a little confused.  I would like you to help me
23  clarify, if you can.  You claim that Big Cat Rescue Corporation
24  has caused your foundation $15 million in damages; is that
25  right?

1  A.  Worth of contracts, yes.

2  Q.  $15 million worth of contracts that you would have

3  exhibited these tiger cubs at various malls?

4  A.  Yes, sir.

5  Q.  Okay.  And how do you calculate that?

6  A.  Because most of our contracts, such as the General Growth

7  Contract, they got canceled with 180 malls, would have carried

8  us almost four years worth of contracts, and we normally repeat

9  each facility at least three times.  So you have cost me years

10  of future contracts.

11  Q.  In 2011, that's the most recent past year, how many shows

12  did your company do at these malls and different venues around

13  the country?

14  A.  Up until 2011, that is what you're asking?

15  Q.  We're talking about last year, 2011, just ended, okay.

16  A.  Without a calendar and our show bookings, I couldn't give

17  you an exact date, but I can go by what you're bragging on the

18  Internet that you canceled 70 of my shows.

19  Q.  Did you in 2011 lose 70 shows?

20  A.  We lost 70 contracts.

21  Q.  Well, do you have the ability to do more than one show at a

22  time?

23  A.  I have two rigs set up to do shows, so I could do 80 shows

24  a year.

25  Q.  Do you do shows simultaneously?

 1 | A.  As long as our contracts don't get canceled, yes.

 2 | Q.  When was the last time you did a show simultaneously?

 3 | A.  At the Amarillo State Fair and the Mounds Mall that you

 4 | have on your prize videotape.

 5 | Q.  Was that 2010?

 6 | A.  I couldn't give you an exact date without my booking

 7 | calendar, no.

 8 | Q.  How much do you make from each show?

 9 | A.  Depends on the location.

10 | Q.  Well, let's talk about Mounds Mall.  How much do you make

11 | on a show at the Mounds Mall?

12 | A.  I believe the Mounds Mall show did somewhere in the

13 | neighborhood of $22,000.

14 | Q.  For the entire show?

15 | A.  Yes.

16 | Q.  Okay.  How about for the Heartland Mall?

17 |         THE COURT:  I'm confused, what is a show; a one-day

18 | event?

19 |         THE WITNESS:  It's a five-day event, ma'am.

20 |         THE COURT:  So for the five days you made $20,000?

21 |         THE WITNESS:  Twenty-two thousand.

22 |         THE COURT:  Twenty-two, all right.

23 | BY MR. JAKES:

24 | Q.  And I believe your testimony was earlier that you thought

25 | you did around 45 shows a year?

1    A.   Forty-five shows a year, and then you asked how many with

2    tiger cubs versus how many without.  I'm confused on something.

3    There's approximately 45 weeks that we perform in the year.

4    Q.  How many weeks last year were you unable to perform because

5    of your belief that you lost shows because of the conduct of

6    Big Cat Rescue Corporation?

7    A.   I couldn't give you that exact number without my booking

8    contract book in front of me.

9    Q.   How about an approximation?

10   A.   Approximately 15 to 17 of them.

11   Q.   Apart from the Centerpointe Mall and the Heartland Mall,

12   can you identify any shows that you claim to have lost as a

13   consequence of any of the speech that was --

14   A.   We lost all of the shows in Nebraska, South Dakota,

15   Illinois, Iowa, Texas, Indiana, Ohio and Michigan.

16   Q.   You've listed eight states, and I think --

17   A.   Some of those malls -- excuse me.

18   Q.   You listed eight states, and I think you said that you lost

19   15 to 17 shows, so a couple of shows a state is what you're

20   saying?

21   A.   Some of the shows, the malls have more malls than one, so

22   the company in North Platte, Nebraska, we lost the entire

23   contract for all of their properties.

24   Q.   Because you claim that you've lost $15 million over the

25   years, you're actually making money from doing the shows,

1  right?

2  A.  I might could be making money from doing these shows, but

3  I'm feeding 170 something big cats and close to 1,000 other

4  unwanted animals.

5  Q.  But the purpose of the shows is to make money, right?

6  A.  To pay for the refuge, yes.

7  Q.  Okay.  So it's accurate to say when you exhibit these cubs

8  at these shows around the country, you're doing it to make

9  money, right?

10  A.  It's not to profit, but it is to make money, yes, sir.

11  Q.  Okay.  You said something a little bit earlier in your

12  testimony about breeding.  You do, in fact, breed animals at

13  your facilities in Oklahoma, don't you?

14  A.  Yes, sir.

15  Q.  Okay.  And last year, how many tiger cubs were born?

16  A.  Exactly 26.

17  Q.  Okay.  How many lion cubs?

18  A.  None.

19  Q.  In the year prior, 2010, how many tiger cubs were born at

20  your facility?

21  A.  I didn't get that date 'cause I figured you'd just be

22  asking for last year.

23  Q.  Well, was it more or less than last year?

24  A.  I couldn't answer that truthfully.

25  Q.  Well, in 2011, how many tiger cubs that were born died?

Case 8:11-cv-00209-MSS-MAP  Document 116-5  Filed 02/24/12  Page 34 of 91 PageID 4572
Case 8:11-cv-00209-MSS-MAP  Document 56  Filed 02/28/12  Page 33 of 90 PageID 698

33

 1  A.  Two were euthanized by our veterinarian.

 2  Q.  In 2010, how many tiger cubs that were born at your

 3  facility died?

 4  A.  I couldn't truthfully answer that because I don't have that

 5  record in front of me.

 6  Q.  More than 10?

 7  A.  It depends on if you're trying to get the ones that died of

 8  the bad formula, but they did not die all in one year.

 9  Q.  Was there, in fact, approximately 23 cubs that died at your

10  facility?

11  A.  In approximately 18 months from bad formula.

12  Q.  Now you're familiar with the Species Survival Plan, aren't

13  you?

14  A.  Yes.

15  Q.  You're not a member of the Species Survival Plan, are you?

16  A.  I'm not aware of the Species Survival Plan membership.

17  Q.  Are you a member of the Species Survival Plan?

18  A.  Not the one you're talking about.

19  Q.  In fact, to be such a member, you have to be a member of

20  the American Zoological and Aquarium Association, right?

21  A.  You have to be accepted to be a member of the ACA, yes.

22  Q.  And you are not?

23  A.  No, I'm not, nor do I want to be.

24  Q.  The Species Survival Plan, that is designed to protect

25  endangered species that otherwise might be extinct, correct?

 1   A.   That would be their logic.

 2   Q.   You disagree with their logic?

 3   A.   It's just a non-profit organization that has their own

 4   beliefs like I do.

 5   Q.   But your belief is that you should be able to breed these

 6   tiger cubs, correct?

 7   A.   I believe as long as I have a Federal license that allows

 8   me to, I live in America and I should be able to.

 9   Q.   And you take the younger cubs with your show when you

10   display animals at these various malls, correct?

11   A.   Some of them.

12   Q.   In fact, the USDA says you can only allow human interaction

13   with small tiger cubs between the ages of eight weeks and 12

14   weeks; isn't that true?

15   A.   Our inspector says that we can interact with tiger cubs and

16   I have it documented on a USD Inspection Report, as long as

17   they are vaccinated, at the age of four weeks to approximately

18   16 weeks old, because it depends on the temperament of the cat.

19   Q.   So if I understand your answer, you believe you can

20   lawfully display or allow human interaction with tiger cubs as

21   young as four weeks and no older than 16 weeks?

22   A.   I believe it depends on what inspector you run into.

23   Q.   Well, is that the criteria that you use?

24   A.   I usually use the criteria of eight to 12 weeks.

25   Q.   When you go to these malls, what name do you operate under?

 1  A.   It depends on if we're doing a magic show and a tiger show

 2  or if we're doing just a tiger show or if we're in a market

 3  that is easier to market under a different name.  It depends on

 4  how many posters we want to hang up.

 5  Q.   One of the names you use is Big Cat Rescue Entertainment,

 6  right?

 7  A.   Yes, when we started using Big Cat Rescue Entertainment was

 8  when we combined in one location the magic show and the animal

 9  exhibit, yes, sir.

10  Q.   You started doing that in the latter part of 2010, correct?

11  A.   Approximately.

12  Q.   That was after you knew about Big Cat Rescue Corp down here

13  in Florida, right?

14  A.   I've known about them for years.

15  Q.   So it was after you knew about Big Cat Rescue?

16  A.   Not intentionally, no.  There's a Big Cat Rescue in

17  Wisconsin, too.

18         THE COURT:  The question was, did you start using the

19  name after you knew about Big Cat Rescue in Florida?

20         THE WITNESS:  Yes.

21  BY MR. JAKES:

22  Q.   Now, when you go to these malls and you have animals on

23  display, you allow petting and pictures to be taken with the

24  small tiger cubs, don't you?

25  A.   Yes.

 1  Q.  And, in fact, that's one of the big draws of your exhibit
 2  is when you go to these malls, right?
 3  A.  Very big draw.
 4  Q.  Because people, young -- people can bring their children in
 5  and have pictures taken with these young cubs, correct?
 6  A.  Same as 99 year old ladies.
 7  Q.  Anybody, I could do it?
 8  A.  Exactly.
 9  Q.  A 99 year old lady, a little child could come in, correct?
10  A.  Yes.
11  Q.  And, in fact, they can pet the animals, too?
12  A.  Yes.
13  Q.  But they have to be, according to your criteria, you shoot
14  for between eight and 12 weeks old, right?
15  A.  For tigers and lions?
16  Q.  Right.
17  A.  Yes, sir.
18  Q.  For tigers and lions.  So what that means is, you've got to
19  be replacing these cubs every couple of months because they're
20  going to outgrow their ability to be petted or have interaction
21  at these malls, right?
22  A.  Not necessarily.
23  Q.  Well, you would have to have another cub in the pipeline as
24  it were if you were going to be able to allow petting, right?
25  A.  We have bears, we have wolves, we have kangaroos, we have

1    monkeys.  Just because we have tigers doesn't mean that we

2    always have to have tigers.

3    Q.  But you do always have tigers, correct?

4    A.  No, we don't.  Right now, we have none.

5    Q.  But as a general proposition, when you go on the road with

6    your show, you have young tiger cubs available for interaction

7    with people, right?

8    A.  Most of the time.

9    Q.  Most of the time.  And to do that, you have to have new

10   young cubs available because after a couple months, or actually

11   a month, you can't have the interaction anymore, right?

12   A.  And a lot of times we --

13          THE COURT:  Answer the question as asked.

14          THE WITNESS:  I don't understand the question.  Is he

15   asking me if I'm breeding that many or is he asking me where I

16   get my cubs?

17          THE COURT:  He's asking you whether you have to have

18   young cubs every eight to 12 weeks in order to have cubs within

19   the petting age of the cubs that can be petted.

20          THE WITNESS:  If I'm going to have cubs on my display,

21   yes, I would.

22   BY MR. JAKES:

23   Q.  And you say you generally do, correct?

24   A.  Most of the time.

25   Q.  And, in fact, that's why you have dozens of cubs born every

1  year at your facility, right?

2  A.  That's not the only reason.

3  Q.  But it's one of the reasons, correct?

4  A.  Yes.

5  Q.  Because you can then go on the road and do these

6  exhibitions at different malls and charge money to have people

7  come in and have pictures taken and pet these young tiger cubs,

8  right?

9  A.  So we can continue to rest old tigers.

10         THE COURT:  That's a yes?

11         THE WITNESS:  Yes.

12  BY MR. JAKES:

13  Q.  You personally hold a USDA license, correct?

14  A.  Yes, sir.

15  Q.  You're a private individual, right?

16  A.  Yes, sir.

17  Q.  Private individuals can hold USDA licenses for exotic

18  animals, right?

19  A.  May I explain that?

20         THE COURT:  Yes, sir.  Well, first of all, answer the

21  question.

22         THE WITNESS:  Yes.

23  BY MR. JAKES:

24  Q.  Okay.  And, in fact, there was an incident, I think, in the

25  news last year about this fellow in Zanesville, Ohio, who had a

1   lot of animals; do you remember that incident?

2   A.   Yes, sir.

3   Q.   And he had a USDA license?

4   A.   No, he did not.

5   Q.   He did not?

6   A.   He did not.

7   Q.   Okay.  Is it true that somebody, a private individual, can

8   buy or acquire animals from you if they have a USDA license?

9   A.   Repeat the question, please.

10  Q.   Okay, I'm sorry, I didn't mean to confuse you.

11       If I have a USDA license and I'm a private individual,

12  can I get the tiger or lion transferred from your facility to

13  me?

14  A.   As long as you have a USDA license, but may I explain my

15  answer?

16  Q.   That's all I asked, actually.

17       The first exhibit that you were asked about, Exhibit

18  2, was a 2009 e-mail.  When did you first see this e-mail?

19  A.   On exhibit which?

20  Q.   Two, your Defendants' 2.

21  A.   When did I first see this e-mail?

22  Q.   When did you first learn about the e-mail?

23  A.   When the marketing director that it came to brought it to

24  the exhibit.

25  Q.   That was back in 2009?

Case 8:11-cv-00209-MSS-MAP Document 116-5 Filed 02/24/12 Page 41 of 91 PageID 7079
Case 8:11-cv-00209-MSS-MAP Document 56 Filed 02/28/12 Page 40 of 90 PageID 705

40

1  A.  Yes.

2  Q.  Okay.  I think the next exhibit you were asked about was

3  Exhibit Number 6.  Can you go to that one?

4       You have it.  And this exhibit is dated it looks like

5  October 29th, 2010.  When did you learn about this e-mail?

6  A.  I'm not sure about the exact date, but Braun forwarded all

7  these e-mails to us.

8  Q.  Did you learn about this e-mail at or around the time that

9  it was sent in October or November of 2010?

10  A.  I learned about it, I can't for say I exactly seen it, but

11  I was at the Mounds Mall when all of these were coming in.

12  Q.  And now let me take you to Exhibit 13.

13  A.  Okay.

14  Q.  That's an exhibit or an e-mail from June 13, 2011, that I

15  think -- let me let you get there.

16       You have it?  I see it's to

17  bigcatentertainment@ymail.com.  That's you, right?

18  A.  Yes.

19  Q.  Okay.  And did you learn of this exhibit on or around June

20  13th, 2011?

21  A.  Our office did, I've never seen this one.

22  Q.  But that e-mail account is your e-mail account?

23  A.  Apparently, yes, sir.

24       MR. JAKES:  Okay.  That's all I have for

25  Mr. Schreibvogel, Your Honor.

1    REDIRECT EXAMINATION

2    BY MR. PINKARD:

3    Q.   Near the end of your testimony there, you were asked a

4    question about whether you could sell to an individual that had

5    a USDA license and you wanted to explain that answer.  Could

6    you explain that answer?

7    A.   First of all, the USDA only sells three kinds of licenses;

8    one is an exhibitor, one is a breeder and one is a broker.

9    Myself and the other four licensed holders that reside at my

10   facility are all licensed as exhibitors such as Big Cat Rescue

11   is.

12       The USDA, when we all got our licenses, will not issue

13   a license to you as a company because they want somebody to

14   hold responsible, okay.  So we're all licensed as individuals

15   doing business as GWE Exotic Animal Park or Big Cat Rescue

16   Corp, or whoever you are.

17   Q.   Have you ever placed any of your animals from your facility

18   to an individual person who had a USDA license?

19   A.   I have never placed an animal from my facility at any

20   facility that was not USDA licensed nor open to the public nor

21   not open to the public, they're all zoos or sanctuaries that

22   are open to the public.

23   Q.   And you mentioned the 23 cubs that died over the 18-month

24   period.  I think you mentioned something about formula.  Could

25   you explain how those cubs expired in your care?

A.   Out of the 23 cubs, some of those cubs were still born, some of those cubs were laid on and died by their mother, most of the cubs had all died from a result of bad formula.

How we arrived at that bad formula was we were losing cubs on between one and four days of when we put them on the formula, and our veterinarian did everything she could to save them and keep them alive, and we tested our cats, we tested our ground, we thought we had some kind of disease in our facility. And so we started doing research.  I found animals dying all the way to Africa.

So, we took our last three cubs that were dying to Oklahoma State University where they have one of the world's best veterinarian schools around.  We paid nearly $8,000 for them to be on life support to have brain scans done, everything possible, and the Oklahoma State University ruled it on the necropsy reports to be tainted formula from PetAg.  So, we went to PetAg, they admitted that they had a problem with the way that they were drying their food --

THE COURT:  Sir, I'm sorry, can you sit back a little bit from the mic.

THE WITNESS:  We had -- is that me?

THE COURT:  Yes.

THE WITNESS:  PetAg admitted they had a problem with --

MR. JAKES:  Objection, Your Honor, extraneous.

Case 8:1-cv-00209-MSS-RAP Document 1685 Filed 02/24/12 Page 44 of 91 PageID 1782
Case 8:1-cv-00209-MSS-MAP Document 56 Filed 02/28/12 Page 43 of 90 PageID 708

43

 1              THE COURT:  Sustained.

 2              MR. PINKARD:  I think he opened to door to it about

 3   the 23 cubs, Your Honor.

 4              THE COURT:  Well, he can't open a door to abject

 5   hearsay three times removed.  I don't have the reports in front

 6   of me, he says it was a formula death, that's his opinion.

 7              MR. PINKARD:  Was it the conclusion that --

 8              THE COURT:  Sustained was the answer.

 9              MR. PINKARD:  I'm sorry, Your Honor?

10              THE COURT:  I sustained the objection.

11              MR. PINKARD:  Okay, I understand, Your Honor.

12              That's all I have Your Honor.

13              THE COURT:  May I see the added exhibit that you put

14   on the witness stand?

15              Thank you.

16              (Brief pause.)

17              Sir, were you investigated and fined by the USDA in

18   2006 for multiple flagrant violations of mistreating animals in

19   your care?

20              THE WITNESS:  I was fined by the USDA, it settled in

21   2006.  The violations were from 1999 to 2004, and none of them

22   were related to animal cruelty or neglect.

23              THE COURT:  How do you arrive at the $15 million

24   number?  It is a number that is a multiple of something, I

25   assume, so can you walk me through that?

Case 8:11-cv-00209-MSS-MAP  Document 168-5  Filed 02/28/12  Page 45 of 91 PageID 1783
Case 8:11-cv-00209-MSS-MAP  Document 158  Filed 02/28/12  Page 45 of 90 PageID 709

44

 1      THE WITNESS:  Okay.  On a low show, you can raise

 2 anywhere between nine and $12,000 in a five-day show.  On a

 3 high show, the largest show we've ever done was $26,000.  So, I

 4 believe that we took a middle figure in there of approximately

 5 14 or $15,000 times how many contracts we lost.

 6      THE COURT:  How many contracts?

 7      THE WITNESS:  Just off the top of my had, Your Honor,

 8 I couldn't give you that, but just that one account was 180

 9 malls.

10      THE COURT:  Well, you have to tell me how you came to

11 $15 million, you can't say trust me, I did it.

12      THE WITNESS:  Well, give me a minute, and let me make

13 a phone call to my office, and I'll give you the exact amount.

14      THE COURT:  You're testifying here with full notice.

15 You've said $15 million, can you tell me how you derived that

16 figure?

17      THE WITNESS:  We took all of our contracts we lost.

18      THE COURT:  How many contracts is that?

19      THE WITNESS:  230.

20      THE COURT:  And when you say "contracts," you mean

21 malls or facilities with whom you had business relationships?

22      THE WITNESS:  Yes.

23      THE COURT:  So you had 230 contracts multiplied by

24 15,000?

25      THE WITNESS:  Times three.

1    THE COURT:  And you believe that number to be $15

2  million?

3    THE WITNESS:  The number I'm going to have off the top

4  of my head today may not add up to $15 million.

5    THE COURT:  I'm not a mathematician, but that doesn't

6  look like 15 million to me.

7    Does anybody have that number?  Counsel, do you know

8  what the number is, it's your damages, your alleged damages.

9    THE WITNESS:  We sent that all to you all the very

10  first --

11    THE COURT:  No, I just want to know what 15,000 times

12  230 times three is.

13    MR. PINKARD:  I'm not a very good mathematician, Your

14  Honor, we have a calculator.

15    THE COURT:  Yes, sir.

16    MR. JAKES:  Before you do the multiplier, it's

17  $3,450,000, so...

18    THE COURT:  Before you do a multiplier of what?

19    MR. JAKES:  I think it's three as he's talking about a

20  multiplier, I'm not sure what the three is, but 230 contracts

21  times 15,000 is going to be $3,450,000.

22    THE WITNESS:  The multiplier of three was, we most

23  generally do each location at least three times within their

24  contract.

25    THE COURT:  So if that's true, then the number would

1    be $9 million, not $15 million.

2            THE WITNESS:  With the numbers we're using today, yes,

3    ma'am.

4            THE COURT:  Yet, you say you don't breed the cubs or

5    take the cubs to display to make money.  You mean personally to

6    have a net positive cash flow make money?

7            THE WITNESS:  Correct.

8            THE COURT:  The money that you derive goes back, you

9    say, to maintaining the property, paying the staff and feeding

10   the animals?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  You do understand that constitutes making

13   money, it's just not making profit?

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  All right.

16           You may step down.

17           Anymore witnesses from the defense?

18           MR. PINKARD:  No, Your Honor.

19           THE COURT:  Any further evidence other than the

20   exhibits that have been offered?

21           MR. PINKARD:  No, Your Honor.

22           THE COURT:  The defense rests on its motion and demand

23   for injunctive relief?

24           MR. PINKARD:  Yes, Your Honor.

25           THE COURT:  Does the Plaintiff have any motions or

 1  evidence to offer?

 2          MR. JAKES:  Your Honor, initially, we believe that the

 3  heavy burden of motion for preliminary injunction in this

 4  context has not been met.  But if the Court desires, we would

 5  call one witness in defense if necessary.

 6          THE COURT:  Why hasn't the burden been met?

 7          MR. JAKES:  Your Honor, I think belatedly through the

 8  process, the Defendants, the movants here have recognized that

 9  what they're really going after is a prior restraint of speech.

10  They've cited to the Court in its supplemental filing a few

11  Florida State cases, one case by Judge Merryday where he

12  references those Florida State cases, but effectively arguing

13  that what Judge Merryday characterizes as an acute exception to

14  the general rule that an injunction will not issue to be a

15  prior restraint on free speech, are these cases, which if

16  they're looked at, deal with time and place and conduct and not

17  free speech.

18          The evidence that's been presented and adduced by the

19  movants here has all been pure free speech, they've all been

20  e-mails, they've all been phone calls.  There have been no

21  actions of physical interference or unlawful, if you will,

22  inflammation.  For example, if I were extolling people who are

23  like-minded people about a particular issue, go out and let

24  your voice be known that you're against this particular action

25  or conduct, that's perfect pure free speech.

1       If, on the other hand, I'm saying go out and burn down

2   the houses or the businesses of people who we think are not

3   adopting our viewpoints, that's, of course, impermissible, but

4   that's not what they've alleged here.  They simply alleged and

5   have adduced evidence that there are e-mails, that there are

6   phone calls in which Big Cat Rescue Corporation, the Plaintiff,

7   has advanced its viewpoints and has told people, such as these

8   malls, that what is going on, in their viewpoint, constitutes

9   abuse and exploitation of animals.  That's pure speech, that

10  does not, under any circumstances, fall within the narrow

11  category that the Florida State cases that are cited in the

12  supplemental filing go to.

13      If the Court looks at them, I think they're only one

14  or two in which any injunctive relief was ever granted.  I

15  questioned whether it's even constitutionally permissible in

16  those cases in light of the Organization For a Better Austin, a

17  Supreme Court case of 1971, but let's put that aside.  Those

18  were situations where the people were not enjoined from

19  picketing, were not enjoined from engaging in pure free speech,

20  but to the extent any injunction was imposed, it was an

21  injunction to prevent physical interference, preventing people

22  from getting from their cars to a sales office, preventing

23  people -- actually going to people's hotel rooms and telling

24  them, you know, if you don't stop doing business with them and

25  do business with me, you know, there's going to be trouble,

 1  those kind of active actions and not free speech.  And so for

 2  that reason --

 3          THE COURT:  Let's assume for a moment that in the age

 4  of modern technology and Internet, that using Internet to

 5  extort a result can constitute action in the same way that a

 6  physical appearance at a hotel room with a viable threat would

 7  be an action in the olden days.  Then do you have an argument

 8  for why the Defendant has not met its burden to establish

 9  likelihood of success on the merits of this tortuous

10  interference case?

11          MR. JAKES:  Respectfully, I would have to disagree

12  with the premise, of course, because I do not believe --

13          THE COURT:  I understand that you would disagree.

14          MR. JAKES:  Okay.  With that understanding, and

15  assuming arguendo with the Court's position, or the Court's

16  hypothetical, we don't believe that there's any extortion going

17  on here.  What there is, is a very, if you will, basic core

18  activism and advocacy of a legitimate viewpoint, and candidly,

19  you are not supposed to get into what is legitimate or what is

20  illegitimate, but the point is, all that is being expressed in

21  these e-mails is that this is their viewpoint, you're doing

22  business with somebody who, in our view, is an abuser, an

23  exploiter --

24          THE COURT:  It's not a viewpoint, it's not opinion

25  speech, this is factual speech, things that cubs are dying and

1  that USDA is investigating and they've been fined, those are

2  not expressions of opinion, those are expressions of fact.

3          MR. JAKES:  Some of them are, yes, Your Honor.

4          THE COURT:  All right.

5          MR. JAKES:  And the -- but that does not change the

6  analysis.  That may change a question of whether, if they're

7  able to prove the falsity of those statements in a trial for

8  damages, they should recover any damages that can be proven up.

9  And the question is, as a matter of a preliminary injunctive

10 and coming to this Court and asking for its invocation of its

11 equitable powers to enjoin that speech prospectively; is that

12 appropriate?

13         And our position is, and I believe the law is clearly

14 supportive of this position, that as long as all that is being

15 done here is pure speech, e-mails, newspaper articles,

16 contacting the media, you know, urging people to, of like

17 views, to have their voices be heard, that is the pristine type

18 of speech that cannot be subject to the equitable powers of the

19 Court through an injunction, differing from a situation where,

20 you know, active acts of violence or physical interference are

21 advocated, and that is just not the record here.

22         THE COURT:  So your view is that if they threaten to

23 sully, besmirch the reputation of the mall by placing truthful

24 or untruthful statements on their website, their Facebook posts

25 and through the entire media by a sort of a mass Internet

 1  blitz, that that is permissible against the Court's authority

 2  to issue injunction for relief?

 3          MR. JAKES:  That is the type of pure speech that the

 4  Courts do not use their equitable powers to intervene on.  That

 5  is our position, Your Honor, yes.

 6          THE COURT:  All right.

 7          Let me hear your witness.

 8          MR. JAKES:  Thank you.

 9          Your Honor, Mr. Barauskas will be calling Mr. Baskin.

10          THE COURT:  Please come forward and be sworn, sir.

11  Thereupon,

12                          HOWARD BASKIN,

13  having first been duly sworn to tell the truth, the whole

14  truth, and nothing but the truth, was examined and testified as

15  follows:

16          THE WITNESS:  I do.

17          THE CLERK:  Please take a seat in the witness box.

18                     DIRECT EXAMINATION

19  BY MR. BARAUSKAS:

20  Q.  Please introduce yourself to the Court.

21  A.  Howard Baskin.

22  Q.  Are you affiliated with the Plaintiff, Big Cat Rescue Corp?

23  A.  I am.

24          THE COURT:  Hold on one second.

25          Sir, you understand that you're under oath, and any

1   statement that you make can subject you to penalties of

2   perjury?

3          THE WITNESS:  I do.

4          THE COURT:  Wait until counsel completes his questions

5   before you answer.  And if you see opposing counsel object,

6   wait until I rule on the objection before you answer.

7          Do you understand that?

8          THE WITNESS:  I do.

9          THE COURT:  Counsel, you may continue.

10  BY MR. BARAUSKAS:

11  Q.  Do you have a position with Big Cat Rescue Corp?

12  A.  Yes, advisory board chairman.

13  Q.  How long have you held that position?

14  A.  Since 2003.

15  Q.  And how long have you been affiliated with Big Cat Rescue

16  Corp?

17  A.  Since 2003.

18  Q.  And in your position, what do your duties entail?

19  A.  I handle our financial record keeping and matters, I deal

20  with our fund raising, I deal with our property issues, and I

21  get involved in what we refer to as our advocacy work which

22  involves educating the public, trying to stop abuse, urging

23  better regulations and legislation so that we end up with a

24  situation where cats are not being bred and abused and end up

25  -- needing to end up in sanctuaries.

1  Q.  So, would it be fair to say you're knowledgeable about Big

2  Cat Rescue's mission and its day-to-day operations?

3  A.  Yes.

4  Q.  And can you describe Big Cat Rescue's missions?

5  A.  Our mission is in two parts; one is to take the best care

6  we can of the cats that we have, and the other is to try to

7  stop the abuse and end the breeding that results in cats ending

8  up at sanctuaries and suffering.

9  Q.  Okay.  And what does Big Cat Rescue do to further its

10 mission, first of care, and second to stop abuse and breeding?

11 A.  We are known for providing an excellent home for the cats

12 with enclosures that are natural enclosures, providing them

13 with enrichments so that they have all kinds of activities, we

14 purchase the best food for the cats, and --

15 Q.  Okay.  And then as to the second prong of your mission, to

16 stop abuse and breeding, what does Big Cat Rescue Corp do?

17 A.  Our website is probably the world's largest resource for

18 information about big cats and the issues that they face.  It's

19 over 8,000 pages.  It gets something like 1.6 million visitors

20 a year.  We do guided tours for the sanctuary and these are

21 educational tours where, during the tour, people are acquainted

22 with the various issues that the cats face, both the abuse in

23 captivity, and the issues in the wild.

24         And then we do the advocacy work where we track

25 various laws, regulations or actions we consider abusive, and

1    then ask our supporters to voice their opinion, either in

2    support or against certain regulations or laws, or against

3    actions that we consider abusive and contact venues that are

4    permitting such abuses.

5    Q.   And is Big Cat Rescue a not-for-profit corporation?

6    A.   Yes.

7    Q.   And is the purpose of a not-for-profit to make money?

8    A.   There's no profit, no.

9    Q.   Okay.   What is Big Cat Rescue's opinion regarding what

10   constitutes abuse or animal abuse?

11   A.   Examples relevant here of things that we consider to be

12   animal abuse would be taking cubs from their mothers 24 or 48

13   hours after they're born, which is a torment both to the

14   mothers and to the cubs; sticking them in a semi-trailer,

15   carting them for hours around the country; setting up at malls

16   and setting them in cages where that are petted constantly by

17   person after person; often awakened from a sleep that they

18   should be getting to be petted when they generally do not like

19   being held up like this under their forearms or four legs for

20   photo opportunities, and so when they struggle or try to get

21   away, we see people throwing them up in the air, bouncing them

22   and blowing in their faces, these people often say they're

23   trying to calm the cats or we've heard them use the word "reset

24   the cat" like it was a clock, but in fact, this is a

25   punishment, this is uncomfortable for the cat and it distracts

1 the cat and hopefully gets the cat to behave for a little while

2 longer for the next photo, when we see cats who are clearly

3 sick being kept on display, such as cats with very serious

4 diarrhea where, instead of being taken off display, the

5 handlers are wiping the floor of the cage of the mall with a

6 towel and then taking the cub by the tail, wiping the cat's

7 very sore bottom with that while the cats are screaming in

8 order to control the diarrhea; cats that have large pieces of

9 fur missing which can be ring worm, that's what ring worm

10 usually looks like, and while not threatening, is very

11 contagious; seeing cats held up in these photo ops where

12 they're screaming; seeing a two-week old cub, which should

13 never be carted around like this, sitting in one of these 10 by

14 10 or whatever cages, they are screaming its lungs out in

15 distress; animals that are kicked or hit; animals that are not

16 provided proper veterinary care; animals that are not provided

17 food properly.  These would be all examples of things that we

18 consider to be animal abuse.

19 Q.  So in Big Cat Rescue's Corp's opinion --

20        THE COURT:  Counsel, this is direct examination.

21 BY MR. BARAUSKAS:

22 Q.  Okay.  So it would be Big Cat Rescue's opinion that all of

23 --

24        THE COURT:  This is still direct examination.

25 BY MR. BARAUSKAS:

1  Q.  Is it Big Cat Rescue's opinion that all the conduct you
2  mentioned would be considered abuse?
3       THE COURT:  Asked and answered.  That was his
4  testimony, what is abuse, he described it.  Ask another
5  question.
6  BY MR. BARAUSKAS:
7  Q.  Moving on, what is Big Cat Rescue Corp's opinion as it
8  relates to the Defendants in your definition of abuse?
9  A.  We have gotten reports --
10       THE COURT:  I'm not going to let him sit here and
11  offer hearsay about what they've heard about what they're
12  doing.  If he has an opinion, he can just tell us what it is
13  without relaying what he heard.
14  BY MR. BARAUSKAS:
15  Q.  Is it Big Cat Rescue Corp's opinion that the Defendants
16  engage in abuse or animal abuse?
17  A.  Yes.
18  Q.  And have you brought visual evidence that forms the basis
19  of that opinion?
20  A.  Yes.
21       MR. BARAUSKAS:  And we submitted that as evidence as
22  Plaintiff's Exhibit 12.  At this time, we'd like to show it to
23  the Court.
24       THE COURT:  All right.
25       (Thereupon, the video was played.)

1          "REPORTER:  The eight-week old cub I got to pet was

2    obviously sick and barely moved during our visit.  Another cub

3    on display was missing a patch of fur and clearly not happy to

4    have its photo taken.  So where do these cubs come from?  Joe

5    Schreibvogel is the president of the company that operates that

6    traveling tiger exhibit in the mall.  He paid $25,000 for

7    repeated animal welfare violations in 2006, and is currently

8    under investigation by the USDA for the unexplained deaths of

9    23 tiger cubs at his park.

10          REPORTER:  How did your 23 tigers die?

11          MR. SCHREIBVOGEL:  Bad formula.

12          REPORTER:  He blames the death of those 23 cubs on bad

13   milk formula, but both the formula manufacturer and the FDA

14   which tested it told us the formula was safe.

15          (Animal crying)

16          ANIMAL HANDLER:  This little guy right here is

17   actually two weeks old.  You're not going to hurt him.

18          (Animal crying)"

19          (Thereupon, the video concluded.)

20   BY MR. BARAUSKAS:

21   Q.  Mr. Baskin, you're aware that we're here today because the

22   Defendants are seeking a temporary restraining order and a

23   preliminary injunction; is that correct?

24   A.  Yes.

25   Q.  And would this proposed restraining order or injunction

1  affect Big Cat Rescue Corp?

2  A.  Yes.

3  Q.  And in what way?

4  A.  It would not allow us to do a critical part of our mission

5  which is to continue to educate and use that this kind of abuse

6  goes on and urge them not to allow this kind of abuse and show

7  them that there are many people who object to this kind of

8  thing, and by having these kinds of exhibits, they would --

9  there are people who think they are offending.

10  Q.  And the Defendants have alleged that you made various

11  defamatory statements which may constitute tortuous

12  interference; is that correct?

13  A.  They have.

14  Q.  And you examined all of those statements?

15  A.  I did.

16  Q.  And did you examine and analyze these step-by step in your

17  affidavit?

18  A.  I did

19  Q.  So your affidavit would be the best place to find Big Cat

20  Rescue Corp's position with respect to each and every statement

21  made?

22  A.  Yes.

23  Q.  Would it be a fair assessment that each and every statement

24  is either true or an opinion of Big Cat Rescue Corp?

25  A.  Yes.

1    Q.   What is Big Cat Rescue Corp's practice as it relates to

2    malls?

3    A.   It can be malls and fairs are other venues, and when we

4    learn that there is going to be an exhibit that we find is --

5    that we believe to be, in our opinion, abusive, we will contact

6    the venue by phone, we have employee, Susan Bass, who is a very

7    experienced PR person, who calls the mall with a very

8    professional call, explaining that they may not realize that

9    these exhibits are abusive, explains why, she offers to send

10   follow-up information, which includes a fact sheet that we put

11   together explaining point-by-point why we think this is

12   abusive, and a list of other references from other

13   organizations like the Global Federation of Sanctuaries, a few

14   other sanctuaries, and representatives from the -- some of the

15   largest animal protection organizations like the Humane Society

16   of the United States or Born Free, all of who agree that these

17   exhibits are abusive.

18          She then follows up with the mall and asks them if

19   they would cancel the act or at least agree not to have it

20   back.  Depending upon their response, if they are unreceptive

21   to that, then she will work on putting out together an alert

22   that we send out to people who have opted into our list asking

23   to be sent these alerts when we find these situations, she will

24   contact the media and ask them to report on this and explain to

25   them why it is abusive.

1    Q.   And the Defendants in this action allege that Big Cat

2    Rescue has targeted them.  Do you target groups or people or do

3    you target conduct?

4    A.   We target contact of the alerts that we have sent since we

5    began doing this.  The alerts related to the Defendant

6    represent only 10 percent of our alerts.  We maintain a website

7    devoted to listing and providing information about the

8    individuals or entities that we consider to be abusive.  The

9    Defendant is one of about 200 that are listed on that website.

10          A significant amount of our effort, 10 percent in

11   those alerts, is devoted to this Defendant, largely because he

12   has become known as sort of the poster child for this kind of

13   abuse, so the volume of what he does merits more attention than

14   some others.

15   Q.   Do other groups or people use activism against the

16   Defendants?

17   A.   Yes, PETA did an undercover operation at his facility right

18   after the USDA settlement in which he agreed to a $25,000 fine

19   and admitted to various violations, a number of which were

20   animal abuse related, if you look at the list.  And in the

21   months after that agreement, this video was taken showing

22   animals being hit with a rifle butt, showing a tiger kicked and

23   showing leaving other animals, not big cats, to die without

24   anesthesia and a number of other horrible situations in the

25   video.

1          Recently, a group called Global Animal has written two

2  stories exposing their view of Mr. -- of the Defendants'

3  behavior and activity, and I know from discussions with the

4  president of Born Free USA who was actually in the Inside

5  Edition piece that you played here, expressing his opinion that

6  this was abusive.  And I know that the World Wildlife Fund, the

7  Humane Society of the United States and the International Fund

8  for Animal Welfare all consider these exhibits, generally, and

9  the Defendants, in particular, to be abusive.

10  Q.  And if another group or individual exhibited the same

11  behavior that Big Cat Rescue considers to be abuse, would you

12  use the same efforts and activism against those groups or

13  people?

14  A.  We already do that with other people.

15  Q.  And in response to such abuse, would Big Cat Rescue engage

16  the same practice with the venues and exhibitors as well as the

17  malls?

18  A.  Yes.

19  Q.  And you've done so in the past?

20  A.  Correct.

21  Q.  And you'll continue to do so in the future?

22  A.  Yes.

23  Q.  And so, finally, if the Defendant stopped engaging in

24  conduct which Big Cat Rescue considers to be abuse, or is

25  contrary to its mission, would Big Cat Rescue Corp leave the

  1  Defendants alone?

  2  A.  Yes, we would like nothing better than to see him run a

  3  facility that did not breed, did not have cub petting, did not

  4  sell or give away cubs and present a message that we think is

  5  the appropriate message to be sending.

  6        MR. BARAUSKAS:  No further questions at this time.

  7        THE COURT:  Counsel.

  8                    CROSS-EXAMINATION

  9  BY MR. PINKARD:

 10  Q.  Sir, how many different malls and venues have you contacted

 11  concerning Mr. Schreibvogel?

 12  A.  I don't know the exact number that we have contacted.

 13  Q.  More than 50?

 14  A.  I don't think it's more than 50, I think it's more in the

 15  neighborhood of 20 to 30, but I'm not sure.

 16  Q.  So you say you're not sure cause you're not the one making

 17  the phone calls?

 18  A.  I do not make the phone calls.

 19  Q.  So are you present when those phone calls are made?

 20  A.  No.

 21  Q.  So you have no personal knowledge of what goes on in these

 22  phone calls, correct?

 23  A.  I only know what's reported to me.

 24  Q.  Now, you state that you filed an affidavit in this case; is

 25  that correct?

1  A.  Yes.

2  Q.  And you went through and you made these determinations as

3  to what is fact and what is opinion.  Do you have some sort of

4  legal expertise in these matters?

5  A.  No.

6  Q.  It's just your own personal opinion about it, about what's

7  a fact and what's an opinion?

8  A.  Yes.

9  Q.  For example, in your affidavit, and I believe you've got

10  our exhibit list in front of you there.

11        THE COURT:  You're free to move about the Courtroom,

12  but you need to be at the microphone when you speak.

13        MR. PINKARD:  Yes, Your Honor.

14  BY MR. PINKARD:

15  Q.  I believe -- I believe contained within that notebook is

16  the affidavit that you filed in this case?

17  A.  I don't know, can you tell me?

18  Q.  Exhibit Number 3.

19  A.  I have it.

20  Q.  All right.

21        If you could turn to page 12 of that exhibit, please.

22        THE COURT:  This is Plaintiff's or Defendants'?

23  BY MR. PINKARD:

24  Q.  Page 6 of that --

25  A.  Are you talking about tab six or page 6.

 1 | Q.   The excel or the spreadsheet you put attached to it.

 2 | A.   Okay, page 6.

 3 |        THE COURT:  I'm sorry, is this Defense 6 -- Defense 3

 4 | or Plaintiff's 3?

 5 |        MR. PINKARD:  Should be Plaintiff's 3, Your Honor.

 6 |        THE COURT:  All right.

 7 | BY MR. PINKARD:

 8 | Q.   Were you able to find that near the bottom of that page,

 9 | the last section of that on the left-hand side is, I believe,

10 | you're referring to one of the e-mails that I used in the

11 | direct examination of Mr. Schreibvogel, and it says, "the cute

12 | cubs being petted at Schreibvogel's shows will end up as a

13 | backyard breeder, shot for a price at a canned hunting

14 | facility, killed and the parts sold off as ingredients for the

15 | Asian medicinal trade which values them highly".

16 |        You consider that an opinion or a fact?

17 | A.   I believe that is our opinion, but that may be the case,

18 | but it says "the cute cubs petted at Schreibvogel's shows," I

19 | believe there I was taking it from your -- I don't know if you

20 | call it your motion, and I believe that what the language in

21 | that e-mail was trying to express was that cubs petted, not

22 | necessarily Mr. Schreibvogel's, do have the possibility of

23 | ending up in these kinds of trade and that opinion is based on

24 | a number of things that I'm not sure if I'm allowed to tell

25 | you.

1        Do you want to know what that opinion is based on?

2  Q.  Well, sir, this says "not possibly," but says "will end up

3  as a backyard breeder shot for a price at a canned hunting

4  facility".  Do you have any evidence that any of the animals at

5  Mr. Schreibvogel's park or sanctuary ever had that happen to

6  them?

7  A.  I can't track Mr. Schreibvogel's animals, I can tell you

8  animals used for this purpose are highly likely to end up in

9  some of these venues.

10        THE COURT:  So you don't have any evidence concerning

11  his pets?

12        THE WITNESS:  Correct.  And there's no way to track

13  where his animals go once they go to another facility.  His

14  statement that the tracking --

15        THE COURT:  That was the only question pending.

16        THE WITNESS:  Sorry.

17  BY MR. PINKARD:

18  Q.  And have you -- is it your understanding that your

19  organization has stated that opinion -- this opinion that you

20  call an opinion to other venues involving his shows?

21  A.  I don't have in mind -- I mean, I don't know what was in

22  each of the alerts, so there may be some reference to some

23  element of this in some of the others.

24  Q.  So you really don't have any idea what's in these alerts

25  and what's not in the alerts?

 1  A.   That is not a true statement.  I do have an idea of what's

 2  in these alerts, I have not memorized every alert and cannot

 3  tell you which ones have what in them and the points that we

 4  make that evolved over time as we have done this.

 5  Q.   Well, this claim that's in this -- that you reference in

 6  your affidavit that "the cubs being petted at Schreibvogel's

 7  shows will end up as a backyard breeder or shot for a price in

 8  a canned hunting facility," that's the claim that's been made

 9  in other e-mails to other malls, too, isn't it?

10  A.   That's possible that there are some references to that kind

11  of thing happening in some of the other e-mails.

12  Q.   And you consider that a -- what you termed as a

13  professional approach to the malls that just give them

14  information?

15  A.   Because we have a basis for that belief that cubs used in

16  -- bred for this purpose may end up in these kinds of

17  circumstances.

18  Q.   And any tigers end up at a canned hunting facility?

19  A.   Not legally, but --

20  Q.   Wouldn't you call accusing Mr. Schreibvogel of "selling his

21  cats so their parts can be sold off as ingredients for the

22  Asian medicinal trade which values them highly," the

23  information that would lead to these malls canceling his

24  contract?

25  A.   It would be one piece of the overall picture that this is

 1 | abuse.
 2 | Q.  I mean, that would be an outrageous thing if he was showing
 3 | these cubs at these shows and then he was selling those various
 4 | cubs so they could be butchered so their parts could be sold,
 5 | wouldn't it?
 6 | A.  Yes.
 7 | Q.  But you have absolutely no evidence that ever happened,
 8 | correct?
 9 | A.  Not with his cubs, specifically, because we can't track
10 | where his cubs end up and neither can he.
11 | Q.  Are you the person that reviewed the contract from the
12 | malls so that you could figure out whether he had to pay the
13 | penalty?
14 | A.  We've never received a contract to view.
15 | Q.  Were you aware that you asked for a contract to review to
16 | see if you could give legal advice to the mall as to how they
17 | could cancel his contract?
18 | A.  I'm aware, in fact, it was my instruction that if the mall
19 | wanted to give us the contract, we would have our attorney
20 | review it to see if there were any default clauses that might
21 | allow them to stop having this abusive display.
22 | Q.  So if there's no injunction entered in this case, you're
23 | going to continue to call malls up and tell them that
24 | Mr. Schreibvogel sells his cubs so they can be butchered and
25 | their parts sold?

1 A.   I don't know that we'll include that or not.

2 Q.   But you might?

3 A.   I think at this point I would say we wouldn't.  We would

4 couch that more carefully the way I explained it to you which

5 is what is the intent which is because there is very inadequate

6 tracking in this country of tigers, there is no way to know

7 whether or not cubs bred this way end up in this kind of

8 traffic.

9        The Fish and Wildlife Service has expressed this.

10 There was a report in 2008 done by World Wildlife that engaged

11 an organization called Traffic which concluded that the lack of

12 tracking of these animals in the United States meant we had no

13 idea if they were going to the trade and the Fish and Wildlife

14 Services has done two undercover operations which prove that

15 there is such an undercover trade, one in 2002, called

16 Operation Snow Plow, where they indicted, I think, something

17 like 18 people for trafficking in various endangered species'

18 parts, including big cat parts, and one that the Fish and

19 Wildlife Service announced a few days ago on January 7th where

20 they indicted 12 people for selling endangered species and

21 their parts over the Internet, one of which was a tiger pelt

22 for $10,000, and another, I think, was a leopard pelt.

23 Q.   And you have no information that any of the places -- the

24 USDA-approved places where this gentleman's cubs or tigers were

25 placed had anything like that happen, correct?

Case 8:11-cv-00209-MSS-MAP   Document 166   Filed 02/24/12   Page 70 of 91 PageID 7308
Case 8:11-cv-00209-MSS-MAP   Document 56   Filed 02/28/12   Page 69 of 90 PageID 734

69

1  A.   I don't know if any of the people indicted had USDA

2  licenses.

3  Q.   Well, do you have any information that he's ever placed a

4  tiger or cub in his custody with an organization that didn't

5  have a USDA license?

6  A.   Not one that did not have a USDA license, I don't have any

7  specific information to that effect, but there are USDA

8  licensees who are considered private owners and, in fact, the

9  Office of the Investigator General --

10        THE COURT:  Sir, there's only one question pending and

11  you've answered it.

12        You have another question?

13        THE WITNESS:  I'm sorry.

14 BY MR. PINKARD:

15 Q.   Do you have any information that Mr. Schreibvogel ever sold

16 any of his animals at all?

17 A.   Yes.

18 Q.   And were those mountain lions?

19 A.   Tiger cub.

20 Q.   A tiger cub, that's one tiger cub for $1,500 to a sanctuary

21 in Florida, correct?

22 A.   I think he said it was $5,000.

23 Q.   Because I believe in your direct testimony you mentioned

24 something about him selling cubs.  Do you have any evidence

25 he's ever sold any of his cubs?

Case 8:11-cv-00209-MSS-MAP Document 1:68-5 Filed 02/24/12 Page 70 of 90 PageID 7359
Case 8:11-cv-00209-MSS-MAP Document 56 Filed 02/28/12 Page 71 of 91 PageID 735

70

1  A.  The one I just mentioned.  He sold a cub to Dade City Wild

2  Things.

3  Q.  A cub?

4  A.  At least one, I don't remember if it was more.

5  Q.  What is an exotic animal trade?

6  A.  Any buying and selling of exotic animals or their parts,

7  whether it's legal or not.

8  Q.  Do you have any evidence that any animal from

9  Mr. Schreibvogel's park that he placed, donated to the

10  USDA-approved facility was ever sold by that facility?

11  A.  Not that I can remember.

12  Q.  And yet, in the e-mails in our exhibits, you agree that the

13  allegation to the mall or information given to the mall that

14  he's a major supplier of fueling the exotic animal trade,

15  that's not true, is it?

16  A.  I think he explained earlier that he -- I think he said he

17  had sent 21 cubs in the last year into other facilities.

18  Q.  But that's not the exotic animal trade and they don't sell

19  them again, is it?

20  A.  Well, I guess I would redefine exotic animal trade as

21  transferring animals as opposed to just selling them.

22  Q.  So one facility transferring this USDA-approved --

23  transferring an animal to another USDA-approved facility is

24  supplying and fueling the exotic animal trade in your opinion?

25  A.  Yes, because these cubs keep -- by continuing to create

1  this supply of cubs, you end up with these cubs as they get to

2  be adults very typically ending up in horrible conditions.

3  He's one of the largest breeders of tiger cubs, if not possibly

4  the largest in the country, in my opinion.

5  Q.  And if this injunction is not granted, are you going to

6  keep contacting the malls and telling them that his

7  organization is a major supplier fueling the exotic animal

8  trade?

9  A.  I think I'll decide that after reflecting on the hearing

10  today.

11  Q.  You might do that, though?

12  A.  I might.

13  Q.  You're aware that he had contracts with these various

14  malls, correct?

15  A.  I've never seen the contracts.

16  Q.  You're aware he had business relations with the various

17  malls, correct?

18  A.  I assume by the fact that he was there that he had some

19  relationship with the mall, yeah.

20  Q.  How did you find out about all these malls that he's going

21  to be exhibiting at?

22  A.  Most frequently one of two ways; either it comes up on the

23  Internet because the mall advertises, or someone calls us

24  concerned about it and says, did you know this is here or hears

25  that it's coming.

 1  Q.  You have somebody on staff reviewing the Internet to try to

 2  find out where his exhibits are going to be taking place?

 3  A.  Yes.

 4  Q.  Is that that person's full time job?

 5  A.  They only work half time and they also watch for alerts for

 6  other kinds of things that we would send an alert about.  For

 7  instance, if they spot someone using exotic animals in an ad,

 8  they will decide if we want to send alerts suggesting that that

 9  shouldn't be done.

10  Q.  So it's basically your goal to put him out of business in

11  its present form?

12  A.  I'd like him to stop breeding and stop displaying these

13  cubs which we consider to be abusive.  So that portion of his

14  business, yes.

15          MR. PINKARD:  That's all the questions I have, Your

16  Honor.

17          THE COURT:  Any redirect?

18                      REDIRECT EXAMINATION

19  BY MR. BARAUSKAS:

20  Q.  Do you have Defendants' Exhibit 2 over there?

21  A.  Yes, attachment.

22  Q.  This is the exhibit that Defendants' counsel was just

23  speaking to you about, correct?

24          THE COURT:  Well, just ask the question; it either is

25  or isn't.

 1        MR. BARAUSKAS:  It is, sure, I just want him to have

 2   it so I can ask a few questions.

 3   BY MR. BARAUSKAS:

 4   Q.  If you look at the binder, it says Defendants' exhibits and

 5   case law on the front of it.

 6        THE COURT:  He wasn't showing him this exhibit, he was

 7   showing him the counterpart to this exhibit in your exhibit

 8   book, so if you want to ask him a question about Exhibit 2,

 9   just ask the question.

10        THE WITNESS:  Exhibit 2 is the one with all his

11   attachments to his affidavit; is that right?

12   BY MR. BARAUSKAS:

13   Q.  Correct.

14   A.  Okay.

15   Q.  And Defendants' counsel was speaking to you about an e-mail

16   sent in 2009; is that correct?

17   A.  Yes, that's A in this binder.

18   Q.  Okay.  And he was speaking to you about a quote where the

19   entire quote says "that cute cub you're petting today will end

20   up as a backyard breeder", et cetera, is that correct?

21   A.  Yes.

22   Q.  And were you referencing the Defendants in particular in

23   that quotation right there?

24   A.  I don't believe that that's what Julie Hanan intended for

25   that to say.

1  Q.  In your affidavit, you expressed the opinion of Big Cat

2  Rescue Corp, not necessarily your personal opinion?

3  A.  Yes.

4  Q.  While they may be aligned, you were speaking for Big Cat

5  Rescue Corp?

6  A.  Throughout my answers, yes.

7  Q.  Yes.  And you also heard a statement that Big Cat Rescue

8  Corp said that the Defendants butcher cubs.  Has Big Cat Rescue

9  Corp ever made that statement?

10 A.  Not that I know of, I don't recall that being said, but --

11 Q.  And if you look at that exhibit that we're considering, if

12 you turn to the very next page, it contains background

13 information, and, you know, various informational sources; is

14 that correct?

15 A.  Yes.

16 Q.  And if you see under contradictory incidents since 2001,

17 you reference the sales and transfers of animals; is that

18 correct?

19 A.  Yes, this is copied from information that -- from the PETA

20 website.

21 Q.  And so the opinion of Big Cat Rescue Corp in making the

22 statement --

23         THE COURT:  Counsel, this is still direct examination,

24 you can't lead him into his answer, you can ask him direct

25 questions.

Case 8:11-cv-00209-MSS-MAP  Document 166  Filed 02/24/12  Page 76 of 91 PageID 1414
Case 8:11-cv-00209-MSS-MAP  Document 158  Filed 02/28/12  Page 75 of 90 PageID 740

75

1              MR. BARAUSKAS:  Sure.

2   BY MR. BARAUSKAS:

3   Q.  What was the purpose of the statement that you were trying

4   to make that we just heard about that the cubs you're petting

5   will end up as a backyard breeder, et cetera?

6   A.  As cubs are bred for petting, that once they're no longer

7   used for petting, they end up going all over the place and we

8   have example after example of the horrible conditions that

9   these cubs end up with, both in USDA licensees and otherwise.

10  The notion that being a USDA licensee means that you are

11  keeping the cubs in good condition is simply wrong.

12              USDA has 100 inspectors to inspect 2,700 exhibitors in

13  addition to thousands of other kinds of facilities.  They can

14  stop by rarely, they can only see certain things, and if you

15  look at the history of their enforcement, right now they have a

16  2,000 case backlog.  It takes 600 days to do an investigation,

17  and if you look at their history of ones, it is -- and I think

18  it's important to understand, it is extraordinary unusual for

19  the USDA to take someone to Court like they did the Defendant

20  back in 2005 and six.  That happens rarely, it only happens in

21  the most extraordinarily abusive cases, and as you can see, it

22  happens after years of citations.

23              MR. BARAUSKAS:  Nothing further.

24              THE COURT:  I'm sorry, sir, in your e-mail, and when I

25  say "you," I mean the company's e-mail, you say, "well, you

 1  know, as puppy mills, is what Mr. Schreibvogel really runs, the

 2  difference being he churns out dangerous carnivores.  Joe is a

 3  major supplier of fueling the exotic animal trade.  That cute

 4  cub you're petting today will end up as a backyard breeder,

 5  shot for a price at a canned hunting facility, killed, and the

 6  parts sold off as ingredients for the Asian medicinal trade

 7  which values them highly.  Is that what you want to be a party

 8  to".

 9          You're suggesting that this statement wasn't intended

10  to be directed toward Mr. Schreibvogel?

11          THE WITNESS:  I don't believe it was intended to be

12  directed specifically to say that one of his cubs.  I think it

13  could have been worded better perhaps.

14          THE COURT:  Well, "that cute cub you're petting will

15  end up this way" was intended to refer to which cub?

16          THE WITNESS:  Any cub that someone is petting in an

17  exhibit like this.

18          THE COURT:  Which cub were they petting -- whose cubs

19  were they petting on the day this e-mail was sent?

20          THE WITNESS:  That would have been Mr. Schreibvogel's

21  cubs.

22          THE COURT:  You weren't talking about some other

23  breeder's cub when you were sending this e-mail, were you?

24          THE WITNESS:  Well, the e-mail was sent by a volunteer

25  in 2009 --

1          THE COURT:  But this is your corporate e-mail.

2          THE WITNESS:  Well, we'll stand by this e-mail.

3          THE COURT:  It was directed at Mr. Schreibvogel's

4    exhibit at this mall, wasn't it?

5          THE WITNESS:  This e-mail was directed at the exhibit.

6    What I'm telling you is that my belief is that what she was

7    trying to express, although she may have been not artfully

8    doing it, is that cubs used in petting can end up in these

9    kinds of circumstances.

10         THE COURT:  Well then she goes on to say, "it's very

11   easy for him to book gigs and travel with these babies".  She's

12   still talking about this same cub that's going to get shot and

13   used for medicine, isn't she?

14         It is what it is.  You can have an opinion about what

15   it ought to be and what it might have been and what it should

16   have been, but it is what it is, isn't it?

17         THE WITNESS:  I guess I'm expressing to you what was

18   intended, but I can understand that it comes across the way

19   that you're describing to me.

20         THE COURT:  And you're getting what it was intended

21   from what source; talking to this volunteer or talking to your

22   staff about what to say here in Court today?

23         THE WITNESS:  From what we knew to be the case and the

24   way we've tried to express it after later on.

25         THE COURT:  Who is this volunteer who wrote this?

 1          THE WITNESS:  Her name is Julie Hanan.

 2          THE COURT:  And who is she in reference to your

 3   company?

 4          THE WITNESS:  She was a volunteer at the company.

 5          THE COURT:  How many years had she volunteered with

 6   you?

 7          THE WITNESS:  I don't know how many years exactly, but

 8   she was a fairly long-time volunteer.  She is currently not a

 9   volunteer because her husband retired and she moved to

10   Colorado.

11          THE COURT:  Does she get a script of what to say?

12   Does anybody review what she says before she sends off e-mails

13   to perceived violators' business relationships?

14          THE WITNESS:  At that time, we didn't have the correct

15   kind of organization that we have now with Susan Bass doing

16   these, and so I don't know at that time, I did not review it.

17          THE COURT:  If this is, in fact, false, if we could

18   know, in fact, that none of the animals that are in this

19   company's care end up this way, it could be an unfair

20   besmirching of their reputation and damage to their business

21   relationships, couldn't it?

22          THE WITNESS:  We don't have a way to know where his

23   cubs end up.

24          THE COURT:  But if we do know, then this would not be

25   fair, would it.

1    THE WITNESS:  It would not be fair if one could prove
2  that none of his cubs ended up this way, yes.

3    THE COURT:  And so you want to make these statements
4  and then make him prove they're not true?

5    THE WITNESS:  Well, I wouldn't -- at the time that
6  this was done, I was not as involved as I am today, and didn't
7  review it and would have worded it differently, which we have
8  now so that it was clearer.

9    THE COURT:  Has your company been sued by other
10  companies of this type for these types of e-mail blasts?

11    THE WITNESS:  No.

12    THE COURT:  How many other companies have you sent
13  these e-mails blasts on in the last two years?

14    THE DEFENDANT:  I don't have a way to know.  I can --
15  I think there are probably four or five exhibitors and then
16  other kinds of companies doing other kinds of things.  I think
17  there have been a couple hundred various alerts to supporters
18  about things, I just don't know which ones were the companies
19  and which ones might have been about legislation.

20    THE COURT:  Thank you.  You may step down.

21    Any additional evidence from the defense -- I mean
22  defense of the motion Plaintiff?

23    MR. JAKES:  On behalf of the Plaintiffs, no further
24  evidence, Your Honor.

25    THE COURT:  Any rebuttal on behalf of the Defense

```
 1   Counter Plaintiff?

 2           MR. PINKARD:  No, Your Honor.

 3           (Brief pause.)

 4           THE COURT:  There is currently a motion to dismiss the

 5   counterclaim -- amended counterclaim concerning the tortuous

 6   interference claim.  Does counsel want to be heard on that

 7   motion?

 8           MR. JAKES:  Your Honor, we'll stand on our papers.

 9           (Brief pause.)

10           THE COURT:  Any argument anyone else wishes to raise

11   with respect to the evidence adduced in the motion to which it

12   relates?

13           MR. PINKARD:  We'll stand on the memorandums that

14   we've provided and the evidence.

15           THE COURT:  Anything from the Plaintiff?

16           MR. JAKES:  Very briefly, Your Honor.

17           On the one piece of evidence that seems to come up

18   which is the 2009 e-mail of Ms. Hanan, the simple additional

19   point we'd bring out is it's a 2009 e-mail.  You will not find,

20   I do not believe, anywhere in the other e-mails that language,

21   so it's not an issue either of imminence or of likelihood of

22   repetition, so that would be additional reasons why that should

23   not be a basis.  Thank you.

24           THE COURT:  If this is such an urgent nature that it

25   requires the Court's immediate and interlocutory sort of
```

1 involvement to cease what could be irreparable harm and so

2 forth, why wasn't it brought to the Court's attention before

3 your client was sued?

4    MR. PINKARD:  I don't have an answer to that right off

5 the top of my head, Your Honor, for that.  My client might

6 have.  I can confer with him.  I don't think we will provide

7 anymore testimony, though.

8    THE COURT:  Well, you need to have an answer for why

9 the Court should intervene on such stale information.

10    MR. PINKARD:  Well, Your Honor, the explanation is he

11 didn't have the funds available to hire counsel, but also I

12 think if you look at the more recent e-mails, that allegation

13 about them ending up in the -- their parts used in trade is

14 repeated on other occasions more recently, and I took

15 Mr. Schreibvogel through that testimony, and the other e-mails

16 later in time also said that, I think the most recent one only

17 a month ago.

18    THE COURT:  This is in the exotic trade, not the --

19    MR. PINKARD:  Exotic trade and also their parts would

20 be sold, on December 12th, 2011, another one in November.

21    THE COURT:  The Court has reviewed the materials

22 submitted by the parties, and as I indicated at the outset of

23 this hearing, it seemed quite clear that the Defendant Counter

24 Plaintiff had abandoned any notion that it was entitled to

25 injunctive relief on pure free speech under a defamation,

1  liable or slander claim.  And that seems to be well settled in

2  the law.  And so, insofar as the motion is directed to that

3  content and context, it is denied.

4      The Court also reviews the motion for temporary

5  restraining order which I will, at this point, consider a

6  motion for a preliminary injunction to enjoin what the

7  Defendant Counter Plaintiff contends is tortuous interference

8  with advantageous business relationships and not pure speech,

9  but act -- speech as action or action as speech.  And

10  considered against this evidentiary showing, I find that an

11  injunction cannot issue.

12      As the parties are well aware, in order to cause the

13  Court to exercise this extraordinary relief that's provided for

14  under its equitable authority in the entry of a preliminary

15  injunction, several tests must be met.  The first is that the

16  Movant must demonstrate a substantial likelihood of success on

17  the merits, a substantial threat of irreparable harm unless the

18  injunction issues, a threatened injury to the Movant that

19  outweighs whatever damage the proposed injunction may cause the

20  Respondent, and if issued, the Court must consider whether the

21  injunction would be adverse to the public interest.

22      In this case, at least one if not three of those

23  showings cannot be made on this evidence, and that is, the

24  Court finds on the basis of the evidence as it sits today, the

25  Defendant cannot demonstrate a substantial likelihood of

1   success on the merits.  It is not that the Defendant must show

2   there is some likelihood of success on the merits or that it

3   might prevail on the merits, if given ample time and ample

4   evidence and ample opportunity to adduce evidence, but as the

5   record sits, can the Defendant Movant in this case establish a

6   substantial likelihood of success on the merits in a tortuous

7   interference claim.

8        To look at that question, the Court has to consider

9   what is the tortuous interference claimed, and under Florida

10  Law, such a claim requires that the Movant show the existence

11  of a business relationship, knowledge of the relationship on

12  the part of the person offending the relationship and an

13  intentional and unjustified interference of the relationship by

14  the alleged offender and damage to the Movant as a result of

15  the tortuous interference with the relationship.  It is that

16  third prong that is difficult for the Defendant to meet on this

17  record, that is, that the interference is intentional and

18  unjustified.

19       In this case, the Plaintiff would argue that it has

20  fair justification both in the exercise of its free speech

21  rights and its desire to end the injury, potential and actual,

22  of the cats in the context of the cat shows.  There is argument

23  that there is some basis for their belief in this respect,

24  there is argument that as to each of the statements made, not

25  all of them are accurate or truthful, but on balance on this

1    record as it sits today, the Court is not satisfied that the

2    Defendant has demonstrated it will be able to convince the

3    trier of fact that the interference alleged in this case was

4    unjustified.

5        In addition, going back to the four injunction

6    standards, one is that the Movant, in this case, the

7    Defendants' injury must be shown to outweigh whatever damage

8    the proposed injunction may cause to the Respondent, in this

9    case, the Plaintiff.  And here, you're balancing the

10   Defendants' rights to continue in its business of displaying

11   big cats in the context of these shows against the Plaintiff's

12   right to exercise their free speech, and balancing those two

13   interests to cause the Court to try to discern what they cannot

14   say in the future is nearly impossible, and certainly, the

15   Court cannot say that the Defendant can show that its interest

16   outweighs the potential harm caused to the Plaintiff.

17       And then, of course, there's a public interest test

18   and the Courts have repeatedly reminded the Court -- the

19   Appellate Courts have repeatedly reminded the Trial Courts that

20   enjoining free speech, enjoining speech entirely is adverse to

21   the public interest; enjoining tortuous interference, not

22   necessarily so, but because we cannot know whether the

23   Defendant is going to prevail on the tortuous interference

24   claim, the Court cannot determine that the free speech interest

25   of the public and the Plaintiffs would not be unfairly

 1  trammeled by the injunction that's being required.  So the
 2  motion for injunctive relief is denied, motion for TRO is
 3  denied.

 4       So where are we?  We're now in a place where the case
 5  has to go forward on the merits and it is not to say that false
 6  speech isn't actionable or can't be pursued in the form of a
 7  damages claim.  And the whole notion that the Plaintiff is free
 8  to say whatever it wants to say, of course, is false.  The
 9  Plaintiff can only say what is true or what is fair opinion.

10       The Court will consider the main claim in this case
11  with respect to the assertions made by the Defendant on the
12  underlying counterclaim on its merits.  And so to the extent
13  the everyone sees now in the air of a Courtroom how harmful
14  loose language can be, impliedly false language can be or
15  unknowing language can be, we don't know whether it's true or
16  not, may be going forward.  The parties can limit themselves in
17  a way that the Court is not authorized to do so as not to make
18  this litigation any more substantial than it already is.

19       The motion to dismiss the counterclaim is granted
20  without prejudice.  The Defendant is free to amend the amended
21  counterclaim filing a second amended counterclaim setting forth
22  in specific detail aspects of the tortuous interference claim,
23  that is, which entities were interfered with and what language
24  the Defendant contends is the improper language, because just
25  generally saying in the context of malls and casinos and

 1  facilities, it's not sufficient to meet the standards under a

 2  claim for an intentional tort such as tortuous interference.

 3  So the amended complaint needs to be filed.

 4       How long do you need to have to reassert your

 5  counterclaim?

 6       MR. PINKARD:  Could we have 30 days, Your Honor?

 7       THE COURT:  We speak in seven-day increments now,

 8  according to the modelers of the new rules, so I'll give you 21

 9  days to file an amended counterclaim and give the Plaintiff an

10  opportunity to respond within 14 days from the filing of the

11  amended counterclaim.

12       Are there anymore pending motions in this case than

13  that one?

14       MR. JAKES:  No, Your Honor.

15       THE COURT:  Are there any other issues the Court needs

16  to address the parties to in going forward in this case?

17       MR. JAKES:  Your Honor, before the counterclaim was

18  brought, the parties had attempted to amend the scheduling

19  order to take into account the realities of what would need to

20  be done.

21       It is fairly obvious, based on where we are now, we're

22  probably going to have to do that again.  Mr. Pinkard and I

23  have been working together and I don't think we're going to

24  have any problem.  We'll probably need to come back to the

25  Court with a proposal once we see the second amended

1    counterclaim.

2         THE COURT:  Yes, sir.

3         MR. PINKARD:  I agree with what counsel just said,

4    we're probably going to have to have a new schedule if we can

5    get one.

6         THE COURT:  What is the status of your discovery to

7    this point?

8         MR. JAKES:  Your Honor, there was initial discovery

9    more in a jurisdictional vein, there is some outstanding

10   discovery that has not -- from that jurisdictional that remains

11   open.  We have a wave of discovery that we were holding,

12   waiting to see what the status of the counterclaim would be.

13   We will get that out in this interim period.

14        THE COURT:  So the answer is nothing much has been

15   done?

16        MR. JAKES:  Well, other than the jurisdictional

17   depositions, Your Honor.

18        THE COURT:  All right.

19        Well, we will -- the Court will direct the parties to

20   file an amended case management report setting forth proposed

21   new agreed-upon dates, not unilateral, but they must be agreed

22   upon, and it will evaluate the proposals.  I think -- when was

23   the original CMS entered in the case?  Do you know, Ms. Vizza?

24        THE CLERK:  July 6th, 2001.

25        THE COURT:  The parties might consider looking at

 1 | their dates toward a five to six-month push back.  Anything
 2 | beyond that the Court would consider to be just an effort to
 3 | delay for delay's sake.
 4 |        MR. JAKES:  Yes, Your Honor.
 5 |        THE COURT:  So five to six months, if that's what you
 6 | need.  If you don't need that much time, that's fine, but that
 7 | would be the outside realm is about a five to six-month delay
 8 | based upon where the case has stood to this point.
 9 |        There being nothing further, we are dismissed.  Thank
10 | you.
11 |        (Thereupon, the proceedings concluded.)
12 |                         *****
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

```
 1                           INDEX
                                              Page
 2   EXAMINATION:

 3   JOSEPH ALLEN SCHREIBVOGEL
     BY MR. PINKARD ........................................... 7
 4   BY MR. JAKES ............................................. 28
     BY MR. PINKARD ........................................... 40
 5
     HOWARD BASKIN
 6   BY MR. BARAUSKAS ......................................... 51
     BY MR. PINKARD ........................................... 62
 7   BY MR. BARAUSKAS ......................................... 72

 8
                           * * * * *
 9
                           EXHIBITS
10

11   Defendants' Exibit Numbers 1 through 15 and Plaintiff's Exhibit
     Numbers 1 through 12
12       EVIDENCE ............ 5
     Defendants' Exhibit 14-B
13       EVIDENCE ........... 26

14                         * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATE

 2

 3   STATE OF FLORIDA        )
                                  SS
 4   COUNTY OF HILLSBOROUGH    )

 5

 6        I, CLAUDIA SPANGLER-FRY, Official Court Reporter for

 7   the United States District Court, Middle District, Tampa,

 8   Division,

 9        DO HEREBY CERTIFY, that I was authorized to and did,

10   through use of Computer Aided Transcription, report in

11   shorthand the proceedings and evidence in the above-styled

12   cause, as stated in the caption hereto, and that the foregoing

13   pages numbered 1 to 90 inclusive, constitute a true and correct

14   transcription of my shorthand report of said proceedings and

15   evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17   in the City of Tampa, County of Hillsborough, State of Florida,

18   this 25th day of February, 2012.

19

20        CLAUDIA SPANGLER-FRY, Official Court Reporter

21

22

23             BY: /s/ CLAUDIA SPANGLER-FRY

24

25
```